UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:04-CV-00416

| | |
|---|---|
| In re KRISPY KREME DOUGHNUTS, INC. SECURITIES LITIGATION | ) ) ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |
| | ) |
| EASTSIDE INVESTORS, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| KRISPY KREME DOUGHNUTS, INC., RANDY S. CASSTEVENS, SCOTT A. LIVENGOOD, MICHAEL C. PHALEN, JOHN TATE, JOHN N. McALEER, and PRICEWATERHOUSECOOPERS, LLP, | ) ) ) ) ) |
| Defendants. | ) |

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND OVERVIEW .......................................................................................1

Background Information of Krispy Kreme's Business.......................................................1

Krispy Kreme Embarks upon Explosive Growth Strategy Regardless of Demand.............3

Krispy Kreme's Issuance of False Financial Results and Accounting
Manipulations during the Class Period ....................................................................5

Despite Knowledge of Slowing Sales Growth and False Financials, Krispy Kreme
Repeatedly Reported EPS above Expectations and Increased Future
Revenue and Earnings Projections............................................................................9

Bad News Slowly Seeps out into the Market as the Company Is Forced to Admit
Slowing Sales Growth and Accounting Improprieties............................................10

PwC Was Actively Involved in the Manipulation of Krispy Kreme's Publicly
Reported Financial Results ....................................................................................18

JURISDICTION AND VENUE ...........................................................................................19

PARTIES .............................................................................................................................20

CONTROL PERSONS .........................................................................................................25

Defendants' Economic Motivation and Insider Stock Sales..............................................27

CONFIDENTIAL SOURCES ..............................................................................................29

FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS
ISSUED DURING THE CLASS PERIOD .......................................................32

Krispy Kreme Reports False Quarterly and Year-End Financial Results for FY01
and FY02.................................................................................................................32

While Reporting False Financials, Krispy Kreme Promotes Former PwC
Executives into High Ranking Positions in the Krispy Kreme Finance
Department..............................................................................................................37

Krispy Kreme Reports False Quarterly and Year-End Financial Results for FY03.........42

Krispy Kreme Buys Failing Bread Company Montana– Pays Defendant Tate for
His Stake in the Failing Business..........................................................................47

Defendant and CFO Casstevens Removed as CFO – Company Falsely Assures
Investors of Stronger Corporate Governance ........................................................52

Krispy Kreme Actually Knew of Each of Its Franchisees' Daily Sales and
Inventory Conditions .............................................................................................54

Krispy Kreme Reports False 1Q04 Financial Results and Raises Guidance,
Despite Known Slowing Sales................................................................................54

Krispy Kreme Conveniently Manipulated the Same-Store Sales Metric to
Disguise Slow Sales...............................................................................................65

Krispy Kreme Pays $50 Million Premium for Dallas, Texas Franchise Owned by
Krispy Kreme Insiders ...........................................................................................67

Krispy Kreme Reports False 2Q04 Financial Results, and Despite Knowledge of
Declining Sales, Increases Earnings Projections Again and Specifically
Misrepresents Value of Dallas Market Acquisition...............................................71

Krispy Kreme Falsely Denies Any Signs of Slowdown in Its Sales Growth ...................80

Krispy Kreme Reacquires the Failing Michigan Franchise and Improperly
Bundles Michigan Debt Owed to the Company into the Purchase Price,
Later Recording It as Income in Order to Meet 3Q04 Earnings
Expectations...........................................................................................................85

Krispy Kreme Reports False 3Q04 Financial Results, Continue to Misrepresent
Sales Momentum and Again Provides False and Misleading Details
Regarding the Michigan Market Dough-Re-Mi ....................................................87

Krispy Kreme Appoints New CFO...................................................................................93

Krispy Kreme Reacquires Franchise Rights to the Golden Gate Franchise; Does
Not Disclose that CEO Livengood's Wife is a $1.5 Million Beneficiary of
Purchase .................................................................................................................93

Krispy Kreme Falsely Reports Record 4Q04 Financial Results, Ignores Sales
Declines and Raises Earnings Estimates – Again..................................................94

Krispy Kreme Admits Severe Sales Declines and Closes and Divests Montana
Mills Taking a $40 Million Charge Sending the Stock Price Plummeting
Lower – Defendants Falsely Blame "Low-Carb Diet" Trend – Fail to

Disclose All True Facts Concerning Financial Statements and Business
Conditions ........................................................................................102

Analysts and Investors Challenge the Credibility of Krispy Kreme Management..........107

Notwithstanding the May 7, 2004 Disclosures, False and Misleading Statements
by the Company Continue – the Stock Price Remains Artificially Inflated ........112

The SEC Announces Investigation of Krispy Kreme Forecasts and Financial
Reporting for Franchise Acquisitions .................................................114

Partial Admissions and Disclosures Seep into the Market but Reported Earnings
and Assets Are Still Overstated and Krispy Kreme's Stock Price Is Still
Artificially Inflated .........................................................................118

Krispy Kreme's Outside Auditor, PwC, Refuses to Sign-Off on 2Q05 Krispy
Kreme Financial Reports ..................................................................119

SEC Formalizes Its Krispy Kreme Investigation...........................................120

Krispy Kreme Misses Its Deadline to File Its 3Q04 Report on Form 10-Q with the
SEC .............................................................................................125

Krispy Kreme Announces that It Must Restate Its Earnings for 2Q04, 3Q04,
4Q04, FY04, 1Q05, 2Q05, and that It Was at Risk of Defaulting on Its
$150 Credit Facility ........................................................................126

Krispy Kreme Ousts CEO Livengood, Replacing Him with the Enron Turnaround
Expert, However Livengood's Termination Is Structured to Pay Him
Anyway ........................................................................................130

Krispy Kreme's Joint Canadian Venture KremeKo Files for Debt Protection –
Documents Say Krispy Kreme Knew of Its Financial Problems........................131

Krispy Kreme Announces Additional Restatements and Announces Financial
Statements for FY01, FY02, FY03 and First Three Quarters of FY05
Should No Longer Be Relied Upon ......................................................132

PRICEWATERHOUSECOOPERS' PARTICIPATION IN THE SCHEME AND
ISSUANCE OF FALSE FINANCIALS ...............................................137

PwC's False Statements as to Krispy Kreme's FY03-FY04 Financial Statements........140

PwC Ignored the Audit Evidence It Gathered .............................................142

- iii -

PwC Ignored Numerous Red Flags.................................................................143

PwC's Audit Violated Fundamental Concepts of GAAS ................................147

DEFENDANTS' FALSE FINANCIAL REPORTING AND GAAP VIOLATIONS
DURING THE CLASS PERIOD ..........................................................149

Krispy Kreme Improperly Accounted for Its Franchise Reacquisitions.........150

Krispy Kreme Improperly Failed to Provide for an Adequate Allowance for
Doubtful Accounts ..............................................................................163

During the Class Period, Krispy Kreme Improperly Recognized Revenue in Its
KKM&D Segment Prior to Its Being Earned and Realizable in Violation
of GAAP .............................................................................................166

Krispy Kreme Improperly Recognized Revenue..........................................167

Krispy Kreme Failed to Timely Record Impairment Charges Related to Its
Acquisition of Montana Mills .............................................................169

Krispy Kreme Improperly Failed to Consolidate Unprofitable Joint Ventures...............177

Krispy Kreme's Restatement Is an Admission of Falsity...............................181

Krispy Kreme Improperly Accounted for Its Property and Equipment and the
Related Depreciation of the Leased Assets..........................................182

Krispy Kreme Improperly Accounted for its Derivative Transactions...........186

Krispy Kreme's Financial Statements Violated Fundamental Concepts of GAAP.........186

APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD-ON-THE-MARKET
DOCTRINE ......................................................................................193

PLAINTIFFS' CLASS ACTION ALLEGATIONS...................................................194

LOSS CAUSATION/ECONOMIC LOSS ...............................................................196

COUNT I ...................................................................................................................201

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against All Defendants ....................................................201

COUNT II ..................................................................................................................................204

      Violation of Section 20(a) of the Exchange Act Against Individual Defendants
          and Krispy Kreme ...............................................................................................204

PRAYER FOR RELIEF ...........................................................................................................206

JURY DEMAND ......................................................................................................................207

## INTRODUCTION AND OVERVIEW

1.     This is a securities class action brought on behalf of all persons who purchased or otherwise acquired securities of Krispy Kreme Doughnuts, Inc. ("Krispy Kreme" or the "Company") during the period from March 8, 2001 to April 18, 2005 (the "Class Period") for violation of the federal securities laws arising from false and misleading statements concerning the Company's business earnings outlook and false financials statements.   The action is brought against the Company and its former Chief Executive Officer ("CEO"), Scott A. Livengood ("Livengood"), its former Chief Operations Officer ("COO"), John Tate ("Tate"), its former Chief Financial Officer ("CFO") Randy S. Casstevens ("Casstevens"), the Company's current CFO, Michael Phalen ("Phalen"), and the Company's Vice President of Concept Development, John N. McAleer ("McAleer") (collectively, "Individual Defendants").   This action is also brought against Krispy Kreme's auditors, PricewaterhouseCoopers LLP ("PwC").

**Background Information of Krispy Kreme's Business**

2.     Founded in 1937, Krispy Kreme owns, operates, and franchises retail stores that sell doughnuts.  The Company operates its stores under the Krispy Kreme name and specializes in making doughnuts, including their hot original glazed.   As part of the marketing of the Company's product, Krispy Kreme displays the doughnut production process to its customers, also known as the doughnut making theater.  The Company is headquartered in Winston-Salem, North Carolina, and, until its Initial Public Offering ("IPO") in April 2000, was a privately held corporation with most of its stores in the southeastern region of the country.

- 1 -

3.　　　Krispy Kreme generates sales and income from three business segments: (a) Company and franchised stores (Company store operations); (b) franchise stores (franchise fees and royalties from franchise stores); and (c) Krispy Kreme manufacturing and distribution ("KKM&D") (a vertically integrated supply chain providing equipment and ingredients to all Krispy Kreme stores). The Company store operations, franchise operations and KKM&D comprise three reportable segments under generally accepted accounting principles ("GAAP").

4.　　　Among the above operating segments, the "Company store operations" purports to be the largest revenue source of the Company through its production and sales of doughnuts. The Company sells its doughnuts retail in its stores and through other sales channels, *i.e.*, "on-premises" and "off-premises" sales. For example, the Company's "on-premises" sales consist of sales of doughnuts at its stores. "Off-premises" or "wholesale" sales consist of sales of Krispy Kreme's doughnuts through a direct store delivery program whereby the Company distributes its doughnuts for sales in grocery stores and convenience stores like Kroger, Food Lion, Albertsons, Speedway, Giant Food and others across the country.

5.　　　The Company reports its financial results on the basis of several different metrics. "Systemwide sales" refer to sales of both the Company and franchise stores, along with the results of the Montana Mills Bread Co., Inc. ("Montana Mills")[1] division – a bread company Krispy Kreme purchased during the Class Period. According to the Company,

---

[1]　　　In May 2004, the Company announced that it would divest Montana Mills, thus its financial reporting after May 7, 2004, does not include "sales" from Montana Mills.

- 2 -

Systemwide sales excludes sales and revenues of KKM&D and franchise operations business segments, and is significant because it shows the overall penetration of the Krispy Kreme brand, consumer demand for Krispy Kreme products and the correlation between systemwide sales and total revenues.

6.      Krispy Kreme also reports comparable store sales, *i.e.*, same-store sales, as a measure of sales growth. This metric measures sales growth at store sites that have been open for more than one year.

**Krispy Kreme Embarks upon Explosive Growth Strategy Regardless of Demand**

7.      From the time that Krispy Kreme went public on April 10, 2000, it was considered a "HOT" IPO, deemed one of the country's most highly-regarded stocks to own. On the first day that the Company's stock traded on the New York Stock Exchange ("NYSE"), the Company's stock price surged 76%. During the Class Period its stock traded as high as $49.74 per share.[2]

8.      Krispy Kreme seized on the excitement surrounding its doughnuts and embarked on an explosive growth strategy, designed to increase revenues and earnings, solely by expanding its store base through new store openings, notwithstanding reports that demand for its products was not growing at a pace to justify the rate at which the Company was opening new stores. Krispy Kreme and the Individual Defendants ignored such reports and flooded the market with Krispy Kreme's doughnuts, expanding the Company's growth strategy to off-premises customers, *i.e.*, grocery and convenience stores and gas stations.

---

[2]      All share and per share amounts are adjusted to reflect Krispy Kreme's 2-for-1 stock splits in March 2001 and June 2001.

9.     Notwithstanding the Company's publicly reported financial results purporting to reflect burgeoning sales and earnings growth, Krispy Kreme franchisees throughout the United States were actually experiencing sales growth declines and defendants knew it. Confidential former Krispy Kreme employee witnesses ("CWs"), report that Krispy Kreme was suffering a consistent and increasing decline in sales growth from the commencement of the Class Period. *See*, *e.g.*, CW12.  Thus, instead of creating additional demand for Krispy Kreme's doughnuts, expansion into off-premises markets and multiple new store openings resulted in market saturation with new stores taking sales from existing stores.

10.     For example, a former Vice President of Finance at Krispy Kreme's Northern California franchise, Golden Gate Doughnuts, LLC ("Golden Gate"), a franchise consisting of 16 Krispy Kreme stores, reported that the Golden Gate franchise in FY04 (beginning in February 2003) repeatedly fell short of sales projections set by Krispy Kreme headquarters, ultimately missing its full year FY04 projections by $3 million.  A former payroll clerk from Dough-Re-Mi Co., Ltd. ("Dough-Re-Mi"), the Company's Michigan franchisee consisting of seven stores, reported that during the Class Period, its sales were so weak that it was in violation of the franchise agreement with the Company to open additional stores, and in fact had to borrow money from Krispy Kreme headquarters to pay its debts.

11.     Krispy Kreme and the Individual Defendants knew of the declining sales growth.  CWs report that sales figures were documented in weekly and monthly financial reports generated at each of the Krispy Kreme Company stores and sent to Krispy Kreme headquarters – including to defendant Livengood.  In fact, former Krispy Kreme commissary managers and supervisors confirm management's knowledge of declining sales and reported that throughout FY04, Krispy Kreme ordered employees to ship double the amount of

- 4 -

doughnuts actually ordered by customers in order to meet Wall Street earnings expectations, knowing that the over-shipments would be returned.

12.     In order to mask slowing sales, during the Company's FY04, Krispy Kreme conveniently obscured the same-store sales statistics reported to investors to include off-premises sales, making it impossible for investors to accurately measure existing store sales performance.

13.     Notwithstanding these facts, the Company assured investors throughout the Class Period that business momentum was rapidly increasing, supporting the Company's exponential growth strategy.

**Krispy Kreme's Issuance of False Financial Results and
Accounting Manipulations during the Class Period**

14.     Defendants also – through a series of franchise reacquisitions, accounting manipulations and the purchase of Montana Mills – caused Krispy Kreme to issue false financial statements during the Class Period in violation of GAAP, resulting in the Company's publicly reported quarterly and fiscal year earnings results being materially overstated, and its liabilities materially understated.

15.     During FY01,[3] FY02, and FY03 the Company reported huge revenues and earnings growth, despite the fact that restaurants in its peer group reported weakening financial results due to the United States economic slowdown. For FY01, for example, the Company reported a 147.2% increase in income, and for FY02, the Company reported an increase of 30.4%. Similarly, for FY03, the Company reported an increase in net income of

---

[3]     Krispy Kreme's fiscal year ends on the Sunday in January or February closest to January 31. FY04, for example, ended February 1, 2004.

51.6%. As the Company has been forced to admit, however, these numbers were false. For FY01-03, the Company has admitted that it improperly accounted for its property and equipment leases and the related depreciation for the leasehold improvements. Krispy Kreme has also admitted that it had improperly failed to consolidate the financials of New England Dough, LLC ("New England Dough") a failing Krispy Kreme franchise of which Krispy Kreme was a majority owner. The Company has further advised that it may also have improperly recorded revenues for its KKM&D segment for the sale of equipment to franchises during FY01-FY03.

16. Defendants' accounting manipulations also impacted its financial reports concerning the acquisition of Montana Mills. In April of 2003, the Company acquired Montana Mills, an unprofitable company (of which defendant Tate was a director and shareholder) whose assets had been impaired at the time of acquisition, as Montana Mills had previously reported eight consecutive quarters of profit declines. The Company nevertheless paid $39 million to acquire the failing Montana Mills but did not record an impairment charge for its long-lived assets and the goodwill associated with Montana Mills as required by GAAP. Instead, the Company improperly reported Montana Mills as intangible assets not subject to amortization, causing the Company's earnings and assets to be overstated. The Company would ultimately admit that Montana Mills was indeed losing money and divest itself of the business altogether, taking a huge *$35-$40 million* impairment charge to earnings.

17. In another transaction designed to inflate earnings, in September 2003, the Company reacquired a deeply indebted Michigan franchise (Dough-Re-Mi) consisting of seven stores. Krispy Kreme artificially inflated the purchase price of the stores to cover

- 6 -

debts owed by Dough-Re-Mi to Krispy Kreme, then improperly recorded the same money as income, thereby artificially inflating the Company's quarterly and FY04 earnings.

18.     During the Class Period, Krispy Kreme and the Individual Defendants also entered into transactions designed to benefit Krispy Kreme insiders, at the same time causing its financials to be materially misstated. For example, in June 2003, the Company reacquired rights to Dallas, Texas and Shreveport, Louisiana stores, falsely representing to investors that the transaction was valued at $67 million (a huge premium over the typical selling prices of Krispy Kreme franchise stores). The Company failed to disclose, however, that the specific sellers of the Dallas franchise and thus beneficiaries of the sales were in fact multiple Krispy Kreme insiders, including John "McAleer" Orell ("Orell"), a relative of defendant McAleer and Joseph A. McAleer, Jr., a former Krispy Kreme CEO. Only $13 million of the $67 million was allocated to tangible assets and the remaining $54 million to reacquired franchise rights which the Company took the position that they were not subject to amortization.

19.     Defendants' failure to amortize reacquired franchise rights and known impairment to business acquisitions during the Class Period artificially inflated Krispy Kreme's value by holding $174.5 million of "reacquired franchise rights" as an "intangible asset" on its books, without amortization. Proper amortization would have required taking a non-cash charge to income, reducing reported earnings throughout the Class Period by approximately *$0.59-$0.68* per share or a *61%-70%* reduction.

20.     In February 2004, the Company reacquired the Golden Gate franchise in Northern California. Krispy Kreme and Livengood failed to disclose, however, that Livengood's wife was a $1.5 million beneficiary of the transaction.

- 7 -

21.     In sum, defendants have been forced to admit that they falsified Krispy

Kreme's Class Period financial statements in the following ways:

- Reacquiring failing franchises owned by insiders, then allocating the majority of the purchase price as "intangible assets" and failing to amortize them for known losses.

- Acquiring Montana Mills – an unprofitable bread company for which Krispy Kreme failed to take an impairment charge at the time of acquisition, or any subsequent quarter, until the taking of the $40 million charge to earnings.

- Overstating Company income by improperly recognizing revenue from Krispy Kreme's off-premises sales.  Defendants unilaterally doubled customers' orders at the end of fiscal quarters and years, knowing the doughnuts would be returned.  The Company nevertheless recognized revenue from such shipments, *i.e.*, "channel stuffing."

- Failing to consolidate the failing joint ventures, as required under GAAP, despite having majority ownership and control, thereby avoiding recognizing a liability on the Company's balance sheet.

- Improperly accounting for Krispy Kreme's derivative transactions by failing to adjust the value of derivative instruments, which caused Krispy Kreme assets to be misstated.[4]

- Failing to properly account for Krispy Kreme's allowance for doubtful accounts related to receivables by its struggling franchises.

- Improperly recognizing revenue from the Company's KKM&D segment for sales of equipment to franchises prior to its being earned realizable in violation of GAAP.

- Improperly accounting for property and equipment leases, leasehold improvements and the related depreciation of the leased assets.

---

[4]     A derivative security is a financial security, such as an option or future, whose characteristics and value depend on the characteristics and value of an underlying security. The Company was required under GAAP to recognize any gains or losses in its income statement based upon the changes in the market value of the instruments. On April 18, 2005, Krispy Kreme announced that it had failed to properly account for its derivative transactions.

- 8 -

**Despite Knowledge of Slowing Sales Growth and False Financials,
Krispy Kreme Repeatedly Reported EPS above Expectations
and Increased Future Revenue and Earnings Projections**

22.     Notwithstanding knowledge of and failure to disclose slowing sales at its

retail and franchise stores, and improper revenue recognition in order to meet or beat Wall

Street earnings expectations, Krispy Kreme denied any deterioration to its doughnut sales

and growth strategy.  As a result of defendants' accounting manipulations, Krispy Kreme

consistently reported revenue and earnings per share ("EPS") above and beyond First Call

analysts' consensus, often by pennies per share.

| Quarter | KKD Reported Earnings | First Call Analyst Consensus | KKD/Beat Consensus – Differential |
|---------|------------------------|------------------------------|-----------------------------------|
| 1Q02 | $0.20 | $0.17 | $0.03 |
| 2Q02 | $0.10 | $0.08 | $0.02 |
| 3Q02 | $0.11 | $0.10 | $0.01 |
| 4Q02 | $0.14 | $0.13 | $0.01 |
| 1Q03 | $0.15 | $0.14 | $0.01 |
| 2Q03 | $0.15 | $0.14 | $0.01 |
| 3Q03 | $0.17 | $0.16 | $0.01 |
| 4Q03 | $0.19[5] | $0.18 | $0.01 |
| 1Q04 | $0.22 | $0.21 | $0.01 |
| 2Q04 | $0.21 | $0.20 | $0.01 |

23.     Moreover, Krispy Kreme told investors that the Company could and would

continue to grow and would reward investors with ever increasing EPS growth.

Accordingly, during the Class Period and in the face of slowing sales and market saturation,

Krispy Kreme repeatedly ratcheted upward its public quarterly and fiscal year revenue and

earning projections.  For example, in FY04 defendants increased the Company's FY04

---

[5]     Without including the impact of an arbitration award.

earnings projections from $0.86 per share to $0.88 per share then from $0.88 per share to $0.90 per share, from $0.90 per share to $0.91 per share, and from $0.91 per share to $0.92 per share.

24. Then, on March 10, 2004, Krispy Kreme told investors that for FY05 Krispy Kreme would report a whopping $1.18 per share, and further assured investors of the value and its commitment to developing Montana Mills:

- *"**The Company expects diluted earnings per share of $1.16 to $1.18 for fiscal 2005 and systemwide comparable store sales growth in the mid-to-high single digits. The Company estimates that systemwide sales will increase approximately 25% in fiscal 2005*. . . ."*

- *"**We anticipate spending up to 24 months refining and expanding the Montana Mills concept, retaining its core best-in-class breads, but expanding the offering*."*

Ex. 47.[6]

**Bad News Slowly Seeps out into the Market as the Company Is Forced to Admit Slowing Sales Growth and Accounting Improprieties**

25. Three weeks later, on May 7, 2004, contrary to its claims that doughnut sales were strong and would continue to generate record profits, the Company admitted, as CWs report was known by the Company throughout the Class Period, that:

(a)   Overall sales were indeed suffering due to "excess capacity" because of market saturation;

(b)   It could not deliver the huge 2005 earnings forecast promised to investors;

---

[6]   All Exhibits referred to herein are attached to the Appendix of Exhibits in Support of the Second Amended Class Action Complaint for Violation of the Federal Securities Laws filed concurrently herewith.

(c)     It would close stores throughout the country including Virginia, Arizona, Indiana, Ohio, California and Maryland; and

(d)     Montana Mills was losing money, and it would divest the business altogether and take a huge $35-$40 million charge to earnings associated with the subsidiary.

26.     Krispy Kreme reported:

- "*We plan to close the majority of the existing Montana Mills locations, which are underperforming, and will pursue a sale of the remaining Montana Mills stores. . . . In conjunction with this action, we will record a non cash, pre-tax asset impairment charge of approximately $35-$40 million . . . .*"

- "*Factory stores in Charlottesville, Virginia, Cincinnati and Columbus, Ohio, and Indianapolis, Indiana, will be closed in the near future. Additionally, two commissaries, one in Hayward, California and one in Baltimore, Maryland, are not adequately positioned or represent excess capacity to serve.*"

Ex. 1.

27.     Investors were furious that only three weeks earlier, the Company issued a bullish forecast for FY05 earnings and claimed that it would commit to at least two years of development of the Montana Mills acquisition.  Investors sold off Krispy Kreme stock in huge volumes, approximately 20.5 million shares, resulting in a one-day price decline of more than $9.00 per share, inflicting hundreds of millions of dollars in losses on investors.

28.     Bad news from the Company continued.  On July 29, 2004, the Company announced that the United States Securities and Exchange Commission ("SEC") was investigating the propriety of the Company's franchise reacquisitions and the May 7, 2004 disclosure.  News of the SEC's investigation caused Krispy Kreme's stock price to fall another 16% to $15.71.  Investors would subsequently learn that Krispy Kreme's reported

- 11 -

financial results had been manipulated by the franchise reacquisitions and other manipulations.

29.    In September 2004, PwC refused to sign Krispy Kreme's financials for 2Q05.

30.    On October 4, 2004, the Company announced the formation of a "special committee to investigate the claims raised by the SEC."  And, on October 8, 2004, the Company announced that the SEC had formalized its investigation.

31.    On December 15, 2004, the Company announced that it would be unable to timely file its Report on Form 10-Q for the period ended October 31, 2004, because of the "ongoing analysis related to the accounting treatment of certain franchise matters."  Ex. 65.

32.    On January 4, 2005, the Company announced that it would, indeed, restate its publicly reported earnings, estimating a net reduction in EPS of between $0.07 and $0.08 for FY04 or 6.6% – 8.6%.  Unbeknownst to the investing public, however, in actuality, Krispy Kreme's restatement was much larger than that announced on January 4, 2005.  Nonetheless, the January 4, 2005 announcement caused the Company's stock price to drop another 17% in a single day.  Ex. 66.  Krispy Kreme claimed that the primary reason for the restatement was that Krispy Kreme had improperly accounted for a large payment made to the former owner of the Michigan franchise.  Rather than accounting for this payment as an expense, the Company improperly included this amount as a part of the purchase price of the reacquisition.

33.    Among the reasons for the restatement Krispy Kreme announced on January 4, 2005:

•    A pre-tax adjustment of between $3.4 million and $4.8 million to record as compensation expense, rather than as purchase price, some or all of the disproportionate consideration paid to a former owner of the Michigan franchise, [and] a pre-tax adjustment of approximately $0.5 million to reverse

- 12 -

certain income and to record as expense amounts that were improperly accounted for as part of the Company's acquisition of the Michigan franchise;

- A pre-tax adjustment of between $0.5 million and $1.0 million to record as compensation expense, rather than as purchase price, some or all of the disproportionate consideration paid to a former owner of the Northern California franchise . . . .;

- A pre-tax adjustment of approximately $0.8 million to record as expense, rather than as purchase price, part of the consideration paid to another former owner of the Northern California franchise . . . .; and

- A pre-tax adjustment of approximately $0.6 million to reverse income recorded as a management fee prior to the Company's acquisition of the minority interest in the Northern California franchise.

*Id.*

34.     On January 18, 2005, CEO Livengood "retired" and was replaced by Stephen Cooper of Kroll, Zolfo, Cooper LLC – a "turnaround" specialist who had recently spearheaded the restructuring of Enron. Ex. 67. Steven Panagos, also of Kroll Zolfo Cooper LLC, was named interim COO. *Id.*

35.     Defendant Livengood, however, remained a consultant to Krispy Kreme, for a salary of over $45,000 per month – the equivalent of his base salary prior to his "retirement." Characterizing Livengood's termination as a "retirement" triggered the immediate vesting of 330,125 share options. Ex. 68.

36.     On February 24, 2005, the Company announced that the United States Attorney for the Southern District of New York had commenced its own investigation into the same matters being investigated by the SEC. Ex. 95.

37.     On April 4, 2005, the Company announced that it had obtained $225 million in additional financing under a new credit facility, in part, to pay off the approximately $91 million already outstanding under the existing credit facility. Ex. 96.

- 13 -

38.     By mid-April 2005, Krispy Kreme's stock was trading in the $7.40-$7.75 per share range as disclosures continued to reveal the true state of the Company's business condition as opposed to prior reports of the Company.

39.     On April 18, 2005, Krispy Kreme filed a Report on Form 12b-25 Notice of Late Filing of its FY05 Report on Form 10-K as it could not complete its accounting restatement.  Ex. 97.

40.     On the morning of April 19, 2005, Krispy Kreme issued a press release announcing the unreliability of its prior financial statements *going back to and including FY01*, and an increase in the magnitude of the previously announced restatement stock price falls again, which stated in part:

> The Company has filed a Notification of Late Filing on Form 12b-25 stating that its annual report on Form 10-K for fiscal 2005 could not be filed timely due to ongoing analysis related to the proper application of generally accepted accounting principles to certain transactions which occurred in the fiscal year ended February 1, 2004 ("fiscal 2004") and earlier years as well as in fiscal 2005.  Until such analyses are complete, the Company is unable to finalize its financial statements for fiscal 2005.  *The Company is also filing today a Current Report on Form 8-K reporting that, because of pending restatements, the Audit Committee and management have concluded that the Company's financial statements for fiscal 2001, 2002 and 2003 and the first three quarters of fiscal 2005, in addition to the financial statements for fiscal 2004, should no longer be relied upon*.
>
> *              *              *
>
> *In addition to the foregoing adjustments, the Company's ongoing analyses have resulted in conclusions that additional restatement adjustments are necessary as follows*:
>
> •       *pre-tax adjustments to increase earnings for fiscal 2004 by approximately $1.2 million and to decrease earnings for years prior to fiscal 2004 by approximately $0.2 million to record mark-to-market adjustments on certain derivative transaction which previously had not been recorded; correlative adjustments are expected to reduce fiscal 2005 first quarter and second quarter pre-tax earnings by approximately $0.4 million and $1.0 million,*

- 14 -

*respectively, and increase fiscal 2005 third quarter pre-tax earnings by approximately $0.2 million*

- *pre-tax adjustments currently estimated to be approximately $1.4 million to decrease earnings for fiscal 2004 to correct errors in the application of accounting principles to certain leases and leasehold improvements; these adjustments are necessary principally to account properly for lease renewal options and/or rent escalations in computing rent expense for operating leases, to determine properly the depreciable lives of leasehold improvements when renewal options are present in leases and to require use of the same lease term in determining the operating or capital classification of a lease, rent expense thereunder and depreciable lives of related leasehold improvements; the Company estimates that correlative adjustments to the first, second and third quarters of fiscal 2005 will reduce pre-tax earnings by approximately $0.5 million, $0.5 million and $0.6 million, respectively; the Company currently is computing the effects of correlative adjustments on years prior to fiscal 2004, and expects the annual amount of such adjustments to be significantly less than for fiscal 2004*

- *a pre-tax adjustment of between $0.6 million and $0.8 million in fiscal 2004 to reverse income related to certain equipment sold by the Company to its Dallas franchisee prior to the Company's acquisition of such franchise*

    *Restatement of the Company's financial statements to reflect all of the adjustments referred to above and certain other minor adjustments is expected to reduce net income for fiscal 2004 by between approximately $5.2 million and $6.2 million (between 9.2% and 10.9%). The adjustments are expected to reduce diluted earnings per share for fiscal 2004 by between approximately $0.09 and $0.10.* Certain restatement adjustments the Company has identified but not enumerated above will affect reported earnings for interim periods within fiscal years but have an immaterial effect on earnings for the full fiscal year.

Ex. 98

41.     In the April 19, 2005 press release and the Report on Form 8-K, filed by the

Company on April 19, 2005, Krispy Kreme also admitted that it should have consolidated

the financial statements of the Company's Canadian area developer no later than the

- 15 -

Company's first quarter FY05. As a result, the restatement of financials would include such consolidation:

The Company also has concluded that under the provisions of FIN46(R), it should have consolidated the financial statements of KremeKo Inc. ("KremeKo"), its area developer for Central and Eastern Canada, effective as of the end of the first quarter of fiscal 2005 rather than as of the end of the third quarter of fiscal 2005. The Company currently expects that restatement adjustments to previously issued interim financial information for fiscal 2005 to correct this error will not have a material effect on pre-tax earnings for such interim periods. *On April 15, 2005, the Company announced that KremeKo was commencing a financial restructuring [i.e., bankruptcy protection]*. The Company is in the process of assessing the impact of the pending restructuring on the carrying value of KremeKo's assets and liabilities.

*The Company also believes it is likely that additional restatement adjustments to previously issued financial statements for fiscal 2004 and earlier years, and potentially to interim financial information for fiscal 2005, will be required to correct the timing of revenue recognition with respect to certain sales of equipment to franchisees. While the Company's analysis to this matter is not complete, the Company expects that adjustments will be recorded to recognize revenue from certain equipment sales on or after the installation of the equipment rather than when the equipment was either shipped or delivered*. The Company currently is reviewing the accounting and quantifying the effects of such potential adjustments which, if necessary and recorded, are expected to affect principally fiscal 2004 and earlier years.

*The Company currently is conducting impairment testing of the reported amounts of goodwill, and anticipates that it will conclude that goodwill is impaired and that an impairment charge will be reflected in fiscal 2005 earnings;* however, the Company has not concluded in which interim period or periods of fiscal 2005 such charge or charges, if any, should be recorded. The interim financial information previously published by the Company for fiscal 2005 does not reflect any such impairment charges.

Because the investigation by the Special Committee of independent directors of the Company (discussed in the Company's Current Report on Form 8-K dated December 15, 2004) is ongoing, there can be no assurance that, upon completion of the investigation, the Special Committee will not conclude, either for quantitative or qualitative reasons, that the Company's historical financial statements require restatement with respect to matters beyond those discussed above. In such event, there can be no assurance that

- 16 -

the amount of any additional adjustment will not be material individually or in the aggregate.

*      *      *

In order that all restatements of previously issued financial statements be accomplished at one time, the Company has concluded that the completion of the fiscal 2005 financial statements and the filing of its annual report on Form 10-K for fiscal 2005 (as well as the quarterly report on form 10-Q for the period ended October 31, 2004) should await the completion of the Company's analyses discussed above, the conclusion of the Special Committee's investigation and the conclusion of the Company's discussions with the Commission staff regarding accounting matters. The completion of such ongoing work could result in adjustments of previously issued financial statements in addition to the adjustments described herein and such adjustments could, individually or in the aggregate, be material.

As a result of the foregoing, the Company was not able to file its annual report on Form 10-K by April 15, 2005, and it does not expect to be able to file its Form 10-K by April 30, 2005. The Company is not at this time able to predict when the Form 10-K will be filed, but intends to file the report at the earliest practicable date.

Exs. 98-99.

42. The same press release also contained an update of its financial results for FY05 which showed how bad Krispy Kreme's reported financial results would have been without the financial manipulations:

*Results for fiscal 2005 were adversely impacted by significant sales declines. For the full fiscal year, systemwide and Company average weekly sales per factory store decreased approximately 13% and 19%, respectively, compared to fiscal 2004. For the fourth fiscal quarter ended January 30, 2005, systemwide and Company average weekly sales per factory store decreased approximately 20% and 27%, respectively, compared to the fourth quarter of fiscal 2004.*

*On a preliminary basis, the Company expects to report fiscal fourth quarter revenues of approximately $153 million, representing a 16% decrease from the prior year comparable period, and fiscal 2005 revenues of approximately $685 million, representing a 4% increase from fiscal 2004.* The annual revenue increase was primarily attributable to an increase in Company store revenues, which was due to sales from new stores as well as the inclusion of sales from New England Dough, LLC, the Company's

- 17 -

consolidated joint venture partner in Connecticut, Maine, Massachusetts, Rhode Island, Vermont and New Hampshire, which was consolidated in May 2004 pursuant to FIN 46 (R) and the inclusion of sales from the Michigan Market, which was acquired in October 2003, partially offset by decreased sales from existing stores. The Company expects to report a net loss for the fourth fiscal quarter ended January 30, 2005. The Company's financial results are also being adversely impacted by the substantial costs associated with the legal and regulatory matters previously disclosed by the Company.

Ex. 98.

43.     After this news was disclosed, Krispy Kreme's stock collapsed to as low as $6.29 per share before closing at $6.48 per share on April 19, 2005.

44.     To date, Krispy Kreme has not filed its restated financials, and has admitted that the magnitude of the restatement may ultimately be larger than announced – the entire picture is not yet complete. During the same period in which the Company issued false and misleading statements, including false financial results, the Individual Defendants unloaded more than 1.5 million shares of Krispy Kreme stock for proceeds of over $57.9 million.

**PwC Was Actively Involved in the Manipulation of**
**Krispy Kreme's Publicly Reported Financial Results**

45.     Defendant PwC was actively involved in this fraudulent scheme. PwC advised the Company and signed off on the Company's financial results that were reported to the market. Throughout the Class Period, defendant PwC purported to provide *"independent"* auditing and accounting services.

46.     PwC, however, was closely intertwined with Krispy Kreme. In fact, several members of Krispy Kreme's management, and even Livengood's wife, are Certified Public Accountants ("CPA") formerly holding management positions at PwC in North Carolina. As the Company was reporting false financial results with the assistance of PwC, Krispy Kreme was recruiting members of PwC's auditing staff to take on management positions at Krispy

- 18 -

Kreme. Between January 30, 2002 and January 31, 2002, Krispy Kreme promoted a number of former PwC employees:

(a)  Defendant Casstevens, who had worked in PwC's audit practice, was promoted to the position of Senior Vice President and CFO of Krispy Kreme;

(b)  Sherry Luper, who had worked for PwC for ten years, was promoted to the position of Senior Vice President of Human Resources; and

(c)  Sherry Polonsky, former Senior Audit Manager at PwC, was promoted to the position of Vice President of Finance at Krispy Kreme.

47.  PwC, not surprisingly turned a blind eye to the pervasive accounting violations at Krispy Kreme. Collectively, Krispy Kreme, the Individual Defendants, and PwC have defrauded investors in their commission of securities fraud. Throughout the Class Period, PwC, Krispy Kreme and the Individual Defendants knew or recklessly disregarded that the Company's financial statements were false and misleading. The impact of defendants' fraud on the stock price is reflected graphically in Ex. A, attached herewith.

## JURISDICTION AND VENUE

48.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b–5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

49.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act [15 U.S.C. §78aa].

50.  Venue is proper in this district pursuant to §27 of the Exchange Act. Krispy Kreme maintains its principal place of business in this district and many of the acts and practices complained of herein occurred in substantial part in this district.

- 19 -

51.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

52.     Pursuant to the Court Order of October 6, 2004, lead plaintiff is Pompano Beach Police & Firefighters Retirement System ("Pompano Beach Police & Fire"); Alaska Electrical Pension Fund ("Alaska Electrical"); City of St. Clair Shores Police and Fire Retirement System ("St. Clair Shores Police and Fire"); City of Sterling Heights General Employee Retirement System ("Sterling Heights"); and Jason Hennessy, collectively, the National Retirement Funds.

        (a)     Plaintiff Pompano Beach Police & Fire is a fund that administers the pension and retirement benefits of retired police officers and firefighters of the City of Pompano Beach. Pompano Beach Police & Fire purchased Krispy Kreme securities during the Class Period and suffered substantial damages as a result thereof.

        (b)     Plaintiff Alaska Electrical is a pension plan that is jointly administered by management and union trustees. Currently the fund administers pension and retirement benefits for 7,700 plan participants, including active and retired electrical workers. Alaska Electrical purchased Krispy Kreme securities during the Class Period and suffered substantial damages as a result thereof.

        (c)     Plaintiff St. Clair Shores Police and Fire is a fund which administers the pension and retirement benefits for active and retired police officers and firefighters of

- 20 -

the City of St. Clair Shores. St. Clair Shores Police and Fire purchased Krispy Kreme securities during the Class Period and suffered substantial damages as a result thereof.

(d)     Plaintiff Sterling Heights is a fund which administers the pension and retirement benefits for active and retired employees of the City of Sterling Heights. Sterling Heights purchased Krispy Kreme securities during the Class Period and suffered substantial damages as a result thereof.

(e)     Plaintiff John Hennessy is an individual investor who purchased Krispy Kreme securities during the Class Period and suffered substantial damages as a result thereof.

53.     Each of the members of the National Retirement Funds purchased Krispy Kreme securities during the Class Period and was damaged thereby.

54.     Defendant Krispy Kreme is a specialty retailer of doughnuts with its principal place of business in Winston-Salem, North Carolina.

55.     Defendant was, throughout the Class Period, CEO, President and Chairman of the Board of Directors of the Company. Livengood joined the Company in 1977 and was appointed President in 1992. Livengood served as COO from 1992 to 1998 and was appointed CEO in 1998. Starting in 1994, Livengood began serving as a director of the Company, and in 1999 was appointed as Chairman of the Board. As Krispy Kreme's CEO, Livengood had general authority over all matters relating to the business and affairs of the Company, including, among other things, store franchise and other corporate acquisitions, and the dissemination of information regarding the Company's operations, financial condition, performance and growth. Livengood reviewed, controlled, and certified the contents of all the Company's Reports on Form 10-Q and Form 10-K filed with the SEC

during the Class Period. In addition, Livengood also led every Krispy Kreme earnings conference call during the Class Period in which false and misleading statements were disseminated. On January 18, 2005, Livengood suddenly "retired" from his position as CEO, President and Chairman. He remains employed by Krispy Kreme, however, as a consultant with a whopping fee of $45,833 per month, the equivalent of his base salary prior to his retirement. Livengood's consulting agreement with Krispy Kreme is for a six-month term, which is renewable for an additional six months. Livengood's "retirement" triggered an automatic vesting of 330,125 options to purchase Krispy Kreme stock. Livengood now has a total of 1.3 million vested options. Ex. 70.

56. Defendant Tate was, during the Class Period, COO of the Company. Tate joined the Company in October 2000, serving as the CFO and President of the KKM&D division. Tate was appointed Krispy Kreme's COO in January 2002. From 1993 to just prior to joining Krispy Kreme in 2000, Tate served as CFO for Williams-Sonoma, Inc., and Dole Foods Company, Inc. Tate was the executive responsible for corporate interaction with the Company's store operations division directors and store management. Tate had frequent communications with all store managers and their staff, using store audits and weekly telephone calls and e-mails. Ex. 4. Defendant Tate also served on the Board of Directors of Montana Mills while actively participating in its acquisition by Krispy Kreme. In addition, Tate also participated in every Krispy Kreme earnings conference call during the Class Period in which false and misleading statements were disseminated.

57. Defendant Casstevens was, during the Class Period, CFO of the Company until his resignation on December 23, 2003. Casstevens joined Krispy Kreme in 1993, became CFO in January 2002 and served as Senior Vice President of Corporate Finance

- 22 -

since April 1998, and Treasurer since August 2000. Casstevens is a CPA and prior to joining Krispy Kreme, Casstevens was employed by PwC from 1987 to 1993. As Krispy Kreme's principal financial and accounting officer, Casstevens' responsibilities included evaluating the effectiveness of disclosure controls and procedures required for preparing reports to be filed with the SEC. Casstevens reviewed, controlled, and certified the contents of all the Reports on Form 10-Q and Form 10-K filed with the SEC during the Class Period until his resignation on December 23, 2003. In addition, Casstevens participated in every Krispy Kreme earnings conference call during the Class Period until his resignation on December 23, 2003.

58. Defendant Phalen served as CFO of the Company from January 5, 2004 to the present. Prior to joining Krispy Kreme, Phalen served as an Executive Director in CIBC World Markets' Consumer & Business Services Group from 2002 to 2003. From 1996 to 2002, Phalen worked at Deutsche Banc Alex. Brown ("Alex. Brown"), most recently as Vice President of Corporate Finance, focusing on the restaurant, retail, consumer products, food and beverage and business services sectors. While at Alex. Brown, he was a key member of the team that executed Krispy Kreme's IPO and follow-on offering. As Krispy Kreme's principal financial and accounting officer, Phalen's responsibilities included evaluating the effectiveness of disclosure controls and procedures required for preparing reports to be filed with the SEC. Phalen reviewed, controlled, and certified the contents of SEC Reports on Form 10-Q and Form 10-K issued by the Company from the time of his appointment as CFO through the end of the Class Period. In addition, Phalen participated in Krispy Kreme earnings conference calls during the Class Period.

59.     Defendant McAleer has been employed by Krispy Kreme since 1981. McAleer, during the Class Period, served as the Executive Vice President of Concept Development.  He served as Vice Chairman of the Board of Directors from October 1999 to March 2004.  He also served as Executive Vice President, Brand Development from March 1998 until October 1999, as Executive Vice President, Marketing from August 1992 until March 1998 and as Senior Vice President, Marketing, Real Estate and Construction from September 1990 until August 1992.  McAleer has served as a director since September 1990 and as Chairman of the Board of Directors from February 1998 until October 1998. McAleer is the brother of former Krispy Kreme CEO Joseph A. McAleer, Jr.  McAleer reviewed, controlled and signed the SEC Reports on Form 10-Q and Form 10-K issued by the Company during the Class Period.

60.     Defendant PwC is a firm of CPAs who provide industry-focused assurance, tax and advisory services for public and private clients primarily in four areas: corporate accountability; risk management; structuring and mergers and acquisitions; and performance and process improvement.  PwC was engaged by Krispy Kreme to provide independent auditing and accounting services prior to and throughout the Class Period.  PwC's Greensboro office, which handles the Greensboro/Winston/Salem triad business area in North Carolina, was engaged to examine and report on Krispy Kreme's financial statements for FY01, FY02, FY03 and FY04, to perform review services of Krispy Kreme's interim FY01 through FY05 results, and to provide significant consulting, tax and due diligence services during the Class Period.  Ex. 71.  As a result of the far-reaching scope of services provided by PwC and the close relationship with Krispy Kreme management, PwC personnel were intimately familiar with Krispy Kreme's business, including Krispy Kreme's

accounting for its reacquired franchise rights, its relationship with its franchises, its accounting for its joint ventures, its revenue recognition practices and its acquisition of Montana Mills.

## CONTROL PERSONS

61.     Because of the Individual Defendants' executive management positions at the Company, they had access to and knew of the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

62.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Krispy Kreme, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the

- 25 -

false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

63.     As officers and controlling persons of a publicly held Company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based upon truthful and accurate information.    The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

64.     As alleged above, the Individual Defendants participated in the drafting, preparation, and/or approval of the various press releases, shareholder reports, SEC filings, and other public statements/communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  In fact, the Individual Defendants certified the accuracy of their year-end results, and consented to the content of the financials.  *See* Ex. 72.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and

- 26 -

releases detailed herein and is therefore primarily liable for the representations contained therein.

65.     Because of their Board membership and/or executive and managerial positions with Krispy Kreme, each of the Individual Defendants had access to the adverse undisclosed information about Krispy Kreme's business, prospects, and financial condition as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Krispy Kreme and its business issued or adopted by the Company materially false and misleading.

66.     Krispy Kreme, each of the Individual Defendants and PwC are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Krispy Kreme publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  Krispy Kreme also was obligated to maintain certain debt-to-equity ratios in order to remain in compliance with its credit facility covenants.  The scheme: (a) deceived the investing public regarding Krispy Kreme's business, operations, management and the intrinsic value of Krispy Kreme publicly traded securities; (b) enabled Krispy Kreme to exchange 1.2 million shares pursuant to the acquisitions of Montana Mills and other properties; (c) enabled the Individual Defendants to receive millions of dollars in insider sales proceeds due to the apparent success of the Company's business; (d) allowed defendants to remain in compliance with Krispy Kreme's senior credit facility; and (e) allowed PwC to reap millions in fees.

**Defendants' Economic Motivation and Insider Stock Sales**

67.     The Individual Defendants were motivated to falsify the Company's revenues and earnings and mask the severe decline in the Company's sales growth and thus capitalize

- 27 -

on the accounting fraud and inflation of Krispy Kreme stock. In fact, many of the executive officers, including the Company's CEO Livengood and CFO Casstevens, had employment agreements containing huge incentive-based bonus structures which were tailored to reward each executive for achieving earnings and revenue targets. *See* Ex. 5.

68. At the same time the Company issued false and misleading statements, the Individual Defendants together sold 1,518,564 shares of their Krispy Kreme stock at artificially inflated prices as high as $43.96 per share for illegal insider trading proceeds in excess of $57.9 million.

| Name | Date | Shares Sold | Price | Proceeds |
|------|------|-------------|-------|----------|
| | | | | |
| Casstevens | 6/11/2001 | 30,000 | $34.52 | $1,035,450 |
| | 3/27/2002 | 18,000 | $40.78 | $734,040 |
| | 6/7/2002 | 6,000 | $38.00 | $228,000 |
| | 9/10/2002 | 18,000 | $33.87 | $609,642 |
| | 12/9/2002 | 18,000 | $37.20 | $669,600 |
| | 3/21/2003 | 18,000 | $33.80 | $608,400 |
| | 6/10/2003 | 18,000 | $35.15 | $632,700 |
| | 8/27/2003 | 24,000 | $43.60 | $1,046,400 |
| | **Total** | 150,000 | | $5,564,232 |
| | | | | |
| Livengood | 6/12/2001 | 160,000 | $33.72 | $5,395,200 |
| | 6/14/2001 | 30,000 | $34.78 | $1,043,400 |
| | 11/4/2002 | 5,618 | $35.03 | $196,799 |
| | 11/6/2002 | 8,400 | $35.03 | $294,252 |
| | 11/14/2002 | 24,100 | $35.03 | $844,223 |
| | 11/26/2002 | 270,000 | $25.83 | $9,673,749 |
| | 11/26/2002 | 119,946 | $35.85 | $4,300,724 |
| | 8/25/2003 | 235,500 | $43.84 | $10,324,320 |
| | **Total** | 853,564 | | $32,072,501 |
| | | | | |
| Tate | 3/27/2002 | 15,000 | $40.78 | $611,700 |
| | 6/7/2002 | 15,000 | $38.00 | $570,000 |
| | 11/26/2002 | 30,000 | $35.83 | $1,074,894 |
| | 3/20/2003 | 60,000 | $32.82 | $1,969,200 |
| | 8/25/2003 | 65,000 | $43.96 | $2,857,400 |
| | **Total** | 185,000 | | $7,083,032 |
| | | | | |
| McAleer | 3/27/02 | 57,225 | $40.86 | $2,338,214 |
| | 3/28/02 | 62,865 | $40.73 | $2,560,491 |
| | 4/1/02 | 59,940 | $39.91 | $2,392,205 |

- 28 -

| | | | | |
|---|---|---|---|---|
| | 4/2/02 | 75,000 | $39.96 | $2,184,626 |
| | 4/3/02 | 53,335 | $39.48 | $766,158 |
| | 4/4/02 | 19,635 | $39.02 | |
| | Total | 330,000 | | $13,328,694 |
| | | | | |
| Total | | 1,518,564 | | $54,961,459 |

## CONFIDENTIAL SOURCES

69.     The allegations pled herein are made on information and belief and are supported by first-hand accounts of 16 CWs.  These witnesses are comprised of former Krispy Kreme Company and franchise employees, each of whom were employed during the Class Period and provided facts from numerous departmental and geographic vantage points within the Company.

        (a)     Confidential Witness 1 ("CW1") is a former Krispy Kreme general manager at a Krispy Kreme corporate-owned retail store in Charlotte, North Carolina, who was employed from February 2001 until February 2003.  As general manager, CW1 was responsible for all store operations, including, but not limited to, sales, inventory and expense management, administrative procedures and personnel management.

        (b)     Confidential Witness  2 ("CW2") is a former Krispy Kreme bookkeeper for a Krispy Kreme Company store in South Carolina, who was employed from June 2003 until April 2004.  As bookkeeper, CW2 was responsible for bookkeeping and accounting activities in the store office, which included, accounts receivable, collecting and counting money from route drivers, balancing money collected with appropriate invoices, counting money contained in the safe at the day's end, and generating daily sales reports for the general manager.

        (c)     Confidential Witness  3 ("CW3") is a former Krispy Kreme Vice President of Finance/Store Development for the Golden Gate Krispy Kreme franchise of Northern California based in Sacramento, California.  CW3 held this position from March 2003 until February 1, 2004, and reported directly to the owner and operator of the Golden Gate franchise, Brad Bruckman.  As Vice President of Finance, CW3 was responsible for the Northern California franchise financials, including compiling and submitting the profit & loss (P&L) statement, balance sheets, trial balance and statement of cash flows and submitting the same to Krispy Kreme headquarters in North Carolina.  CW3 specifically submitted the franchise financials to Krispy Kreme accounting director of joint venture David Mills ("Mills").  CW3 also worked with Krispy Kreme Vice President of Finance Sherry Polonsky, Controller Elizabeth Hood, Manager of Financial Planning & Analysis Erik Vaughan and operations consultant Kurt Kuyper.

- 29 -

(d)     Confidential Witness 4 ("CW4") is a former payroll clerk for Michigan-based Dough-Re-Mi, a Krispy Kreme franchise consisting of seven stores, who was employed from March 1997 until June 2004. CW4 was based out of Livonia, Michigan and reported directly to Dough-Re-Mi owner Joe Nachtrab. CW4 was responsible for assisting Nachtrab in preparing financials on a monthly basis to submit to Krispy Kreme corporate headquarters until 2001 when the accounting department was moved to the corporate office. According to CW4, Dough-Re-Mi submitted its financials to Krispy Kreme corporate, directly to CEO Livengood, on a monthly basis, which CW4 explained was required under the franchise agreement.

(e)     Confidential Witness 5 ("CW5") is a former Krispy Kreme corporate trainer who was employed from 1999 until April 2004. CW5 began as a general manager of a Krispy Kreme store, during which time she/he was responsible for supervising store operations, risk management, scheduling, interviewing, human resources functions, and hiring new employees. As a corporate trainer, CW5 was responsible for overseeing the final stages of new store construction, hiring and training employees. In subsequent months after store opening, CW5 would return to audit the process. CW5 worked for both Krispy Kreme's Colorado franchise, Glazed Investments LLC ("Glazed Investments"), and in 2002, transferred to Rigel Corp., another franchise of Krispy Kreme in Arizona. CW5 participated as a trainer in Krispy Kreme store openings in Colorado and throughout the southwest. While at Glazed Investments, CW5 worked from the "bottom up" at Krispy Kreme, and became general manager, then corporate trainer.

(f)     Confidential Witness 6 ("CW6") is a former general manager of a Krispy Kreme franchise store in Tennessee who was employed from winter of 2003 until July 2004. CW6 reported to Joe Messick, who owned the Tennessee Krispy Kreme franchise.

(g)     Confidential Witness 7 ("CW7") is a former general manager at the Restaurant Associates Krispy Kreme franchise in New York and was employed from approximately 2002 until mid-2003. Specifically, CW7 worked for KKNY LLC ("KKNY") – a New York Krispy Kreme franchise which was owned and operated by Restaurant Associates, a major food industry company. Within CW7's role, she/he opened and managed the seventh KKNY franchise store. CW7 currently works for a large supermarket chain which currently sells Krispy Kreme doughnuts. Within CW7's position, she/he negotiates contract terms between Krispy Kreme and the grocery store. CW7 has specific knowledge of Krispy Kreme off-premises partner relationships and specifically negotiated the current Krispy Kreme contract with this particular chain of grocery stores.

(h)     Confidential Witness 8 ("CW8") is a former Krispy Kreme supervisor for the Columbus, Ohio Krispy Kreme commissary who was employed from November 2002 until July 2004. As commissary supervisor, CW8 was responsible for managing the distribution of doughnuts throughout the Central/Eastern Ohio region. CW8's duties included calculating daily doughnut delivery amounts or orders for each wholesale customer in the region using historical data and ensuring customers received those orders.

(i)     Confidential Witness 9 ("CW9") is a former Krispy Kreme sales manager for the Company-owned Ravenna, Ohio commissary and was employed from September 2003 through January 2004. CW9 was responsible for delivery of Krispy Kreme doughnuts baked at the Ravenna commissary to Krispy Kreme wholesale customers, which consisted of grocery and convenience stores. CW9 used historical sales data on customer sell-through to determine amounts of doughnuts to be delivered.

(j)     Confidential Witness 10 ("CW10") is a former office manager/bookkeeper for the Dallas franchise of Krispy Kreme who was employed from August 2001 until July 2003. CW10 was responsible for the data entry of accounts receivable into the IBM AS400 system, which was connected to the Krispy Kreme corporate computer system. CW10 was also responsible for preparing and distributing reports outlining outstanding accounts receivable balances. CW10 further was responsible for back-up, tracking, and distributing daily cash balance reports.

(k)     Confidential Witness 11 ("CW11") is a former accounts receivable specialist for the Golden Gate franchise of Krispy Kreme based in Northern California who was employed from June 2002 until January 2004. As accounts receivable specialist, CW11 was responsible for orders/invoicing, applying cash payments and journal entries for the Golden Gate off-premises sales.

(l)     Confidential Witness 12 ("CW12") is a former general manager for the Krispy Kreme Southern California's Great Circle Family Foods LLC ("Great Circle") franchise who was employed from 2001 until July 2004. CW12 was a member of the Great Circle Opening Team, responsible for opening new Krispy Kreme retail stores throughout Southern California. Within this role, CW12 opened a total of 12 stores, increasing the number of stores owned by the franchise to 22.

(m)     Confidential Witness 13 ("CW13") is a former Krispy Kreme general manager, who was employed with Krispy Kreme for a total of 12 years on two different occasions. CW13's second tenure commenced in 1998, wherein she/he returned as an assistant store manager, and later became a store manager responsible for opening a number of new stores in Georgia. During CW13's last three years of employment and during the Class Period, she/he was a market manager responsible for the Georgia and South Carolina region. As a market manager, CW13 was responsible for hiring and firing employees for Company-owned stores. When dealing with the associate and area developer franchise stores, CW13 was responsible for upholding the Company standards and making sure the franchisees were operating within the Company by-laws.

(n)     Confidential Witness 14 ("CW14") is a former general manager for the Colorado franchise stores of the Krispy Kreme Glazed Investments franchise who was employed from January 2001 until July 2003. CW14 was responsible for store operations and generating/compiling P&L statements. CW14 also had authority over 160 employees and six managers.

(o)     Confidential Witness 15 ("CW15") is a former general manager for the Sweet Traditions LLC ("Sweet Traditions") franchise store of Krispy Kreme. Sweet

Traditions owns the Krispy Kreme franchise in the Chicago area. In October 2002, CW15 was a manager for L&L Holdings, which owned the rights to develop Krispy Kreme in five states, including Nevada, Utah, Wyoming, Montana and Idaho. The franchise owned 12 stores at the time of CW15's employment. In June 2003, CW15 became general manager with Sweet Traditions. CW15 held this position for eight months.

(p) Confidential Witness 16 ("CW16") is a former Director of Real Estate for the New York franchise of Krispy Kreme who was employed from June 2002 until July 2003. The New York franchise – KKNY – was a wholly-owned subsidiary of Restaurant Associates. CW16 was responsible for identifying and obtaining real estate on which KKNY would open new restaurant locations. CW16 reported to President of KKNY, Joe Morgan, who reported to the President of Restaurant Associates, Nick Valenti.

## FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[7]

**Krispy Kreme Reports False Quarterly and Year-End Financial Results for FY01 and FY02**

70. <u>False and Misleading Statement</u>: On March 8, 2001, Krispy Kreme issued a press release announcing false fourth quarter and year ended FY01 results in which the Company asserted that its fourth quarter EPS of $0.075 Beat Consensus by $0.01. The release stated in part:

> *Net income for the fourth quarter was $4.2 million, an increase of 265.3% compared with $1.2 million in the fourth quarter last year. Diluted earnings per share increased to $0.30 in the fourth quarter of fiscal 2001 from $0.11 per share in the prior year comparable period.*
>
> *       *       *
>
> *Net income for the fiscal year was $14.7 million, an increase of 147.2% compared to $6.0 million a year ago. Diluted earnings per share increased to $1.10 for the year from $0.61 per share in the prior year.*
>
> *Commenting on company's financial performance, Scott Livengood, Chairman, President and CEO of Krispy Kreme Doughnuts, said: "I am pleased to report that our momentum from the first three quarters continued into the fourth quarter and contributed to record results*

---

[7] False and misleading statements are primarily in bold and italics.

*for fiscal 2001. We once again achieved strong results across all major sales channels and across the country. I attribute our success during this first year as a public company to maintaining a clear focus on our business strategy.*"

\* \* \*

*The company also provided guidance for fiscal 2002 generally and for the first quarter specifically. The company's long-term business model is for 20% revenue growth, mid-single digit comparable store sales growth, and 25% earnings per share growth annually. The company's expectations for fiscal 2002 are consistent with this model, which would result in diluted earnings per share of $1.38. For the first quarter of fiscal 2002, the company expects comparable store sales growth of mid-single digits and diluted earnings per share of $0.34, a 26% improvement above the comparable period last year.*

Ex. 100.

71.     <u>False and Misleading Statement</u>: On April 27, 2001, Krispy Kreme filed its Report on Form 10-K for the FY01 ended January 28, 2001, including therein the Company's previously reported false FY01 financial result, accompanied by an unqualified audit report by PwC as to those financial results. Ex. 101.[8] The Report on Form 10-K was signed by defendants Livengood, Tate and McAleer, Vice Chairman of the Board of Directors and Executive Vice President of Concept Development among others.

---

[8]     The PwC Audit report stated as follows: Our audits of the consolidated financial statements referred to in our report dated March 8, 2001, except as to the last paragraph of Note 1 for which the date is March 19, 2001, appearing in the 2001 Annual Report to Shareholders of Krispy Kreme Doughnuts, Inc. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10-K) also included an audit of the financial statement schedule listed in Item 14(a)(2) of this Form 10-K. *In our opinion, this financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.*

Ex. 101.

- 33 -

72.    <u>False and Misleading Statement</u>:    On May 16, 2001, Krispy Kreme announced "record first quarter results" and increased its earnings projections for FY02 and FY03.   The Company reported its EPS of $0.20 beating First Call analyst consensus estimates by $0.03 as Systemwide sales were up 35.8%.  The release also stated:

> ***Net income for the first quarter was $5.7 million, an increase of 88.6% compared with $3.0 million in the first quarter last year.  Diluted earnings per share increased to $0.20 in the first quarter of fiscal 2002 from $0.13 per share in the prior year comparable period***.

> Commenting on company's financial performance, Scott Livengood, Chairman, President and CEO of Krispy Kreme Doughnuts, said: ***"It has been another great quarter for Krispy Kreme.  Every business segment set new performance records***.

Ex. 102.[9]

73.    On May 18, 2001, Krispy Kreme, while trading at $63.85 per share, announced a 2-for-1 Stock Split, its second in three months.

74.    As a result of the false statements regarding the Company's financial and business strength,  between May 16, 2001 and May 29, 2001, Krispy Kreme's stock price increased from $56.40 [$28.20 split adjusted] per share to $75.60 [$37.80 split adjusted] per share.  Ex. 103.  By the end of June 2001, Krispy Kreme's stock price reached $40 per share. *Id*.

75.    <u>False and Misleading Statement</u>:  On June 13, 2001, Krispy Kreme filed its Report on Form 10-Q for the period ending April 29, 2001 (2Q02).  The Form 10-Q repeated

---

[9]    Also, on May 16, 2001, Krispy Kreme announced it would begin trading on the NYSE on May 17, 2001.

Case 1:04-cv-00416-JAB   Document 125   Filed 05/23/05   Page 40 of 214

the false financials reported in the May 16, 2001 press release. The Form 10-Q was signed by defendants Livengood and Tate.

76. <u>False and Misleading Statement</u>: On August 23, 2001, Krispy Kreme announced that its "Earnings [again] Beat Consensus" in the second quarter FY02 with EPS increasing 57.8% and systemwide sales up 34.0% The release stated in part:

> *Systemwide sales, including sales of both company and franchise stores, increased 34.0% to $144.3 million in the second quarter, compared with $107.7 million in the second quarter of fiscal 2001. Sales were driven by an increase in company store sales of 19.4% to $61.5 million and growth in franchise store sales of 47.3% to $82.8 million. On a comparable store basis, systemwide store sales increased 13.1% and company sales grew 11.9%.*

*     *     *

> *Net income for the second quarter was $5.9 million, an increase of 65.0% compared with $3.6 million in the second quarter last year. Diluted earnings per share increased to $0.10 in the second quarter of fiscal 2002 from $0.06 per share in the prior year comparable period, a 57.8% gain versus last year.*

*     *     *

> *Commenting on the second quarter results, Scott Livengood, Chairman, President and CEO of Krispy Kreme Doughnuts, Inc., said: "Our fundamentals remain strong. We once again achieved very positive results across all sales channels and across the country. Our continued focus on opening stores in new markets, establishing strong relationships with our customers and communities, and gaining greater market penetration through multiple channels of sales has generated results in excess of our previous projections for the quarter. . . . On the strength of this momentum and to provide our investors with prudently conservative but more realistic projections, we have elected to increase our forward looking guidance."*

> *Earnings guidance for the full fiscal year 2002 has been raised to $0.42 per diluted share versus the previous consensus of $0.40 per diluted share. The Company additionally expects to open 40 stores in fiscal year 2002 versus previous guidance of 38 new stores. For fiscal 2003, the Company expects earnings per diluted share to increase by 40% to $0.59 per diluted share, an increase of 18% over the previous consensus*

- 35 -

*estimates. **Finally, the Company indicated that over a three year planning horizon it now expects to grow earnings between 30% and 35% per year versus the previous guidance of 25%***.

Ex. 104.

77.   <u>False and Misleading Statement</u>:  On September 12, 2001, Krispy Kreme filed its Report on Form 10-Q for 2Q02.  The Form 10-Q repeated the false financials reported in the August 23, 2001 press release.  The Form 10-Q was signed by defendants Livengood and Tate.

78.   <u>False and Misleading Statement</u>:  On November 15, 2001, Krispy Kreme reported its third quarter FY02 results, again reporting that EPS had beat consensus estimates.  The release stated in part:

> ***Systemwide sales, including sales of both company and franchise stores, increased 37.5% to $154.4 million in the third quarter, compared with $112.3 million in the third quarter of fiscal 2001***.  Sales were driven by an increase in company store sales of 26.9% to $68.6 million and growth in franchise store sales of 47.5% to $85.8 million.  On a comparable store basis, systemwide store sales increased 13.6% and company store sales grew 11.1%.
>
> \*       \*       \*
>
> ***Net income for the third quarter was $6.5 million, an increase of 68.2% compared with $3.9 million in the third quarter last year.  Diluted earnings per share increased to $0.11 in the third quarter of fiscal 2002 from $0.07 per share in the prior year comparable period, a 63.2% gain versus last year***.
>
> \*       \*       \*
>
> ***Commenting on the third quarter results, Scott Livengood, Chairman, President and CEO of Krispy Kreme Doughnuts, Inc., said, "I am extremely pleased with our third quarter results and our continued momentum.  Business continues to be strong across all sales channels and across the country***.
>
> \*       \*       \*

- 36 -

> *The Company also indicated that, based on its performance in the*
> *third quarter and projections for the fourth quarter, it now expect to earn*
> *$.44 per fully diluted share, or $.02 above consensus, in the current fiscal*
> *year and $.61 per share, or $.02 above consensus, in FY2003. Finally, the*
> *Company increased its full year guidance on new store openings from 40 to*
> *43*.

Ex. 122.

79. <u>False and Misleading Statement</u>: On December 12, 2001, Krispy Kreme filed its Report on Form 10-Q for 3Q02. The Form 10-Q repeated the false financials reported in the November 15, 2001 press release. The Form 10-Q was signed by defendants Livengood and Tate.

**While Reporting False Financials, Krispy Kreme Promotes**
**Former PwC Executives into High Ranking Positions in**
**the Krispy Kreme Finance Department**

80. On January 30, 2002, the Company promoted defendant Casstevens to the position of Senior Vice President and CFO. Krispy Kreme stated in a press release of the same day that Casstevens worked in the audit practice of PwC (Krispy Kreme's outside auditors) for six years. In the same release, the Company announced the promotion of Sherry Luper to the position of Senior Vice President and that Ms. Luper had previously worked for PwC for ten years. The January 30, 2002 press release stated in part:

> The Company also announced the promotion of Randy Casstevens to the position of Senior Vice President and Chief Financial Officer. Mr. Casstevens joined Krispy Kreme in 1993 as Corporate Controller. He was instrumental in the Company's IPO in April 2000 as well as its secondary offering in February 2001. Prior to joining Krispy Kreme, Mr. Casstevens worked in the audit practice of PricewaterhouseCoopers, LLP for 6 years.

> Finally, the Company announced the promotion of Sherry Luper to the position of Senior Vice President of Human Resources. Ms. Luper joined Krispy Kreme last year as Vice President of Recruitment and Training, having most recently run her own business. Ms. Luper also directed recruitment and training at Inmar Enterprises. Prior to that she worked for PricewaterhouseCoopers, LLP for 10 years in various human resource roles.

- 37 -

Ex. 105.

81.     On January 31, 2002, the company announced the appointment of Sherry Polonsky to the position of Vice President of Finance and that she too had worked in the audit practice of PwC as Senior Audit Manager.

> Sherry Polonsky, our new VP of Finance, will also assist with our growth efforts. Her extensive experience at PricewaterhouseCoopers and subsequently at a much larger consumer products company with a significant international component, will be a key element in our efforts to continue growing in scale and geography over the coming years.

Ex. 106.

82.     <u>False and Misleading Statement</u>:   On February 12, 2002, Krispy Kreme announced preliminary fourth quarter FY02 results and confirmed earnings guidance for FY02 and FY03.  The release stated:

> ***Preliminary results indicated that total company revenues increased 40.3% in the fourth quarter of Fiscal Year 2002 to $114.9 million, while on a full year basis, total company revenues were up 30.4% to $392.2 million. System-wide sales for the fourth quarter of Fiscal Year 2002 were $182.6 million, an increase of 46.3%, while company store sales increased 31.9% to $75.4 million.  For the full Fiscal Year 2002, system-wide sales of $621.7 million rose 38.7% versus the same period a year ago.  Company store sales for all of Fiscal Year 2002 increased 24.6% when compared to the full fiscal year of 2001.***

Ex. 107.

83.     In light of the publicity surrounding the Enron accounting and bankruptcy scandal, Krispy Kreme and Livengood used the February 12, 2002 release to inspire investor confidence and the strength and accuracy of Krispy Kreme's balance sheet and financial reporting:

> "In the current economic climate, investors understandably are paying closer attention to the financial strength of their companies.  There is no reason for us to do anything that could be misinterpreted, regardless of how legal and

- 38 -

acceptable it may be. The perception and confidence of our investors and customers is more important than the propriety of accounting vehicles."

> **"Fortunately, Krispy Kreme's balance sheet and cash generation ability is very strong, and close scrutiny by investors works to our advantage**." Livengood went on to indicate that the Company's banks have approved conventional financing for this facility without use of the Company's cash or unused credit line, a further indication of the Company's financial strength.

*Id.*

84. <u>False and Misleading Statement</u>: On March 8, 2002, Krispy Kreme announced "record" sales and earnings for the fourth quarter of FY02. The release stated in part:

> **Total company revenues, which include sales from company stores, franchise operations, and Krispy Kreme Manufacturing and Distribution ("KKM&D"), rose 43.0% to $117.1 million in the fourth quarter, compared with $81.9 million in the fourth quarter of fiscal 2001. Sales from company stores increased 31.9% to $75.4 million; revenues from franchise operations were up 61.5% to $4.4 million; and KKM&D sales increased 69.3% to $37.3 million.**

> **Net income for the fourth quarter was $8.3 million, an increase of 94.2% compared with $4.3 million in the fourth quarter last year. Diluted earnings per share increased to $.14 in the fourth quarter of fiscal 2002 from $.08 per share in the prior year comparable period.** The Company has made an estimate of the impact of the 14th week on earnings. It estimates the impact at approximately $.01 per share. On this basis, a comparable 13-week fourth quarter fiscal 2002 earnings growth rate versus the same 13-weeks a year ago would be 73.3% rather than the 86.7% indicated by the unadjusted comparison.

*        *        *

> **The Company also provided guidance for fiscal 2003. Total diluted earnings per share for fiscal 2003 is expected to be $.62, above consensus by $.01. The Company indicated quarterly earnings guidance as follows: Q1 – $.14; Q2 – $.14; Q3 – $.16; Q4 – $.18. Regarding comparable store sales, the Company anticipates an average of 10% for the year with first quarter expectations of systemwide comparable store sales of 10%. Additionally, the Company anticipates opening 59 new stores in 15 new markets. Finally, the Company indicated that it expects to sign at least two**

- 39 -

*franchise agreements for development of international markets in fiscal 2003*.

Ex. 108.

85.    <u>False and Misleading Statement</u>:  On May 6, 2002, Krispy Kreme filed its Report on Form 10-K with the SEC for the FY02 ended February 3, 2002, including therein the Company's previously reported false FY02 financial results, accompanied by an unqualified audit report by PwC as to those financial results.[10]

86.    <u>Reasons Why Statements in ¶¶70-72, 75-79, 82, 84-85 Were False and Misleading</u>: The statements regarding the Company's quarterly and year-end financial results for its FY01 and FY02 revenue and earnings results were each false and misleading for all the reasons set forth below:

(a)    The Individual Defendants and PwC knew or recklessly disregarded that Krispy Kreme improperly accounted for Krispy Kreme's property and equipment leases and the related depreciation of the leased assets, as alleged *infra* in ¶¶345-354.  Specifically, Krispy Kreme used the initial lease term in determining whether to classify the leases as a

---

[10]    The PwC audit report stated as follows:

To the Board of Directors of Krispy Kreme Doughnuts, Inc.:

Our audits of the consolidated financial statements referred to in our report dated March 8, 2002, except Note 21 for which the date is March 27, 2002, appearing in the 2002 Annual Report to Shareholders of Krispy Kreme Doughnuts, Inc. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10-K) also included an audit of the financial statement schedule listed in Item 14(a)(2) of this Form 10-K.  *In our opinion, this financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements*.

Ex. 109.

- 40 -

capital lease or an operating lease[11] and in calculating its rent expense. Krispy Kreme depreciated the assets associated with the lease (buildings, leasehold improvements) over a period that included both the initial term of the lease and its option periods (or the useful life if shorter). By depreciating its leasehold assets over a period that includes both the initial term and the renewal options, Krispy Kreme violated GAAP and caused Krispy Kreme to understate depreciation expense for the affected periods and thus overstate earnings.

(b)     The Individual Defendants and PwC knew or recklessly disregarded that the Company's statements regarding Krispy Kreme's FY02 financials were false and misleading as the Company failed to consolidate the financials of its 57%[12] interest in New England Dough, its joint venture established in 2002, which was losing money as of its first fiscal year of operation and at the time had current liabilities of more than $7 million. The Company's failure to consolidate New England Dough's liabilities into its financials caused Krispy Kreme's reported FY02 earnings to be overstated in violation of GAAP as detailed in ¶¶324-336; and

(c)     Krispy Kreme improperly accounted for certain derivative transactions by failing to record mark-to-market adjustments in violation of GAAP, as analyzed fully in ¶¶355-358.

_____

[11]     Under GAAP, there are different methodologies used in accounting for leases available to lessees and to lessors. SFAS No. 13, *Accounting for Leases,* ¶6. In the case of a lessee, a lease can be classified as either a capital or an operating lease depending on the characteristics of the lease.

[12]     Upon the creation of New England Dough, Krispy Kreme acquired a 49% interest, which was increased on March 5, 2002, to 57%.

87.     The Company has also admitted that Krispy Kreme's reported FY01 and FY02 financial results may also be false and misleading for additional reasons including, but not limited to, the improper recognition of revenue in its KKM&D segment from the sale of equipment to franchises.   Specifically, Krispy Kreme recorded revenue from the sale of equipment at the time of shipment of the equipment to its franchises rather than at the time of installation and acceptance as is required by GAAP and SEC Staff Accounting Bulletin ("SAB") No. 101, as detailed in ¶¶302-304.  Ex. 99.

**Krispy Kreme Reports False Quarterly and
Year-End Financial Results for FY03**

88.     <u>False and Misleading Statement</u>:   On May 23, 2002, Krispy Kreme announced revenues and earnings for its first quarter FY03 again telling investors that its earnings exceeded First Call analyst consensus estimates.  For 1Q03, defendants claimed that "[o]n a comparable store basis, systemwide store sales increased 12.9% and company store sales were up 10.5%."  The release stated in part:

> *Net income for the first quarter increased 54.9% to $8.9 million compared with $5.7 million in the first quarter of Fiscal 2002.  Diluted earnings per share increased to $0.15 in the first quarter compared with $0.10 for the same period in Fiscal 2002*.

> *       *       *

> *The Company indicated that based on its performance in the first quarter, it now expects to earn $0.63 per fully diluted share or $0.01 above consensus for Fiscal Year 2003.  Quarterly earnings guidance is as follows*: *Q2 – $0.14; Q3 – $0.16; Q4 – $0.18.  The Company anticipates systemwide comparable store sales of 10% for the year and second quarter expectations of 10%*.

Ex. 110.

89.     <u>False and Misleading Statement</u>:  On June 19, 2002, Krispy Kreme filed its Report on Form 10-Q for 1Q03.  The Form 10-Q repeated the false financials reported in the

- 42 -

May 23, 2002 press release. The Form 10-Q was signed by defendants Livengood and Casstevens.

90. <u>False and Misleading Statement</u>: On August 29, 2002, the Company issued a press release announcing revenues and earnings for its second quarter FY03. Krispy Kreme reported earnings $0.15 per share exceeding First Call analyst consensus estimates. The Company also raised FY03 earnings projections above current consensus estimates. For 2Q03, the Company also stated that sales continued to grow claiming that, "[o]n a comparable store basis, systemwide store sales increased 12.8% and company store sales were up 13.5%." The release stated in part:

> *Net income for the second quarter increased 49.8% to $8.9 million compared with $5.9 million in second quarter of Fiscal 2002. Diluted earnings per share increased to $0.15 in the second quarter compared with $0.10 for the same period in Fiscal 2002.*
>
> \*     \*     \*
>
> *The Company indicated that based on its performance in the first six months of Fiscal 2003, it now expects to earn $0.64 per fully diluted share or $0.01 above consensus for Fiscal Year 2003. Quarterly earnings guidance for the remainder of Fiscal 2003 is as follows: Q3 – $0.16; Q4 – $0.18. The Company anticipates systemwide comparable store sales of 10% for the year and third quarter expectations of 10%.*

Ex. 111.

91. <u>False and Misleading Statement</u>: On September 18, 2002, Krispy Kreme filed its Report on Report on Form 10-Q for 2Q03. The Form 10-Q repeated the false financials reported in the August 29, 2002 press release. The Form 10-Q was signed by defendants Livengood and Casstevens, who also filed certifications in accordance with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §§302 and 906.

- 43 -

92.  <u>False and Misleading Statement</u>:  On November 22, 2002, Krispy Kreme

issued a press release, announcing revenues and earnings for its third quarter fiscal 2003.

The Company reported that its EPS of $0.17 exceed First Call analyst estimates.  The press

release stated in part:

> *Net income for the third quarter increased 56.3% to $10.1 million compared with $6.5 million in third quarter of Fiscal 2002.  Diluted earnings per share increased to $0.17 in the third quarter compared with $0.11 for the same period in Fiscal 2002.*

> *Total company revenues, which include sales from company stores, franchise operations, and Krispy Kreme Manufacturing and Distribution ("KKM&D"), rose 29.4% to $129.1 million, compared with $99.8 million in the prior year comparable period.  Sales from the company stores increased 15.1% to $79.0 million; revenues from franchise operations grew to $4.9 million, up 47.0%; and KKM&D sales increased 62.6% to $45.2 million.*

> *Systemwide sales, including sales of company and franchise stores, were $195.3 million in the third quarter, a 26.5% increase compared with $154.4 million in the third quarter of Fiscal 2002.  Sales were driven by an increase in company store sales of 15.1% to $79.0 million and an increase in franchise store sales of 35.6% to $116.3 million.  On a comparable store basis, systemwide store sales increased 10.1% and company store sales were up 13.0%.*

> *Net income for the nine months was $27.8 million, a 53.7% increase compared with $18.1 million in the same period last year.  Diluted earnings per share increased to $0.47 in the first nine months of the year from $0.31 per share in the same period a year ago.*

> *Total Company revenues increased 28.0% to $354.8 million in the first nine months of the year compared with $277.3 million for the same period in Fiscal 2002.  Sales from company stores increased to $227.9 million, a 19.4% increase; franchise operations increased 45.9% to $14.0 million; and KKM&D increased 46.9% to $112.9 million.*

> *For the nine months ended November 3, 2002, systemwide sales increased 28.7% to $565.3 million from $439.1 million for the same period in Fiscal 2002.  This increase was a result of growth in franchise store sales of 35.9% to $337.4 million and a 19.4% increase in company store sales to $227.9 million.*

> *Commenting on the Company's third quarter results, Scott Livengood, Chairman, President and Chief Executive Officer of Krispy*

*Kreme Doughnuts, Inc.* said, *"Our fundamentals remain extremely strong, and we have delivered solid results for this extremely active third quarter. During the quarter, we completed a systemwide roll-out of a new line of signature coffee blends, which has already been met with extremely positive customer response*."

Ex. 123.

93.    <u>False and Misleading Statement</u>:  On December 18, 2002, Krispy Kreme filed its Report on Form 10-Q for 3Q03.  The Form 10-Q repeated the false financials reported in the November 22, 2002 press release.  The Form 10-Q was signed by defendants Livengood and Casstevens who also filed certifications in accordance with Sarbanes-Oxley, §§302 and 906.

94.    <u>Reasons Why Statements in ¶¶88-93 Were False and Misleading</u>:   The Indvidual Defendants and PwC knew or recklessly disregarded that Krispy Kreme's statements regarding its 1Q03, 2Q03 and 3Q03 earnings results were each false and misleading for all of the reasons set forth below:

(a)    First, Krispy Kreme failed to consolidate into its publicly reported financials its 57% interest in New England Dough, its joint venture established in 2002, which was losing money as of its first fiscal year of operation and at the time had current liabilities of more than $7 million.  The Company's failure to consolidate New England Dough's liabilities caused its FY02 and 1Q03 and 2Q03 publicly reported earnings to be overstated in violation of GAAP as detailed in ¶¶324-336.

(b)    Krispy Kreme also improperly accounted for its property and equipment leases and the related depreciation of the leased assets, as alleged *infra* in ¶¶345-354.  Krispy Kreme's failure to appropriately account for the depreciation of its leasehold assets over the appropriate period of time also caused the Company's earnings to be

- 45 -

overstated.  By depreciating its leasehold assets over a period that includes both the initial

term and the renewal options, Krispy Kreme violated GAAP.  This caused Krispy Kreme to

understate depreciation expense for the affected periods and thus overstate earnings.

(c)     The Company has also admitted that Krispy Kreme's quarterly and

FY03 financial results were also false and misleading for additional reasons, including, but

not limited to, the improper accounting for certain derivative transactions by failing to record

mark-to-market adjustments in violation of GAAP[13] and the improper recognition of revenue

in its KKM&D segment of the sale of equipment to franchises, as discussed in ¶¶302-304,

355-358.  Ex. 99.

(d)     Krispy Kreme and the Individual Defendants' false and misleading

statements concerning the Company's financial condition caused the market price of Krispy

Kreme stock to be artificially inflated.

---

[13]     Under GAAP, as set forth in FAS 133, "[t]he gain or loss on a derivative instrument
not designated as a hedging instrument shall be recognized currently in earnings."  Basically,
at the end of a reporting period, a company is required to record adjustments that are
recognized in its current period earnings in order to mark or adjust the value of the derivative
instrument to its then current market value (*i.e.*, to mark it to market value or mark-to-
market).  FAS 133, ¶18.

Here, Krispy Kreme failed to record the gain or loss on certain derivative transactions
in its reported earnings during the Class Period.  It failed to mark the value of certain of its
derivative instruments to their market value at the end of the reporting periods as required.

Krispy Kreme has indicated that it will restate its financial statements due to this
GAAP violation, reducing its pretax income for years prior to FY04 by approximately $0.2
million and reducing its 1Q05 and 2Q05 results by $0.4 million and $1.0 million,
respectively, and by increasing its pretax income for fiscal year ending 2004 and 3Q05 by
approximately $1.2 million and $0.2 million, respectively.

95.     Between November 4, 2002 and November 26, 2002, defendants Livengood and Tate dumped 428,064 shares and 30,000 shares of Krispy Kreme stock at inflated prices, reaping over $15.3 million and $1.07 million in illegal insider stock sales, respectively.

**Krispy Kreme Buys Failing Bread Company Montana–**
**Pays Defendant Tate for His Stake in the Failing Business**

96.     <u>False and Misleading Statement</u>: On January 24, 2003, Krispy Kreme issued a press release, announcing the acquisition of Montana Mills for approximately 1.2 million shares of Krispy Kreme common stock. Ex. 6. Montana Mills was a specialty bread and baked goods franchise based in Rochester, New York, with 30 stores. Notably, defendant Tate, at the time of the announced acquisition, was a member of the Board of Directors of Montana Mills and owned 13,333 shares of Montana Mills stock. Ex. 7. In the press release, Livengood bragged that the Montana Mills acquisition created a second avenue to leverage Krispy Kreme growth. Ex. 6. Livengood also stated that the Company would spend two years fully developing the wholesome bakery and café concept the "Krispy Kreme way." *Id.* The press release stated in part:

> Livengood added, "***The opportunity to create a wholesome, fresh-baked bakery and cafe concept the 'Krispy Kreme way' is obviously unique to Krispy Kreme***. . . . ***In Montana Mills, we found the perfect foundation for this new concept – passionate bread bakers who have created a fiercely loyal customer following around a wide variety of fresh-baked goods*** . . . .

> *         *         *

> "Asked about the timing of this move, Livengood indicated, "***I expect we will spend in the range of two years fully developing the concept I described. As we have indicated regarding our international expansion, we will always try to prepare for any type of expansion well before we need the***

*growth. We want the time to do it right. For this concept, I think that time is now*."[14]

*Id.*

97. <u>False and Misleading Statement</u>: On February 14, 2003, Krispy Kreme issued a press release reporting false year end and 4Q03 revenue and earnings results, in which the Company stated that it was experiencing strong sales growth across its entire Company system including comparable store sales. The Company also falsely stated that every aspect of its business was performing at record levels, stating: "Systemwide Comps of 11.8%; Initial FY 2004 Guidance Exceeds Consensus by $0.03," and that:

> The Company indicated that *top line growth and business momentum continued to be very strong, driven by comparable store sales growth and new store openings*. . . . "While comparable store sales were robust across our entire system, we were especially pleased with the very strong company store showing. Our area developer comps also continue to gain strength."

> \*      \*      \*

> Commenting on the coming year's earnings, Livengood indicated, *"Our business momentum continues to be very strong. We see no abatement from the strong top line results of the past year. Every segment of our vertically integrated business model is performing at record levels.*

Ex. 9.

98. Investors quickly absorbed this news from Krispy Kreme and the Company's stock price spiked from $31.15 per share on February 14, 2003, to $33.35 per share on February 21, 2003. Ex. 10.

---

[14] On February 25, 2003, Krispy Kreme filed its Form S-4 (amended on March 6) with the SEC, registering 1.2 million shares of Krispy Kreme securities to be issued in the acquisition of Montana Mills. The February 25, 2003 Form S-4 reiterated the false financial results previously reported for FY02-FY03. Ex. 8. On April 7, 2003, the Company issued 1.2 million shares of its common stock at a value of $39 million to acquire Montana Mills.

99.     On February 19, 2003, consistent with its well-publicized growth and reacquisition strategy, Krispy Kreme announced that it would acquire the rights to the Kansas (Kansas City, Kansas) markets – consisting of five stores.  Ex. 11.  While the Company did not disclose the agreed-upon purchase price, the Company assured investors that the acquisition would be accretive in the current fiscal year, FY04:

> Krispy Kreme Acquires Kansas Market; Franchisee to Join Krispy Kreme Management Team
>
> Krispy Kreme Doughnuts, Inc. (NYSE:KKD) announced today an agreement to acquire the Kansas City, KS, Wichita, KS, Topeka, KS and Springfield, MO markets. . . . **The Company did not disclose the purchase price, but did indicate it expects to pay cash and that the acquisition would be accretive in Fiscal Year 2004, which began February 3, 2003**.

*Id.*

100.     <u>False and Misleading Statement</u>: On March 18, 2003, the Company hosted a conference call for analysts and investors to discuss its 4Q03 and FY03 revenues and earnings.  The call was led by defendants Livengood, Tate and Casstevens.  The Company repeated the false revenues and earnings initially announced in a February 14, 2003 press release (excerpted above at ¶97) and reiterated its FY04 earnings forecast of at least $0.88 per share – $0.02 per share above First Call consensus estimates of $0.86 per share.  Finally, defendants assured investors again of the current and future value of the Montana Mills acquisition, promising break-even results for the unit in 2004:

> ***System wide sales increased 25.9%, $213.3 million.  Company store sales increased 30.8%, $91.7 million.  Earnings increased 46.7% to $11.3 million.  Earnings per share were 19 cents compared to 13 cents last year***.
>
> \*     \*     \*
>
> ***We expect FY '04 to be another strong year with earnings that will meet or exceed 88 cents per share which is 2 cents above the consensus estimate.  And while we've never issued guidance for system wide sales, there is an***

*expectation that it will grow at a rate of 30%. This has been and remains a fair expectation*. . . .

        \*       \*       \*

*Guidance quarter by quarter for FY '04 is as follows: EPS for the first two quarters will be 20 cents in each quarter, EPS for the 3rd quarter approximately 22 cents. EPS for the 4th quarter will be 26 cents. New store openings for FY '04 are projected to be 77 new openings in 17 new markets*. . . .

        \*       \*       \*

*Additional guidance points are as follows: We expect the results of Montana Mills to be break even for FY '04.*

Ex. 12.

    101.   <u>False and Misleading Statement</u>: On March 18, 2003, J.P. Morgan Securities, Inc. ("J.P. Morgan") issued a research report on the Company's fourth quarter financials repeating the Company's FY04 guidance:

Krispy Kreme Doughnuts (Neutral)
4Q Sales Light, F04 Increasingly Difficult To Exceed

        \*       \*       \*

*KKD reported 4Q (13 weeks) operating EPS of $0.19, versus $0.14 last year (14 weeks), above pre-released and consensus expectations of $0.18*. . . .

        \*       \*       \*

*Although the company highlighted that its F04 guidance of $0.88 is $0.02 above the current consensus estimate*, there was no change from previous guidance issued on February 14. Guidance continues to reflect 10% systemwide comps and 77 new units. *In addition, the company continued to support a goal for 30% systemwide sales growth.*

Ex. 13.

    102.   <u>Reasons Why Statements in ¶¶97, 100-101 Were False and Misleading</u>: The February 14, 2003 press release reporting Krispy Kreme's FY03 year end and 4Q03 financial results (also reported in the Company's May 2, 2003 Form 10-K), the subsequent March 18,

- 50 -

2003 conference call stating that the Company's business momentum and earnings continued to be very strong and that every segment of the Company's business model was performing at record levels were each false and misleading for all of the reasons set forth below:

(a)      The Individual Defendants and PwC knew or recklessly disregarded that the Company failed to consolidate its interest in New England Dough, its joint venture established in 2002, which at the time had current liabilities of more than $7 million.   In FY03, New England Dough lost more than $800,000.  The Company's failure to consolidate New England Dough's franchise financials and liabilities caused its 4Q03 and FY03 earnings to be materially overstated in violation of GAAP as detailed in ¶¶324-336

(b)      The Company also improperly accounted for property and equipment leases, leasehold improvements and the related depreciation of the leased assets, as alleged *infra* in ¶¶345-354.

(c)      The Company has also admitted that Krispy Kreme's FY03 financial results may also be false and misleading for additional reasons including, but not limited to, improper accounting for certain derivative transactions by failing to record mark-to-market transactions in violation of GAAP and the improper recognition of revenue in its KKM&D segment from the sale of equipment to franchises, as discussed in ¶¶302-304, 355-358.  Ex. 99.  Specifically, Krispy Kreme was recording revenue from the sale of equipment at the time of shipment instead of the time of installation and acceptance by the customer as is required by SAB No. 101.

(d)      In addition to the false financial reports, the Company's statements regarding the future strength of the Company and Montana Mills were false and misleading. CWs disclosed in detail, *infra* at ¶112, Krispy Kreme and the Individual Defendants knew

- 51 -

the Company's aggressive growth strategy of opening new stores to maintain revenue and earnings growth had already resulted in market saturation and depleted sales from its existing stores which worsened with the opening of every new Krispy Kreme store. For example, as CW12, former general manager within the Great Circle franchise, reported, sales in one Krispy Kreme store had declined 80% between 1999 and the present. This, according to CW12, was due to market saturation.

**Defendant and CFO Casstevens Removed as CFO – Company Falsely Assures Investors of Stronger Corporate Governance**

103.    On April 9, 2003, Krispy Kreme announced that defendant Casstevens would resign as CFO, and would instead, serve as Chief Governance Officer ("CGO"). Ex. 14. The reasoning, according to Livengood, was "*[a]s we have intensified our governance examination* over the past year, Randy [Casstevens] has demonstrated clear leadership and developed a depth of knowledge in this important area which will serve us well. In this new era of scrutiny, this is another in a series of efforts to assure that we retain the trust and confidence of our investors and the public."[15] *Id.*

104.    <u>False and Misleading Statements</u>:  On May 2, 2003, the Company filed its Report on Form 10-K for the fiscal year ending February 2, 2003 with the SEC. The Form 10-K was signed by defendants Livengood, Casstevens and McAleer included certifications

---

[15]    On April 9, 2003, the Company officially removed Frank E. Guthrie ("Guthrie"), Robert L. McCoy ("McCoy") and Steven D. Smith ("Smith") from the Board of Directors stating that it wanted to assure that fully independent directors comprised the voting majority of the Board. *Id.* Instead, Smith was to act as an "emeritus" or non-voting director. The Company also reported later (May 28, 2003 conference call) that while Guthrie, McCoy and Smith were no longer Board members, each would continue to operate their respective Krispy Kreme franchises. *See* Ex. 15.

of Livengood and Casstevens in accordance with Sarbanes-Oxley, §§302 and 906, attesting to the accuracy of the financial results. Ex. 112. The Form 10-K also included the unqualified audit report of PwC regarding the fair presentation of the Company's financial statements.[16] The Form 10-K repeated the false financial results for FY03, and was false and misleading for all of the reasons set forth in ¶102, above.

105. The May 2, 2003 Report on Form 10-K further stated that Krispy Kreme's earnings prospects and business momentum were strong and that its doughnut sales growth would continue in strength due to "increased snack food consumption and growth in doughnut purchases." Ex. 4.

> ***We expect doughnut sales to grow due to a variety of factors, including the growth in two-income households and corresponding shift foods consumed away from home, increased snack food consumption and further growth of doughnut purchases from in-store bakeries***.

*Id.*

---

[16]    Our audits of the consolidated financial statements referred to in our report dated March 13, 2003 appearing in the 2003 Annual Report to Shareholders of Krispy Kreme Doughnuts, Inc. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10-K) also included an audit of the financial statement schedule listed in Item 15(a)(2) of this Form 10-K. In our opinion, this financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Greensboro, North Carolina

Ex. 112.

**Krispy Kreme Actually Knew of Each of Its
Franchisees' Daily Sales and Inventory Conditions**

106.    The May 2, 2003 Report on Form 10-K also assured investors that the

Company could and did closely monitor both on-premises and off-premises sales, thus

providing the Company "daily" communication with its stores and area developers and

pooled sales information allowing defendants to analyze sales data:

> *Krispy Kreme has a management information system that allows for the rapid communication of extensive information among our corporate office, support operations, company stores, associates and area developers. Our franchisees and other affiliates connect to this system through our Intranet and have access to e-mail and the ability to provide financial reporting.*

> \*      \*      \*

> *All company stores have been retrofitted with a Windows NT-based point of sale, or POS, system.  This POS system provides each store with the ability to more closely manage on-premises and off-premises sales while providing a kiosk into our Intranet.  We poll the sales information from each store's POS system, which gives us the ability to analyze data regularly.  Daily two-way electronic communication with our stores permits sales transactions to be uploaded and price changes to be downloaded to in-store POS servers.*

> *Direct store delivery sales operations have access to an internally-developed route accounting system networked into the corporate Intranet. Information from these systems is polled at multiple times weekly and aggregated into the corporate manufacturing data warehouse.*

Exs. 4, 16.

**Krispy Kreme Reports False 1Q04 Financial Results
and Raises Guidance, Despite Known Slowing Sales**

107.    <u>False and Misleading Statement</u>: On May 28, 2003, Krispy Kreme issued a

press release reporting false 1Q04 revenue and earnings results.  The Company again

reported double digit sales and net income which allowed Krispy Kreme to beat First Call

analysts' forecasts by one penny.  This announcement marked the eleventh consecutive

- 54 -

quarter that Krispy Kreme beat analyst's expectations. The report was entitled, "Krispy Kreme Earnings Exceed Consensus EPS Increases 45%; Systemwide Comp Store Sales Up 11.2% Fiscal Year 2004 Earnings Guidance is Increased to $0.90," and reported its 1Q04 financial results. Ex. 19. The press release also stated in part:

> **Net income for the first quarter increased 48.3% to $13.1 million compared with $8.9 million in the first quarter of Fiscal 2003. Diluted earnings per share increased to $0.22 in the first quarter compared with $0.15 for the same period in Fiscal in Fiscal 2003 . . . .**

> \*    \*    \*

> **Systemwide sales, including sales of company and franchise stores, advanced 24.4% to $227.8 million in the first quarter compared with $183.1 million in the first quarter of Fiscal 2003. Sales were driven by an increase in company store sales of 37.8% to $102.2 million and an increase in franchise store sales of 15.3% to $125.6 million. On a comparable store basis, systemwide store sales increased 11.2% and company store sales were up 15.4%.**

> Commenting on the Company's financial performance, Scott Livengood, Chairman, President and Chief Executive Officer of Krispy Kreme Doughnuts, Inc. said, "**Our business momentum continues and our first quarter results give us a strong start to our Fiscal Year 2004. In spite of a challenging environment for most retail businesses, we produced systemwide sales of $228 million and net income growth of 48%. I am very proud of these results**."

*Id.*

108. <u>False and Misleading Statements</u>: On the same day, May 28, 2003, Krispy Kreme held a conference call for analysts and investors during which the Company and the Individual Defendants repeated the false 1Q04 revenue and earnings results. The call was hosted by defendants Livengood, Tate and Casstevens. Despite declining sales reported by CWs and actually known by Krispy Kreme and the Individual Defendants, the Company also announced that it was **raising** its FY04 earnings forecast an additional $0.02 per share from

- 55 -

$0.88 per share, to $0.90 per share. Finally, the Company reiterated and falsely assured investors that the Montana Mills acquisition would report break-even results in FY04:

> *For the remainder of the year we are forecasting system-wide sales growth to be in a range of 25 to 30% because [of] new store openings and the timing of openings in the quarter . . . .*
>
> *While we believe there is possible upside to this range, we are confident that we will deliver our new earnings commitment of 90 cents per share within this range of sales growth.*
>
> *  *  *
>
> *As John mentioned earlier, or as I mentioned earlier, we expect system-wide sales growth to range between 25 and 30% although we believe there is upside to this metric. With the two cents out performance in this quarter . . .full year earnings per share for fiscal 2004 are now projected to be 90 cents per share, 3 cents ahead of currents consensus.*
>
> *Guidance quarter-by-quarter for the remainder of FY '04 is as follows: EPS for the second quarter of 20 cents, EPS for third quarter of 22 cents and EPS for the fourth quarter 26 cents.*
>
> *New store openings for FY '04 are projected to be 77 new openings in 17 new markets.*
>
> *  *  *
>
> *Additional guidance points are as follows: we expect the results of Montana Mills to be breakeven for fiscal '04.*

Ex. 15.

109. The next day, May 29, 2003, *The Wall Street Journal* reported on Krispy Kreme's huge 1Q04 48% earnings growth and the increase in the Company's earnings outlook:

> Food Brief – Krispy Kreme Doughnuts Inc.: Fiscal First-Quarter Earnings Rose 48% on Strong Revenue
>
> *Krispy Kreme Doughnuts Inc.'s fiscal first-quarter earnings surged a better-than-expected 48%, thanks to strong sales, and the company boosted its full-year earnings forecast.*

- 56 -

Ex. 22.

110.    <u>False and Misleading Statement</u>:  On June 18, 2003, Krispy Kreme filed its Report on Form 10-Q for 1Q04.  The Form 10-Q repeated the false financials reported in the May 28, 2003 press release.  The Form 10-Q was signed by defendants Livengood and Casstevens, who also filed certifications in according with Sarbanes-Oxley, §§302 and 906.

111.    <u>Reasons Why Statements in ¶¶107-108, 110 Were False and Misleading</u>: Krispy Kreme and the Individual Defendants' statements in the May 28, 2003 press release and during the conference call reporting Krispy Kreme's false fiscal 1Q04 financial results, projecting sustained record growth, and representing that the Montana Mills acquisition would be profitable and contribute to Krispy Kreme's future growth were false when made in light of the true circumstances known to the Company and reported by multiple CWs detailed below:

(a)    Krispy Kreme and the Individual Defendants' statements that, "assets when compared to the end of the fourth quarter of FY03 increased by a net of $64.2 million, [were] primarily the result of amounts assigned to reacquired franchised rights for goodwill for Kansas City and Montana Mills acquisitions, respectively," were also false and misleading.  In fact, the Company knew, but failed to disclose, that at the time Montana Mills was acquired, the assets were already impaired.  Krispy Kreme had both overpaid for Montana Mills, and should have taken a significant asset impairment charge immediately. For example:

- For the quarter ending October 30, 2002, Montana Mills had incurred at least eight straight quarters of operating losses during the previous quarters;

- For the quarter ending October 30, 2002, Montana Mills' net book value was $12.6 million, most of which was due to the funds raised in the Company's IPO in June 2002;

- 57 -

- For the quarter ending October 30, 2002, Montana Mills' operations resulted in at least eight consecutive quarters of negative cash flow from operations; and

- On March 19, 2003 (two weeks before the deal closed), Montana Mills announced that it was going to close nine of its 31 stores as they were either underperforming and/or in markets where the Company's penetration was generally weak.

(b)    The Company's 1Q04 earnings were overstated in violation of GAAP because defendants failed to properly account for reacquired franchise rights by overpaying for the franchises apparently to line the pockets of insiders, then failing to write down known asset impairments failing to amortize intangible assets, as detailed *infra*, at ¶¶247-291.

(c)    The Company's 1Q04 reported financial results were also false because the Company had improperly accounted for property and equipment leases and the related depreciation of the leased assets, as alleged *infra* at ¶¶345-354, causing its 1Q04 EPS and assets to be misstated.

(d)    Krispy Kreme improperly recognized revenue in its KKM&D segment for sales of equipment to franchises prior to its being earned and realizable in violation of GAAP and SAB No. 101.

(e)    Krispy Kreme improperly accounted for certain derivative transactions by failing to record mark-to-market adjustments in violation of GAAP, as analyzed fully in ¶¶355-358.

(f)    The Company failed to consolidate the failing New England Dough franchise, despite having the requisite ownership and control, and knowledge that New England Dough had current liabilities of and had in fact lost .8 million in FY03 as discussed *infra* at ¶¶324-336.

(g) Krispy Kreme's 1Q04 financial results were also false and misleading because defendants failed to properly account for the Company's allowance for doubtful accounts, related to receivables by its struggling franchises, as discussed *infra*, at ¶¶292-301. Specifically, while Krispy Kreme's receivables increased substantially during the Class Period, its allowance for doubtful accounts actually decreased.

112. In addition to the false 1Q04 financial results, the Company's statements of sustained and projected sales growth were also false and misleading as reported by multiple former Krispy Kreme employee witnesses who disclosed that throughout the Class Period, sales growth had been severely declining and defendants knew it. For example:

(a) According to CW1, a former Krispy Kreme general manager in North Carolina, she/he recognized Krispy Kreme's doughnut sales and profits in his/her store began to decline starting January 2003. According to CW1, Krispy Kreme executives actually knew of declining sales because CW1 reported his/her store sales figures to the Krispy Kreme headquarters daily and provided inventory reports weekly. CW1 further reported that the sales decline extended beyond the store that she/he managed and specifically noted that a nearby satellite store in Meyers Park, North Carolina, which the Company opened in January 2002, only lasted two years before being shut down due to lack of sales. *See also* Ex. 17 (*BusinessWeek* article corroborating CW1's account). According to CW1 the decline in sales was not due to the low carb diet trend because if that were the case, bakeries other than Krispy Kreme would have been affected.

(b) CW4, a former payroll clerk for the Dough-Re-Mi franchise consisting of seven Krispy Kreme stores in Michigan, corroborates CW1's report of the dramatic sales decline and specifically reported that even before January 2003, sales had shrunk so low that

the Dough-Re-Mi franchise was unable to comply with its franchise agreement with Krispy Kreme, which required it to open a number of Krispy Kreme stores mandated under its franchise agreement. CW4 explained that Krispy Kreme headquarters knew of the Dough-Re-Mi financial problems and had specifically recommended to Dough-Re-Mi that in lieu of opening new stores, Dough-Re-Mi expand to include off-premises sales. According to CW4, this expansion led directly to market saturation in the Michigan area, further cannibalizing store sales.

(c)     CW4 further disclosed that Dough-Re-Mi was suffering serious financial difficulties such that the franchise owed money to Krispy Kreme on open invoices, and that Dough-Re-Mi had to borrow money from Krispy Kreme's headquarters to pay certain of its expenses. Indeed, the Company's corporate officers knew of the weak financial performance of the Dough-Re-Mi franchise, because according to CW4, during his/her tenure at Dough-Re-Mi, the franchise submitted its financials to defendant Livengood on a monthly basis pursuant to the franchise agreement. *See also* Ex. 18 (*The Wall Street Journal* article discussing debt owed to Krispy Kreme by Dough-Re-Mi).

(d)     CW5 is a former Krispy Kreme corporate trainer and was responsible for opening numerous Krispy Kreme stores in Colorado and the southwestern United States. CW5 was also responsible for hiring and training office and personnel management, tracking register procedures and customer service. CW5 received his/her training at Krispy Kreme University. CW5 explained that it was typical for Krispy Kreme stores to experience a decline in sales after each store was opened. However, CW5 reported that she/he recognized even greater declines once Krispy Kreme entered into off-premises sales, which contributed to market saturation. CW5 further revealed that inventory, sales, and P&L reports detailing

- 60 -

store sales were provided to Krispy Kreme headquarters every Monday. CW5 explained that at every Krispy Kreme store, sales reports were generated nightly that tracked the amount of product being sold each day and that Krispy Kreme corporate had 24-hour access to the computer systems of all Krispy Kreme stores. *See* Exs. 4, 16 (describing Krispy Kreme computer information systems).

(e)     CW12, a former general manager within the Great Circle, the Company's large Southern California franchise, reported a continual decline in sales in several of the franchise's stores during his/her tenure and during the Class Period. CW12 explained, for example, that the Claremont Mesa store's weekly sales declined 80% between 1999 and the present – plummeting from $100,000 in weekly sales to only $20,000. The Sports Arena store sales declined 13% between August 2002 and 2004. CW12 reported that she/he knew of this trend because as general manager, she/he had access to P&L statements for the retail stores in the Great Circle franchise. According to CW12, the sales decline was the result of market saturation once Krispy Kreme products became available off-premises.

(f)     CW12 confirmed that wholesale, *i.e.,* off-premises, customers of the Great Circle franchise only sold 50% of the doughnuts that they were contractually obligated to purchase. CW12 explained that the franchise, therefore, consistently bought back the remaining 50%. Notwithstanding, CW12 revealed that Krispy Kreme recognized revenue on 100% immediately notwithstanding the imminent return of 50%.

(g)     CW3, a former Golden Gate Vice President of Finance – further corroborates CW1, CW4 and CW12 and reported Golden Gate experienced significant sales declines throughout FY04 (February 2, 2003-February 1, 2004). According to CW3, Krispy Kreme headquarters dictated the quarterly forecasts for the Golden Gate franchise and CW3

provided Krispy Kreme headquarters with monthly reports identifying that actual sales were below those projected by headquarters. According to CW3, during CW3's tenure, Krispy Kreme headquarters consistently set unrealistic high sales projections for the Golden Gate franchise, and during FY04, Golden Gate repeatedly failed to meet monthly projections.

(h)     Specifically, CW3 explained that Krispy Kreme based sales projections nationwide on a "warped" idea of how many doughnuts people eat in a year. According to CW3, Krispy Kreme estimated 12 doughnut transactions in a year for every 1,000 people, however, CW3 stated Californians only averaged 3-½ doughnut transactions. As a result, CW3, along with the owner of the franchise, Brad Bruckman, submitted to Krispy Kreme headquarters monthly "re-projections" to show reduced actual sales projections based upon Golden Gate's actual sales experience versus the Krispy Kreme corporate offices' inflated projected sales.

(i)     With regard to doughnut sales, CW3 explained that sales were declining in Northern California because the Krispy Kreme doughnut market at least in Northern California was saturated. Specifically, CW3 explained that the Company's off-premises sales were continually cannibalizing retail sales. CW3 explained that overall, retail sales were typically down 30% each month from the previous year. Ultimately, according to CW3, the Golden Gate franchise missed its FY04 sales forecast by $3 million. CW3 further stated that Golden Gate's balance sheet reflected that Golden Gate was low on cash due to poor sales, and Krispy Kreme actually knew of Golden Gate's financials because CW3 provided monthly financial statements for Golden Gate to Mills, Krispy Kreme's Director of Joint Venture Accounting. Moreover, Krispy Kreme headquarters guaranteed any loans taken by Golden Gate – with Mills and defendant Casstevens signing off on the loans.

- 62 -

(j)     According to CW3, she/he began calculating comparable store sales for Golden Gate and forwarding these figures to Mills on Excel spreadsheets every month. CW3 was also responsible for compiling and submitting the P&L statement, balance sheet, trial balance and statement of cash flows on a monthly basis to Krispy Kreme headquarters. Based on the results, CW3 stated that she/he did not know how Krispy Kreme was able to report double digit comp store sales.

(k)     CW14, a former general manager for Colorado stores of the Glazed Investments franchise, reported that Glazed Investments suffered reduction in retail sales franchise-wide by 50% during his/her tenure and the Class Period and that she/he believed that the decline in sales growth in his/her region was also due to market saturation. During CW14's tenure (2001-2003), the franchise stores started to sell doughnuts to grocery and convenience stores. As a result, CW14 explained that typical Colorado Krispy Kreme retail sales plummeted 50% – from $50,000 per week to $25,000.

(l)     CW15, a former general manager of the Sweet Traditions Krispy Kreme franchise in Illinois, further recounts management's unsuccessful attempts to mask declining sales growth by saturating the market. CW15 explained that while the expansion into off-premises sales was supposed to increase sales, it ultimately decreased profits. CW15 described off-premises business as "the easy way out" instead of directly addressing declining sales growth at the retail store level. In CW15's experience, a franchise would experience an increase in sales in the first year after entering the off-premises sales, but sales would flatten in the second year. CW15 also noted that the expansion into the off-premises sales market caused same-store sales (under the traditional model – not management's

revised model) to decrease by 30%-40%. According to CW15, the market for which she/he was responsible became saturated upon expansion into the wholesale market.

(m)     CW16, a former Director of Real Estate for the KKNY franchise, corroborated the decline in sales during the Class Period. According to CW16, KKNY had eight to ten retail stores when she/he was hired, but KKNY was obligated to open eight to ten more stores under the franchise agreement with Krispy Kreme. CW16 was hired to aid in the process of opening the additional stores. CW16 explained, however, that KKNY was in violation of the franchise agreement because it had failed to open the requisite number of stores. CW16 further explained that this was in part due to declining sales. CW16 attended weekly staff meetings with the President of KKNY, Joe Morgan, President of Restaurant Associates, Nick Valenti, Krispy Kreme Divisional Director, Glen Dorman, and Krispy Kreme Vice President of Operations, Stephen Gorman. CW16 revealed that the declining sales and non-compliance with the franchise agreement were discussed in these meetings. In fact, according to CW16, Krispy Kreme threatened to "take back" the franchise if KKNY did not open the required additional stores. When CW16 left the Company in July 2003, she/he stated that sales had declined 8%-10% from the previous year. CW16 explained that Krispy Kreme did not have a plan to address the decline in sales except to continue opening new retail stores.

113.     Thus, at the same time that defendants stated that FY04 would be another year of record profits and Montana Mills would report break-even results or even a profit, Krispy Kreme and the Individual Defendants actually knew that sales growth at Company-owned and franchise stores were slowing significantly.

- 64 -

**Krispy Kreme Conveniently Manipulated the**
**Same-Store Sales Metric to Disguise Slow Sales**

114.     Same-store sales, or "comps," measure sales growth at store sites that have

been open for more than a year.  Ex. 21.  Analysts and investors rely heavily on same-store

sales as it is the most effective way to measure the strength of the Company's existing stores

and therefore its overall financial health.   Rising comps mean that sales are increasing

without the added costs associated with new stores.  The whole point of comps is to measure

the strength of a company's existing stores.  Including new stores in the analysis defeats the

purpose.  *Id.*

115.     Including sales at stores that are not in the comp base distorts the revenue

picture and makes it impossible for investors to confirm same-store figures.

116.     In order to disguise the decline in same-store sales, on May 28, 2003, Krispy

Kreme announced for the first time that it was revising the metric it used to report same-store

sales performance to include all off-premises sales associated within the region of any

particular store.  Krispy Kreme knew the materiality of the same-store metric as it was the

dominant  metric  used  by  analysts  and  investors  to  measure  sales  strength  and/or

growth/decline in sales from the same store open for at least one year:

> ***Beginning next quarter, we are going to begin when off premises***
> ***sales comp, we are going to comp all of the off premises sales in the***
> ***market***.   Up until now we have comped stores based on the production
> equipment except when a comp sale that was off premises was moved from a
> comping store to a non-comp store.  When that happened we included the off
> premises sales of that non-comping store in the comp base.   So what's

happening to us today is the system is getting larger and larger.  There are more and more stores.[17]

> *We don't have a process to automatically track every area developer and where they are producing their off premises sales, and we don't want to limit them*.

Ex. 15.

117.    Nevertheless, investors absorbed Krispy Kreme's false financial results and false statements about the strength of its business.  Indeed, on that day, May 28, 2003, Krispy Kreme's stock increased more than $2.32 per share to above $34 per share.  Ex. 10.

118.    <u>False and Misleading Statement</u>: On June 4, 2003, *Dow Jones News Service* reported on the Company's comments to its shareholders on Wednesday, May 29, 2003.  During the meeting, Krispy Kreme again told investors that 2004 would be a "record" earnings year of $0.90 per share and that the Montana Mills acquisition would be a driving contributor to the Company's future growth:

Krispy Kreme Sees '04 EPS 90c, Comp-Sales Up 10%

*             *             *

CHARLOTTE – (Dow Jones) – Krispy Kreme Doughnuts Inc. (KKD) *Chief Operating Officer John Tate told shareholders Wednesday the company expects fiscal 2004 to be another year of record profit increases, with per-share earnings of 90 cents*.

> *Tate also reiterated company guidance from a week ago that the Winston-Salem, N.C., doughnut maker plans to generate 10% comparable-store sales growth in the January-ending fiscal year.  Krispy Kreme has posted double-digit growth in each of the last 13 quarters, Chief Financial*

---

[17]    This new methodology for same-store sales is unique relative to retailers and restaurants that do not have material off-premises revenue.  Ex. 20 at 11-12 (Brean Murray Research analyst report).  It is almost as if Williams-Sonoma included catalog revenue in the same-store sales of its retail units.  *Id.*

*Officer Randy Casstevens said during the meeting, which was broadcast on the Internet.*

\* \* \*

*Tate said the company expects operating income as a percentage of sales this year could hit 15%, which was a three-to-five year target the company articulated about 18 months ago.*

Ex. 23.

119.     <u>False and Misleading Statement</u>: On June 4 2003, *Dow Jones News Service* also reported that during the same interview defendant Tate again assured investors that Montana Mills would break even and possibly post a profit in 2004:

*Tate told shareholders that the company's acquisition earlier this year of a small bakery chain, Montana Mills, will help future company growth. Company Chairman and Chief Executive Scott Livengood and other executives will spend one, maybe even two, years redeveloping the chain's concept to include meals and fit in with Krispy Kreme's strong distribution system, Tate said.*

*"The good news is we expect it to be break-even maybe even a small profit in fiscal 2004 as we focus on the concept development," Tate said.*

*Id.*

120.     For all the reasons reported by CWs and articulated in ¶¶111-112, the June 4, 2003 statements by defendants Tate and Livengood regarding the Company's "record profit" and Montana Mills reporting break-even results were false and misleading.

**Krispy Kreme Pays $50 Million Premium for Dallas, Texas**
**Franchise Owned by Krispy Kreme Insiders**

121.     On June 23, 2003, the Company announced that it would acquire the rights to six stores in the Dallas, Texas and Shreveport, Louisiana markets. The Company did not immediately disclose the purchase price of the acquisition. Instead, Krispy Kreme and defendant Livengood promised that the acquisition would be accretive in the current fiscal year – FY04.

- 67 -

Krispy Kreme Acquires Dallas and Shreveport Markets

WINSTON-SALEM, N.C., June 23/PRNewswire-FirstCall/ – Krispy Kreme Doughnuts, Inc. (NYSE: KKD) announced today an agreement to acquire the Dallas, TX and Shreveport, LA markets. The Company has agreed to purchase the rights to these markets, as well as the associated assets, from the franchisee that currently operates these markets. ***The Company did not disclose the purchase price, but did indicate it expects to pay cash and that the acquisition would be modestly accretive in Fiscal Year 2004*** . . . .

\* \* \*

Scott Livengood, Krispy Kreme's Chairman, President and Chief Executive Officer commented, "***We believe that Krispy Kreme's unit economics are among the best in the industry***. ***As I've indicated previously, we will continue to pursue the acquisition of additional franchise markets when our franchisees indicate an interest to sell***."

Ex. 24.

122. On or about July 10, 2003, Krispy Kreme, in its SEC Report on Form 8-K, disclosed that it had paid ***$67.5 million in cash*** for the Dallas/Shreveport stores, which consisted of only five stores and one commissary. Ex. 26. The Company used Krispy Kreme's credit standing to take a $55 million promissory note to secure the purchase. *Id.* However, only $13.8 million of the purchase price was allocated to store assets of the Dallas market. Ex. 27. The remaining approximately $53 million purchase price, which Krispy Kreme conveniently, but improperly characterized as an unamortized intangible asset, was paid to Joseph A. McAleer, a former officer and Board Member of the Company, Steven D. Smith, an emeritus director, and Orell, the cousin of Joseph A. McAleer, Jr.. *Id.* Smith and McAleer both resigned from their positions on Krispy Kreme's Board on April 9, 2003, two months before the Company announced the acquisition. Ex. 14. The Company had previously failed to disclose, however, that these specific insiders were the sellers of the Dallas franchise and the recipients of the $53 million premium. The Company also failed to

- 68 -

disclose that the third partner in the selling group was Orell, another relative of the former Chairman of the Board. *Id; see* ¶141; Ex. 28 (August 16, 2004 *Business Week* article discussing Krispy Kreme's failure to disclose that the Company purchased the Dallas market from the brother and cousin of a senior executive).

123.    In addition, despite Livengood's comments that the Company would continue to pursue reacquisitions of other franchises when they indicate interest in selling, the Company only pursued reacquisitions which would result in cash payments to Krispy Kreme insiders or related parties. For example, on July 11, 2003, Great Circle, which operated 22 Krispy Kreme stores in Southern California, announced that it was up for sale. Ex. 29. Great Circle was seeking $80 million for its Krispy Kreme stores, an average of just over $3.6 million per store, a bargain given the premium paid for the Dallas franchise reacquisition.

> The chain's largest franchisee, Great Circle Family Foods LLC in Southern California, is exploring a possible sale, and Krispy Kreme has spent nearly $100 million in cash since February to purchase franchise and development rights in such markets as Dallas, Springfield, Mo., Wichita, Kansas, and Shreveport, La., from former company directors or employees.
>
> ***Krispy Kreme has said all franchise acquisitions have been accretive to earnings***. And Great Circle President Roger Glickman, who owns a majority of the franchise with partner Richard Reinis, said owners are exploring a sale "because it's doing well, and given environmental factors, not the least of which is Krispy Kreme's desire to acquire its successful franchises."

Ex. 30.

124.    On July 11, 2003, Krispy Kreme confirmed to news organizations that Great Circle was interested in selling its franchise consisting of 22 stores (with the right to develop 42 stores) in Southern California, the largest Krispy Kreme franchise in the country, for $80 million. This news development raised even more questions surrounding the high priced

Dallas market purchase for which the Company paid $67 million for only six stores and then failed to disclose that certain relatives of the Company's Board of Directors were the beneficiaries of the transaction:

Krispy Kreme Confirms Franchisee's Interest In Selling

\*   \*   \*

Charlotte – (Dow Jones) – Krispy Kreme Doughnuts Inc. (KKD) confirmed Friday that its largest franchisee, Southern California's Great Circle Family Foods LLC, has expressed interest in selling itself.

\*   \*   \*

"All I'd say there is we obviously have bought franchises," Casstevens said. ***"We look at the merits of each one and we don't talk about whether we're looking at one or might or might not***."

\*   \*   \*

***News that the franchisee is interested in selling came the same day Krispy Kreme announced it had paid $67 million for the rights to the Dallas and Shreveport, La., markets as well as the assets from its franchise operating in those markets***. Krispy Kreme on June 23 announced an agreement to pay cash for the development rights but hadn't disclosed how much it would pay the former franchisees, who were a former company officer and director and a retired director. Krispy Kreme has six stores in Dallas and none in Shreveport.

\*   \*   \*

The Dallas/Shreveport acquisition price, Glass said, ***was "surprisingly high," given the number of current stores***. "***They're big markets, but still, it's a lot of money to pay***."

Ex. 29.

125. In addition, though the Company claimed publicly that it would repurchase almost any franchise, it declined to repurchase Great Circle's 22-store franchise for $80 million - an average selling price of $3.6 million per store. In fact, since February of 2003, Krispy Kreme had spent nearly $100 million in cash to purchase franchises and development

- 70 -

rights in Dallas, Shreveport, Springfield, Missouri and Wichita, Kansas.  Ex. 30.  To date, Krispy Kreme has not repurchased Great Circle.

126.    Notably, two months after the Dallas transaction, on August 26, 2003, the McAleer family unloaded 1.5 million shares of Krispy Kreme stock for proceeds of $65 million.  Exs. 33-34.

**Krispy Kreme Reports False 2Q04 Financial Results, and Despite**
**Knowledge of Declining Sales, Increases Earnings Projections**
**Again and Specifically Misrepresents Value of Dallas Market Acquisition**

127.    <u>False and Misleading Statement</u>: On August 21, 2003, Krispy Kreme issued false 2Q04 financial results in a press release entitled, "Krispy Kreme Earnings Exceed Consensus; Net Income Increases 46.8%; Systemwide Comp Store Sales Up 11.3%."  Ex. 31.  The Company press release also stated in part:

> Net income for the second quarter increased 46.8% to $13.0 million compared with $8.9 million in the second quarter of Fiscal 2003.  Diluted earnings per share increased to $0.21 in the second quarter compared with $0.15 for the same period in Fiscal 2003.
>
> *            *            *
>
> ***Systemwide sales, including sales of Company and franchise stores, advanced 27.6% to $238.5 million in the second quarter compared with $186.9 million in the second quarter of Fiscal 2003.  Sales were driven by an increase in company store sales of 39.6% to $104.3 million*** and an increase in franchise store sales of 19.6% to $134.2 million.  ***Systemwide sales, including Krispy Kreme stores and Montana Mills, increased 29.0% to $241.1 million in the second quarter.  On a comparable store basis, systemwide store sales increased 11.3% and Company store sales were up 15.6%.***

*Id.*

128.    On the same day, the Company also announced that it had acquired the Charlottesville, Virginia franchise.

- 71 -

129.    <u>Reasons Why Statements in ¶127 Were False and Misleading</u>:  The publicly reported 2Q04 earnings were not the result of an increase in actual sales or sales demand but instead a product of Krispy Kreme's strategy of increased store openings and off-premises markets which usually enjoy an initial sales "pop" then flatten to reflect normal customer demand.  *See* Ex. 21.  In addition, the reported increase in Company store sales was only achievable because of the change in calculation of same-store sales to include stores not in the comp base.  *Id*.  Further, the Company's failure to amortize known impaired assets for Montana Mills as discussed in detail at ¶¶311-323 caused its reported earnings to be materially overstated.  Finally, Krispy Kreme was only able to report such positive quarterly financial results because it had committed improper accounting manipulations in violation of GAAP, including improperly accounting for reacquired franchises, improperly accounting for the Company's leases and depreciation of leased assets, improperly recognizing revenue in its KKM&D segment, improperly accounting for certain derivative transactions, failing to take assets impairment charges and failing to consolidate failing joint ventures on Montana Mills and failing to improperly account for the Company's doubtful accounts, as discussed in ¶¶243-360.

130.    <u>False and Misleading Statement</u>: On August 21, 2003, the Company hosted a conference call for analysts and investors to discuss its 2Q04 revenue and earnings results.  Ex. 32.  The call was specifically hosted by defendants Livengood, Casstevens, and Tate.  During the call, the Company (a) repeated the false financial results issued in the August 21, 2003 press release; (b) falsely stated that it had in fact put the Dallas acquisition through a crucial screening process based upon a revenue multiple – rather than simply paying a premium to former director Joseph A. McAleer, Jr. and relatives of Krispy Kreme executives

- 72 -

(indeed, the Company was currently paying approximately $6 million per store for reacquisitions as opposed to the approximately $11 million per store premium for the Dallas markets); and finally (c) in the face of known declining same-store growth rates, again reported that growth momentum continued, and increased its FY04 public earnings projections from $0.90 per share to $0.91 per share:

> *I'm also pleased to report that our business momentum remains strong. We've kept our focus on opening stores, establishing strong relationships with our customers and communities, adding greater market penetration through multiple channels of sales.*
>
> This focus has generated results that have allowed us to meet, and in some cases exceed, our previous projections for the quarter. . . .
>
> \*      \*      \*
>
> Company store sales increased 39.6 percent to $104.3 million, again the largest increase since FY '01, *driven by strong company store comparable sales growth, as well as the consolidation of Kansas City, Dallas in Glazed Investments as company markets.*
>
> \*      \*      \*
>
> *As in previous quarters, the increases in per capita sales continue to drive significant economies of scale and improved profitability. Systemwide per capita sales increased by 24 percent. . . . Per capita growth in the second-quarter was primarily driven by strong comp store sales from continued gains from new store and new market openings over the past year.*
>
> \*      \*      \*
>
> *For the third quarter we expect system wide comps to be approximately 10 percent. Based on our performance in the first two quarters, systemwide comp store sales gains for the year would be in excess of our previous ten percent guidance. We continue to expect systemwide sales growth to range between 25 and 30 percent.* We believe there is an upside to this metric. *Depending on our performance in this quarter, full year earnings per share for fiscal 2004 are projected to be 91 cents per share, two cents ahead of current consensus.*
>
> \*      \*      \*

- 73 -

Guidance quarter by quarter for the remainder of FY '04 is as follows. ***EPS for the third-quarter will be approximately 22 cents. EPS for the fourth quarter will be approximately 26 cents. New store openings for FY '04 are projected to be 77 new openings in 17 markets.***

Ex. 32.

131.    <u>False and Misleading Statement</u>: During the same August 21, 2003 conference call, when questioned about the recent $67 million Dallas acquisition, Krispy Kreme and the Individual Defendants provided a false explanation of how the $67 million acquisition price for the Dallas market was arrived at:

> [Question:] One more questions if I could. Could you just provide a little more framework on the Dallas acquisition? It was five stores I guess and a commissary you paid $67 million. Can you give us some sense of the metrics you use to buy it, and can you also maybe talk about how you weigh what the criteria you use is? Is it simply accretion to earnings? Is it return on capital on that acquisition?

> [Answer (Tate):] That is a great question. ***We have actually a fairly detailed screen that we put through any potential acquisition. We – one important element of which is it must be accretive in the first year, at least modestly accretive, but we also project out five years. We value, as you know, John, our acquisitions based on a multiple of EBITDA, and that multiple can range from as low as 3.5 percent to as much as 10 percent. We correlate what we are willing to pay in terms of a multiple directly with the per capita sales and a low per capita sales for us implies a high market development potential***. . . .

> *            *            *

> ***So we adhere fairly rigidly to the relationship between per capita and multiple***: But even having made that decision on what multiple we would like to offer, we didn't put it through a screen.[18] Based on our (technical difficulty) year projections we expect it to be accretive to our growth rate. We expect to generate an internal rate of return on a cash basis of greater than 20 percent.

---

[18]    While the transcript of the conference call states "we ***didn't*** put it through a screen," a review of the actual audio file of the conference call reveals that defendants actually stated (falsely) "we ***then*** put it through a screen." *See* Ex. 32 (audio CD excerpt attached).

- 74 -

We expect positive accretion, and we expect to see a return on equity over that five-year period reaching a long-term goal or exceeding it, of 20 percent. One thing we don't do which I know is common in the restaurant industry, is *we don't look at the valuation in terms of the sales dollars we are paying per store because what we are paying for is future earnings potential and an attractive return on our invested capital*.

*Id.*

132. <u>Reasons Why Statements in ¶¶130-131 Concerning Dallas Market Were False and Misleading</u>: Krispy Kreme and the Individual Defendants' statements concerning the value of the Dallas market and the manner in which the Company determined how much to pay for the Dallas market were knowingly false. While defendants told investors that they had put the acquisition through a rigid screening process Krispy Kreme had in place and that the value of the deal was determined by the relationship between per capita and revenue multiple, Krispy Kreme and the Individual Defendants knew, but failed to disclose, that the Dallas market franchise consisting of only six stores was owned by Joseph A. McAleer, Jr., Steven Smith and Orell. The Company also failed to disclose that two of these sellers were the cousin and brother of senior executives of the Company. Moreover, 80% of the $67 million purchase price was allocated to reacquired franchise rights which the Company was not amortizing but instead listing as an asset on its balance sheet in violation of GAAP. *See* ¶¶247-255, 258-262, 288-291.

133. <u>False and Misleading Statement</u>: During the August 21, 2003 conference call, the Company also reported that Montana Mills stores posted a $685,000 operating loss which it claimed "reflected in the ongoing cost of administrative consolidation" and attributed its results to "seasonal" variables rather than known weak sales and asset impairment at Montana Mills. Ex. 32. Defendant Tate also explained the Montana Mills loss as merely associated with a revamping of the Montana Mills/Krispy Kreme concept and again told

- 75 -

investors that Montana Mills would report close to break-even results. *Id.* However, because the Company was not amortizing the goodwill of Montana Mills, as it should have, *see* ¶¶311-322, the negative impact on earnings was not reflected in the Company's financial statements, thereby artificially inflating its publicly reported quarterly earnings. Ultimately, the Company would divest itself of Montana Mills and take a huge impairment charge to earnings of $35-$40 million. *See* Ex. 35. As discussed in detail below at ¶¶311-322, had Krispy Kreme taken the charge for impairments to Montana Mills known to the Company during FY04, its 2004 publicly reported earnings would have been reduced by between $0.59 and $0.68 per share.

134.    Krispy Kreme and the Individual Defendants' August 21, 2003 false statements concerning the Company's 2Q04 financials, the Dallas market acquisition and projected fiscal 2Q04 earnings forecasts caused the Company's stock price to be artificially inflated.

135.    Nevertheless, by August 25, 2003, based on defendants' false and misleading statements alleged above, Krispy Kreme's stock price had skyrocketed and between August 23, 2003 and August 26, 2003, Livengood and Tate sold a total of 235,500 shares and 65,000 shares, respectively, of their Krispy Kreme stock at artificially inflated prices as high as $43.96 per share, for proceeds totaling $13 million. In addition, on August 26, 2003, the McAleer Family Trust, Jubilee Investment LP, unloaded 1.5 million shares for $65 million. Exs. 32, 33.

136.    <u>False and Misleading Statement</u>: On September 17, 2003, the Company filed its Report on Form 10-Q with the SEC for the period ending August 3, 2003. The Report on Form 10-Q was signed by defendants Livengood and Casstevens, each of whom also

- 76 -

submitted certifications pursuant to Sarbanes-Oxley, §§302 and 906, affirming the accuracy of the financial statements and material information reported in the Form 10-Q. The Company repeated the false financial results issued in the August 21, 2003 earnings release and disclosed for the first time that it allocated $53 million of the $67 million purchase-price of the Dallas market to reacquired franchise rights, an intangible asset not subject to amortization, for all the reasons set forth in ¶132. Ex. 27.

137. <u>Reasons Why Statements in ¶¶133, 136 Were False and Misleading</u>: Krispy Kreme and the Individual Defendants' August 21, 2003 statements and September 17, 2003 Report on Form 10-Q reporting false 2Q04 financial results were false and misleading when made because:

(a) Krispy Kreme and the Individual Defendants knew, but failed to disclose, that sales growth had been in fact declining as reported by CWs, such that it could not maintain the exponential growth forecasted to investors. *See* ¶112.

(b) Krispy Kreme and the Individual Defendants knew or recklessly disregarded that Krispy Kreme had improperly accounted for the acquisition of Montana Mills. Indeed, defendants knew, but failed to disclose that at the time Montana Mills was acquired, the assets were already impaired. Krispy Kreme had both overpaid for Montana Mills, and should have taken a significant asset impairment charge immediately. For example:

- For the quarter ending October 30, 2002, Montana Mills had incurred at least eight straight quarters of operating losses during the previous quarters;

- For the quarter ending October 30, 2002, Montana Mills' net book value was $12.6 million, most of which was due to the funds raised in the Company's IPO in June 2002;

- 77 -

- For the quarter ending October 30, 2002, Montana Mills' operations resulted in at least eight consecutive quarters of negative cash flow from operations; and

- On March 19, 2003 (two weeks before the deal closed), Montana Mills announced that it was going to close nine of its 31 stores as they were either underperforming and/or in markets where the Company's penetration was generally weak.

(c)    The Company's 2Q04 earnings were overstated in violation of GAAP because defendants failed to properly account for reacquired franchise rights by overpaying for the franchises apparently to line the pockets of insiders, then failing to write down known impaired assets and failing to amortize intangible assets, as detailed in ¶¶247-291.

(d)    The Company's 2Q04 financial results were also false because the Company had been improperly accounting for property and equipment leases and the related depreciation of the leased assets; improperly recognized revenue in its KKM&D segment for sales of equipment to franchises prior to its being earned and realizable, improperly accounted for certain derivative transactions; failed to consolidate the failing Montana Mills franchise, despite having the requisite ownership and control; finally because the Company failed to properly account for the Company's allowance for doubtful accounts related to receivables by its struggling franchises, as discussed *infra* at ¶¶292-304, 311-360.

(e)    In addition to the reporting of false financials, according to CW8, a former Krispy Kreme supervisor in the Company's Columbus, Ohio commissary, the Company engaged in illegal channel stuffing during 2Q04 (ending July 31, 2003), 3Q04 (ending October 31, 2003), FY04 (ending February 1, 2004) and 1Q05 (ending April 3, 2004) to meet the Company's earnings expectations by shipping two times the amount of product actually ordered by customers knowing they would be returned.  Specifically, according to CW8, customers were typically required to purchase a minimum volume of

doughnuts dictated by contract. CW8 explained that Krispy Kreme accepted returns of doughnuts and set the acceptable rate at 30%. Krispy Kreme allowed grocers to return packaged doughnuts for credit. During CW8's tenure, however, the return rate had skyrocketed up to 40%.

(f)     In addition, CW8 reported that during each quarter in FY04, she/he was instructed by Ohio commissary sales manager Terry Kennedy to double-ship customer orders. According to CW8, by doubling customer orders, Krispy Kreme was able to artificially inflate revenues for FY04. CW8 described this practice as commonplace during his/her tenure at Krispy Kreme, as she/he was directed to ship double orders at the end of quarters at least four separate times during his/her tenure at the Company. *See* ¶¶305-310.

(g)     CW9, a former sales manager at the Krispy Kreme Ravenna, Ohio commissary, corroborates CW8's report of the illegal channel stuffing directed by Krispy Kreme management to meet quarterly earnings projections. According to CW9, on January 28, 2004, Krispy Kreme regional manager, Tommy Ward ("Ward"), ordered CW9 to ship two times the actual orders to the Ravenna off-premises customers on the last Friday and Saturday of FY04 (ending February 1, 2004), increasing deliveries to 15,000-16,000 dozen. According to CW9, Ward explained to CW9 that Krispy Kreme wanted to boost the sales for the fiscal year in order to meet Wall Street projections and meet the numbers represented to the shareholders. Ward further explained that Krispy Kreme recorded revenue for the full amount of doughnuts delivered, knowing that most of the doughnuts would be returned the following week, which would begin FY05. CW9 reported that she/he received similar instructions in October 2003 to ship double what customers ordered and learned from other sales managers at the Columbus and Indianapolis commissaries that they too received similar

instructions from Ward. CW9 understood that it was commonplace at Krispy Kreme to channel stuff in order to meet Wall Street expectations. The Ravenna, Ohio commissary was opened in 2004 and then closed in October 2004.

(h)     CW7, a former general manager at a Krispy Kreme New York franchise corroborated other CWs' accounts of market saturation, that demand for Krispy Kreme products was not growing and that new stores did not generate new customers but instead took customers from the existing Krispy Kreme store. According to CW7, who is now employed by another store that participates in Krispy Kreme off-premises business, this store disposes of approximately 50%-80% of the Krispy Kreme doughnuts at the end of each day due to poor sales and attributes that to market saturation of Krispy Kreme's doughnuts.

(i)     CW13, a former Krispy Kreme manager in Georgia, reported that Krispy Kreme granted a right of return for wholesale product. Although Krispy Kreme maintained a guideline that returns should not exceed 30%, throughout CW13's tenure at the Company she/he reported that wholesale returns varied at 25%-50%.

138.     Defendants' failure to disclose the known facts about the deterioration of the Company's sales growth and the issuance of false financials caused the market price of Krispy Kreme stock to be artificially inflated.

**Krispy Kreme Falsely Denies Any Signs of Slowdown in Its Sales Growth**

139.     <u>False and Misleading Statement</u>: During September 2003, Krispy Kreme was roundly criticized for its growth strategy and failure to credit the fact that slowing sales numbers in its stores were a sign that the fad surrounding Krispy Kreme was beginning to fade, and that its projected growth by increasing off premises sales and opening numerous new stores was probably unreachable. In response to the criticism, defendants continued to

make false statements about the Company's current sales strength and future outlook. On September 16, 2003, *The Wall Street Journal* published an article entitled, "Krispy Kreme Sales Seem to Show Signs Of a Sugar Crash." Ex. 36. Tate's false and misleading statements that the critics were wrong and the Company was exactly on target for its growth model:

> Internal figures reviewed by The Wall Street Journal cover results for roughly 40 Krispy Kreme outlets that opened between September 2002 and April 2003, most of the stores that opened during that period. *On average, the stores posted weekly retail sales of about $35,000 during the 13 weeks ended Aug. 4, below what the company says is the norm for its newer outlets – and well below what some investors expect for a retailer whose new stores tend to open particularly big thanks to the company's large following*.
>
>     \*      \*      \*
>
> *But the company says the numbers are fragmentary and don't provide a complete picture of a company that has reported stunning growth in recent years, including an average 63% quarterly growth in operating earnings over the past 10 quarters*.
>
>     \*      \*      \*
>
> *John W. Tate, Krispy Kreme's chief operating officer, says the naysayers are wrong. He won't comment on Great Circle's results, but says the franchisee has "done a great job of building out Southern California*," adding that Krispy Kreme itself would like to buy the operation at the right price.
>
>     \*      \*      \*
>
> *Speaking about average unit volumes for the company as a whole, Mr. Tate says Krispy Kreme is "exactly on our target and on strategy for our growth model*."

*Id.*

140. <u>Reasons Why Statements in ¶139 Were False and Misleading</u>: Krispy Kreme and the Individual Defendants' statements assuring the public that the Company was exactly on target for growth strategies were false and misleading when made as defendants knew or

recklessly disregarded sales growth had been and continued to decline due to market saturation.

(a)     For example, as described by CW3, *supra*, ¶¶112(g), (h), sales for the Golden Gate franchise were down 30% each month from the previous year because of market saturation.

(b)     CW12, *supra*, ¶¶112(e), (f), reported an 80% decline in weekly sales between 1999 and the present for one store within the Great Circle franchise and 13% over the last two years for another store.

(c)     CW14, *supra*, ¶112(k), reported that franchise-wide Glazed Investments suffered a decline in sales of 50% between 2001 and 2003.

(d)     Furthermore, according to CW8, a former Krispy Kreme supervisor in the Company's Columbus, Ohio commissary, the Company engaged in illegal channel stuffing during 2Q04 (ending July 31, 2003), 3Q04 (ending October 31, 2003), FY04 (ending February 1, 2004) and 1Q05 (ending April 3, 2004) to meet the Company's earnings expectations by shipping two times the amount of product actually ordered by customers knowing they would be returned. Specifically, according to CW8, customers were typically required to purchase a minimum volume of doughnuts dictated by contract. CW8 explained that Krispy Kreme accepted returns of doughnuts and set the acceptable rate at 30%. Krispy Kreme allowed grocers to return packaged doughnuts for credit. During CW8's tenure, however, the return rate had skyrocketed up to 40%. In addition, CW8 reported that during each quarter during FY04, she/he was instructed by Ohio commissary sales manager Terry Kennedy to double-ship customer orders. According to CW8, by doubling customer orders, Krispy Kreme was able to artificially inflate revenues for FY04. CW8 described this

- 82 -

practice as commonplace during his/her tenure at Krispy Kreme, as she/he was directed to ship double orders at the end of quarters at least four separate times during his/her tenure at the Company.

(e)     CW9, a former sales manager at the Krispy Kreme Ravenna, Ohio commissary, corroborates CW8's report of the illegal channel stuffing directed by Krispy Kreme management to meet quarterly earnings projections.  According to CW9, on January 28, 2004, Krispy Kreme regional manager Ward ordered CW9 to ship two times the actual orders to the Ravenna off-premises customers on the last Friday and Saturday of FY04 (ending February 1, 2004), increasing deliveries to 15,000-16,000 dozen.  According to CW9, Ward explained to CW9 that Krispy Kreme wanted to boost the sales for the fiscal year in order to meet Wall Street projections and meet the numbers represented to the shareholders.  Ward further explained that Krispy Kreme recorded revenue for the full amount of doughnuts delivered, knowing that most of the doughnuts would be returned the following week, which would begin FY05.  CW9 reported that she/he received similar instructions in October 2003 to ship double what customers ordered and learned from other sales managers at the Columbus and Indianapolis commissaries that they too received similar instructions from Ward.  CW9 understood that it was commonplace at Krispy Kreme to channel stuff in order to meet Wall Street expectations.  The Ravenna, Ohio commissary was opened in 2004 and then closed in October 2004.

(f)     CW7, a former general manager at a Krispy Kreme New York franchise corroborated other CWs' accounts of market saturation and that demand for Krispy Kreme products was not growing and that new stores did not generate new customers but instead took customers from existing Krispy Kreme stores.  According to CW7, who is now

- 83 -

employed by another store that participates in Krispy Kreme off-premises business, this store disposes of approximately 50%-80% of the Krispy Kreme doughnuts at the end of each day due to poor sales and attributes that to market saturation of Krispy Kreme's doughnuts.

(g)     CW13, a former Krispy Kreme manager in Georgia, reported that Krispy Kreme granted a right of return for wholesale product. Although Krispy Kreme maintained a guideline that returns should not exceed 30%, throughout CW13's tenure at the Company she/he reported that wholesale returns varied at 25%-50%.

(h)     CW2, a former Krispy Kreme bookkeeper for a South Carolina Company-owned store, reported that Krispy Kreme regional manager, Steven Graves ("Graves"), frequently audited the financials for the store in which she/he worked. According to CW2, this was because both retail and off-premises sales had consistently been dropping since she/he started at the South Carolina store in June 2003. CW2 recalls Graves auditing the store every four to six weeks. CW2 revealed that daily sales reports were e-mailed to Graves at Krispy Kreme headquarters.

(i)     CW11 is a former Golden Gate franchise accounts receivable specialist who revealed that the franchise's retail sales were declining long before the repurchase of Golden Gate by Krispy Kreme in January 2004. CW11 attributed this decline to the increasing of off-premises sales which saturated the market. CW11 believes that the decline in sales was discussed in weekly meetings with Brad Bruckman.

141.     Krispy Kreme's false statements published in the September 16, 2003 edition of *The Wall Street Journal*, specifically rejecting slowing growth, but instead stating that unit volumes were exactly on target caused Krispy Kreme's stock price to be artificially inflated.

- 84 -

**Krispy Kreme Reacquires the Failing Michigan Franchise and Improperly Bundles Michigan Debt Owed to the Company into the Purchase Price, Later Recording It as Income in Order to Meet 3Q04 Earnings Expectations**

142.    <u>False and Misleading Statement</u>: On September 22, 2003, the Company announced that it would purchase a 73% interest in the Michigan "Dough-Re-Mi" franchise. The Company failed to disclose that at the time of the acquisition, the Michigan franchise was indebted to Krispy Kreme for several million dollars.  In fact, in order to pay-off the Dough-Re-Mi debts, Krispy Kreme: (a) artificially inflated the value and purchase price; (b) overpaid for Dough-Re-Mi; (c) then collected on the debt that was owed by Dough-Re-Mi with the same money; and (d) thereby paid itself and boosted earnings.  Krispy Kreme never disclosed these facts, and instead, the Company boasted the growth of the Michigan franchise:

> **Krispy Kreme to Acquire Michigan Market**
>
> WINSTON-SALEM, N.C., Sept. 22/PRNewswire-FirstCall/-- Krispy Kreme Doughnuts, Inc. (NYSE: KKD) today announced its intent to acquire a 73% interest in the Michigan market.  The current operating partner in Dough-Re-Mi Co., Ltd, the Michigan franchise entity, will retain a 27% interest in this market.  The Company and its franchisee in the Michigan market are in the final stages of negotiating a definitive purchase agreement for Krispy Kreme to acquire some of the existing Michigan stores and the rights to continue development of this market with additional factory stores, doughnut and coffee shops and satellite units, along with further expansion of off-premises sales.  ***The proposed purchase price of $18.6 million, payable in Krispy Kreme Doughnuts, Inc. common stock, represents an Earnings before Interest, Taxes, Depreciation and Amortization (EBITDA) multiple that is within the range used by Krispy Kreme in its acquisitions of other developing markets***. . . .
>
> *                *                *
>
> Scott Livengood, the Company's Chairman, President and Chief Executive Officer said, ***"The success of previous market repurchases has validated our acquisition strategy***.  We will continue to acquire or expand our interest in markets where such an acquisition is mutually advantageous for Krispy Kreme, our franchisees and our customers.  ***We believe there is***

- 85 -

*tremendous opportunity for growth in Michigan, both in retail and off-premises channels*." 

Ex. 37.

143.  <u>Reasons Why Statements in ¶142 Were False and Misleading</u>: The Individual Defendants knew or recklessly disregarded that Krispy Kreme's statements concerning the purchase of the Michigan franchise were false and misleading, as the Company failed to disclose that Dough-Re-Mi was in substantial debt to Krispy Kreme and instead of paying off the debt, Krispy Kreme inflated the purchase price of the acquisition.  Krispy Kreme then improperly applied the overpayment to the debt owed by Dough-Re-Mi and recorded it as income in 3Q04, as summarized here and detailed below in ¶¶263-275:

(a)     The Michigan franchise had been struggling financially prior to the acquisition and Krispy Kreme knew it.  It owed Krispy Kreme several million dollars for equipment, supplies and its royalty payments, and was behind on its payments.  The Michigan franchise was in further violation of its franchise agreement with the Company as it was behind in its schedule to open new stores in its market.

(b)     During the purchase negotiations, Krispy Kreme and the Michigan franchise agreed that the Michigan franchise would do the following, which would allow the Company to avoid reporting losses occurring at failing Michigan stores: close two of its underperforming locations prior to completion of the acquisition and pay to Krispy Kreme accrued interest on its past due loans for the money it owed Krispy Kreme.  In exchange, Krispy Kreme agreed to increase its purchase price to cover the costs of the store closings and the accrued interest payment.

(c)     Krispy Kreme improperly recognized earnings and asset associated with the reacquisition of the Michigan franchise due to this artificial increase in the purchase

- 86 -

price specifically to cover debt owed by. First, Krispy Kreme recognized interest income on the agreed-upon accrued interest payment even though it essentially paid the interest income due to an increase in purchase price. In addition, Krispy Kreme then recognized the increased purchase price on its books as an asset during FY04. *See also* ¶¶263-275.

(d)     On October 28, 2003, the Company filed its Form S-3 with the SEC. The Form S-3 offered 443,917 shares of Krispy Kreme common stock for registration to facilitate the reacquisition of the Michigan market franchise. Ex. 38.

**Krispy Kreme Reports False 3Q04 Financial Results, Continue to Misrepresent Sales Momentum and Again Provides False and Misleading Details Regarding the Michigan Market Dough-Re-Mi**

144.     <u>False and Misleading Statement</u>:  On November 21, 2003, Krispy Kreme issued a press release reporting its 3Q04 financial results. The press release was entitled, "Krispy Kreme Announces Third Quarter Earnings; Net Income Increases 43.4%; EPS Increases 35.3% to $0.23." The press release stated that sales were driven by the Company's systemwide sales growth, including Montana Mills, of 29.6%. The Company also stated that but for bad weather, the Company would have reported even stronger quarterly sales:

> *Systemwide sales, including sales of company and franchise stores, advanced 28.6% to $251.2 million in the third quarter compared with $195.3 million in the third quarter of Fiscal 2003. Sales were driven by an increase in company store sales of 40.0% to $110.6 million and an increase in franchise store sales of 20.9% to $140.6 million. Systemwide sales, including Krispy Kreme stores and Montana Mills, increased 29.6% to $253.1 million in the third quarter. On a comparable store basis, systemwide store sales increased 9.5% and company store sales were up 13.3%. Events affecting systemwide comp store sales included Hurricane Isabel, grocery store strikes and unseasonably warm weather in many markets late in the quarter. In the absence of these factors, the Company estimates systemwide comps would have been at least 10% for the quarter.*

*         *         *

- 87 -

*Systemwide sales, including Krispy Kreme stores and Montana Mills, advanced 27.7% to $722.0 million*.

*"Our business momentum continues and our third quarter results reflect our focus on opening new stores, establishing strong off-premises relationships and gaining greater market share," said Scott Livengood, Chairman, President and Chief Executive Officer. "Our fundamentals remain very strong and we delivered solid results in an active quarter. Despite weather related issues and the grocery store strike that impacted several of our markets, we produced systemwide sales of $253 million and grew net income by 43%."*

Ex. 39.

145. <u>False and Misleading Statement</u>: On the same day, November 21, 2003, the Company hosted a conference call for analysts and investors during which it repeated the false 3Q04 financial results. The call was specifically hosted by defendants Livengood, Casstevens, and Tate. Individual Defendants also discussed the Dough-Re-Mi acquisition and falsely represented that the purchase price was consistent with the valuation previously announced. The Company failed to disclose, however, that Krispy Kreme was essentially paying off a debt owed to Krispy Kreme by Dough-Re-Mi and recording that money as profit in the quarter. Defendants stated:

We continue to forecast system wide sales growth for the remainder of the year in a range of 25 to 30%.

\* \* \*

*The acquisition of the Michigan market one week before the end of the quarter did not materially affect company store growth rates but set the stage for strong contributions moving forward. . . . Total purchase price was $25.4 million which is consistent with the original valuation for the 73% we had announced*.

\* \* \*

Other assets, when compared to the end of the second quarter, increased by a net $29.5 million. *Other increased $24.5 million was for amounts assigned to reacquire franchise rights for the Detroit market acquisition*.

- 88 -

* * *

*Stockholder's equity increased by $65.8 million or 18.1% primarily as a result of the stock issued for the Detroit acquisition,* net income, as well as the issuance of stock options and related tax benefits.

* * *

*With a one cent outperformance in this quarter, related, as compared to our guidance, full year earnings per share for fiscal 2004 are projected to be 92 cents per share* . . . .

* * *

As it applies to Krispy Kreme, *FIN-46 requires us to analyze the accounting treatment for our joint venture relationships to determine the appropriate method of accounting, that is, the equity or consolidation methods and consistent with our second quarter comments, based on our work to date, we will begin to consolidate New England Dough, our joint venture partner in Boston and other Northeastern areas in the fourth quarter*.

Ex. 40.

146.    <u>False and Misleading Statement</u>:  On December 17, 2003, Krispy Kreme filed its Report on Form 10-Q for the fiscal 3Q04 ending November 2, 2003, wherein defendants repeated false 3Q04 financial results.  Ex. 42.  The Form 10-Q was signed by defendants Livengood and Casstevens, each of whom signed and submitted certifications pursuant to Sarbanes-Oxley, §§302 and 906, attesting to the accuracy of the financial statements and material information therein.  The false and misleading financial results and accompanying false statements concerning the strength of Krispy Kreme's business and growth prospects caused the Company's stock price to be artificially inflated.

147.    <u>Reasons Why Statements in ¶¶144-146 Were False and Misleading</u>: Defendants' November 21, 2003 statements and December 17, 2003 Form 10-Q reporting Krispy Kreme's 3Q04 earnings results, assuring the public that Krispy Kreme's "business momentum continues," misrepresenting facts concerning that the Dough-Re-Mi acquisition

- 89 -

improperly recording as revenue and profit on the transaction and discussing the accounting treatment for the New England Dough franchise were false and misleading when made given the information then known to or recklessly disregarded by defendants:

(a)    As disclosed by CWs, Krispy Kreme and the Individual Defendants knew that sales growth had been and continued to decline due to market saturation.

(b)    For example, as described by CW3, *supra*, at ¶¶112(g), (h), sales for the Golden Gate franchise were down 30% each month from the previous year because of market saturation.

(c)    CW12, *supra*, at ¶¶112(e), (f), reported an 80% decline in weekly sales between 1999 and the present for one store within the Great Circle franchise and 13% over the last two years for another store.

(d)    CW14, *supra*, at ¶112(k), reported that franchise-wide Glazed Investments suffered a decline in sales of 50% between 2001 and 2003.

(e)    Further, CW10, a former accounts receivable specialist for the Golden Gate franchise, revealed that there was a decline in retail sales by the end of 2003. This, according to CW10, was due to increasing off-premises sales, which had saturated the Northern California market. CW10 further confirmed that wholesale customers were credited for doughnut returns and that Krispy Kreme headquarters had access to the returns information. Specifically, the returns were entered onto the AS400 system, which was connected to corporate, and only individuals at corporate could adjust the billing to provide credit for the returns.

(f)     CW6, former Krispy Kreme General Manager in a Tennessee franchise store, also reported declining sales upon starting at Krispy Kreme in late 2003 – these sales, explained CW6, were consistently lower than projected by the corporate office.

(g)     Defendants' statements justifying the valuation of Dough-Re-Mi were knowingly false when made as the Michigan franchise had been struggling financially prior to the acquisition.  Krispy Kreme and the Individual Defendants knew that Michigan owed Krispy Kreme several million dollars for equipment, supplies and its royalty payments and was behind on its payments.  As reported, the Michigan franchise was further in violation of its franchise agreement with the Company as it was behind in its schedule to open new stores in its market.

(h)     During the negotiations, Krispy Kreme and the Michigan franchise agreed that the Michigan franchise would do the following, which would allow the Company to avoid reporting losses occurring at failing Michigan stores: close two of its underperforming locations prior to completion of the acquisition and pay to Krispy Kreme accrued interest on its past due loans for the money it owed Krispy Kreme.  In exchange, Krispy Kreme agreed to increase its purchase price to cover the costs of the store closings and the accrued interest payment.

(i)     Krispy Kreme improperly recognized earnings and asset associated with the reacquisition of the Michigan franchise due to this increase in its purchase price.  First, Krispy Kreme recognized interest income on the agreed upon accrued interest payment even though it essentially paid the interest income due to an increase in purchase price.  In addition, Krispy Kreme then recognized the increased purchase price on its books as an asset.

- 91 -

(j)     Defendants knew or recklessly disregarded that Krispy Kreme's reported 3Q04 financial results were also misstated because Krispy Kreme had failed to consolidate the financials its 57% interest in New England Dough, its joint venture established in 2002, which had lost more than $800,000 in FY03 and had liabilities of more than $7 million.  The Company's failure to consolidate New England Dough's liabilities caused the financial results to be overstated in violation of GAAP as detailed in ¶¶324-336.

(k)     Defendants knew or recklessly disregarded that Krispy Kreme's 3Q04 publicly reported financial results were overstated as a result of improper accounting for Krispy Kreme's property and equipment leases and the related depreciation of the leased assets, as alleged *infra* in ¶¶345-354.  Krispy Kreme improperly depreciated its leasehold assets over a period of time that differed from the terms of the real estate lease in which the assets themselves were maintained in violation of GAAP.

(l)     Krispy Kreme's earnings announcement and financial statements reporting 3Q04 financial results were also false and misleading as defendants, falsely stated that they are only required to consolidate New England Dough starting in 4Q04.  Rather, as defendants knew, they should have been consolidating New England Dough from its inception.  Failure to do so caused the Company's reported earnings to be overstated.

(m)     Krispy Kreme's 3Q04 financial results were also false and misleading because defendant improperly recognized revenue in its KKM&D segment, wherein defendants recognized revenue upon delivery of equipment rather than as of installation and acceptance as required by GAAP, and defendant also improperly accounted for certain derivative transactions by failing to record mark-to-market adjustments, as analyzed in ¶¶302-304, 355-358.

(n)     Finally, defendants knew or recklessly disregarded that Krispy Kreme's 3Q04 financial results were also false and misleading as Krispy Kreme failed to properly account for the Company's allowance for doubtful accounts related to receivables by its failing franchises, as discussed *infra* at ¶¶292-301.

148.    Krispy Kreme and the Individual Defendants' false statements concerning the Company's 3Q04 financials, the Michigan market acquisition and projected fiscal 2004 earnings outlook caused Krispy Kreme's stock price to be artificially inflated.

**Krispy Kreme Appoints New CFO**

149.    On December 23, 2003, Krispy Kreme announced that it had appointed Phalen as the new CFO to replace Casstevens, who had been appointed CGO on April 9, 2003.  Phalen's appointment was to begin January 5, 2004.  On the same day, however, Casstevens curiously announced his resignation from his position as CGO "to pursue personal interests."  Ex. 43.

**Krispy Kreme Reacquires Franchise Rights to the
Golden Gate Franchise; Does Not Disclose that CEO Livengood's
Wife is a $1.5 Million Beneficiary of Purchase**

150.    On January 5, 2004, Krispy Kreme announced that Golden Gate, Krispy Kreme's largest Northern California franchise, laid-off a huge number of employees. Ex. 44.

151.    <u>False and Misleading Statement</u>: Notwithstanding the financial difficulties of the Golden Gate franchise as reported by CW3 and CW11 and known to defendants, *i.e.,* that sales growth was declining, on February 4, 2004, Krispy Kreme announced that the reacquisition of the Golden Gate franchise for Northern California had closed.

**Krispy Kreme Acquires Remaining Interest In Northern California Market**

WINSTON-SALEM, N.C., Feb. 4/PRNewswire–FirstCall/– Krispy Kreme Doughnuts, Inc. (NYSE: KKD) today announced that it has acquired the remaining 33% minority interest in Golden Gate Doughnuts, LLC, the Company's area developer for Northern California. The Company now owns 100% of the rights to develop the Northern California market as well as existing stores and the associated assets. The purchase price was not disclosed, but the Company indicated that the acquisition will be modestly accretive in Fiscal Year 2005, which began February 2, 2004.

\*     \*     \*

Scott Livengood, the Company's Chairman, President and Chief Executive Officer, *said this acquisition is consistent with other recent market acquisitions by the Company*. . . . "*As we have said previously, we will continue to acquire or expand our interest in markets where such an acquisition is mutually advantageous for Krispy Kreme, our franchisees and our customers*."

Ex. 45.

152.    <u>Reasons Why Statements in ¶151 Were False and Misleading</u>:  Krispy Kreme's announcement that it had reacquired the remaining interest in the Golden Gate franchise was false and misleading when made as defendants knew but failed to disclose that the reacquisition was also advantageous to defendant Livengood's ex-wife, who owned a 3% ownership interest in Golden Gate and therefore profited (receiving approximately $1.53 million) from the sale of the franchise back to Krispy Kreme.  *See also* ¶¶276-285.

**Krispy Kreme Falsely Reports Record 4Q04 Financial Results, Ignores Sales Declines and Raises Earnings Estimates – Again**

153.    <u>False and Misleading Statement</u>:  On February 17, 2004, the Company issued a press release announcing 4Q04 results and issuing preliminary earnings guidance for 2005. The press release falsely stated that the Company's business momentum continued to be strong mainly driven by increases in same-store growth and reported that the Company's

sales momentum would indeed support 4Q04 and FY04 earnings expectations of $0.26 per

share and $0.92 per share, respectively.  Finally, the Company told investors that its same-

store sales growth and its strategy of opening even more stores would drive FY05 earnings

as high as $1.18 per share:

> WINSTON-SALEM, N.C., Feb. 17 /PRNewswire-FirstCall/ -- Pending its release of audited fiscal 2004 financial results on March 10, 2004, Krispy Kreme Doughnuts, Inc. (NYSE: KKD) announced certain key preliminary business metrics designed to provide investors with early indications of the Company's operating performance in the fourth quarter of fiscal 2004, which ended February 1, 2004.

> *       *       *

> **The Company indicated that business momentum and sales growth continued to be strong, driven by increases in comparable store sales and new store openings.  Fourth quarter systemwide sales including sales of company and franchise stores grew 25.6%.  Systemwide and company comparable store sales increased 9.1% and 10.7%, respectively, for the quarter.  Sales momentum increased throughout the quarter, but sales were affected by the grocery store strikes and unseasonably warm weather early in the fourth quarter. Systemwide sales including Krispy Kreme stores and Montana Mills increased 26.6% in the fourth quarter**. . . .

> **Commenting on these results, Scott Livengood, the Company's Chairman, President and Chief Executive Officer stated**. . . . **"We experienced strong comparable store sales performance across the system in fiscal 2004, driven by continued strength among company stores**."

> **Additionally, the Company estimates that diluted earnings per share will be approximately $0.26 in the fourth quarter, consistent with previous guidance.  The Company expects to earn approximately $0.92 per diluted share for fiscal 2004, including the $0.01 positive impact of the arbitration settlement recorded in the first quarter**. . . .

> **The Company also issued preliminary guidance for fiscal 2005. Mike Phalen, the Company's Chief Financial Officer commented, "The forward estimates were developed based on the continuing evolution of our business model.  The primary growth drivers in fiscal 2005 will continue to be opening new factory stores and improving existing store productivity**. . . .

> **The Company expects diluted earnings per share of $1.16 to $1.18 for fiscal 2005 and systemwide comparable store sales growth in the mid-to-high single digits.  The Company estimates that systemwide sales will**

*increase approximately 25% in fiscal 2005, while each quarter may be slightly above or below 25%.*

Ex. 46.

154.   <u>False and Misleading Statement</u>:   On March 10, 2004, Krispy Kreme announced its 4Q04 and FY04 results in a press release entitled, "Krispy Kreme Announces Record Fourth Quarter and Fiscal 2004 Results." The press release reported among other things false and misleading financial results for the quarter and stated in part:

> *Net income for fourth quarter fiscal 2004 increased 45.3% to $16.4 million compared with $11.3 million in the fourth quarter last year*, before the $9.1 million pre-tax arbitration award discussed in the Company's 8-K filing dated February 10, 2003. Diluted earnings per share for the quarter increased to $0.26 compared with $0.19 last year, before the arbitration award.

> *Total revenues for the quarter, which includes sales from company stores, franchise operations, Krispy Kreme Manufacturing and Distribution (KKM&D) and Montana Mills increased 35.7% to $185.5 million compared with $136.7 million in the fourth quarter of last year. Sales from company stores advanced 36.0% to $124.7 million; KKM&D sales increased 31.5% to $52.2 million; franchise operations grew 18.3% to $6.3 million and Montana Mills revenues were $2.3 million.*

> *Fourth quarter systemwide sales including sales of company and franchise stores advanced 25.5%. Systemwide sales were driven by an increase in company store sales of 36.0% to $124.7 million. On a comparable store basis, company store sales advanced 10.7% and systemwide sales increased 9.1%. Systemwide sales including Krispy Kreme stores and Montana Mills rose 26.6%.*

> *   *   *

> Fiscal 2004 net income advanced 45.0% to $56.8 million compared with $39.1 million, before the arbitration award. *Diluted earnings per share for fiscal 2004 grew to $0.91 compared with $0.66 in fiscal 2003*, before the arbitration award. Including the $0.01 positive impact of the arbitration award, diluted earnings per share for fiscal 2004 was $0.92.

> *   *   *

> *Fiscal 2004 systemwide sales including company and franchise stores increased 26.5% primarily due to company stores sales advancing*

- 96 -

***38.3% to $441.9 million. On a comparable store basis, company store sales advanced 13.6% and systemwide sales rose 10.2%. Systemwide sales including Krispy Kreme stores and Montana Mills grew 27.4%.***

Ex. 47.

155.    <u>False and Misleading Statement</u>:  On the same day, March 10, 2004, the Company hosted a conference call for analysts and investors during which it reiterated its false statements of its revenue and earnings results for FY04 and 4Q04.  In addition, despite sales growth declines the Company stated it was not seeing any meaningful cannibalization, and instead of seeing market saturation, the overall market was in fact underdeveloped.  The Company ***reiterated its earnings estimate for FY05 between $1.16-$1.18 a share*** and denied any cannibalization effect caused by continuing to penetrate the market by opening off-premises locations:

(a)    For example, during the call, John Ivankoe from J.P. Morgan asked:

I have several nonrelated questions, if I may.  The first is on retail store development.  Have you seen any cannibalization where it doesn't make sense at some point to expect cannibalization of on premises sales when the stores are built versus the other existing units?  It is fairly well-documented or discussed that off premise actually adds to on premise stores.  What about on premise to on premise cannibalization?

Ex. 48.  Defendant Tate, Krispy Kreme's COO, responded:

I would like to talk about it in two different ways.  We talked about the Le Havre effects.  Scott often talks about this.  It in a new [sic] market there certainly is cannibalization. . . .

In more developed markets we plan pretty carefully. . . .  ***[A]t this point in our development of both heritage markets and the more developed are developer markets we are able to place stores so there is – you may get 5 or 6 percent but there is not a meaningful amount of retail cannibalization***.

*Id.*

(b)    John Glass of CIBC World Markets asked:

- 97 -

But if you're seeing – this will be my follow on question. If you're seeing a slight decline in average unit volumes even though the unit economics are good, why are you accelerating Company development?

*Id*. Defendant Tate responded:

> ***The fact is that at this level of average unit volumes we still have better than 40 percent cash on cash. If you look at a Company average of approximately $70,000 per week, $3.5 million a year, the returns are phenomenal. But they also represent the fact that the overall market is underdeveloped***.

*Id*.

> (c)     Abe Rouskin of Glenview Capital asked:

The return on capital in the business, if your average sales per store is going down and you're opening stores in mature markets that have less sales, and you're opening satellites and such. It appears as though your return on capital is going to continue to go down. Is that correct?

*Id*. Defendant Phalen responded:

> ***I don't believe so. We have been predicting a gradually increasing return on equity, and have been seeing one for the last three years***.

*Id*.

> (d)     Rouskin also asked:

I am talking about unleveraged return on capital, not return on equity. Because your leverage keeps going up and it helps return on equity, but at some point there is going to be a limit on the amount of leverage you can take on.

*Id*. Phalen responded aggressively:

> ***I will still say the same thing. We have been increasing it***. Things have happened that have put it on a temporary sort of plateau, and one is the acquisition of new markets with a significant goodwill component, and the other was the acquisition of Montana Mills. We are going to continue to make those acquisitions because we believe they are an investment in our future and ultimately unlock our greatest potential.

> ***But I think you'll see – I don't think you'll see a downward trend. I think you'll see some pressure that keeps them from rising. And it will be***

*largely related to periods when we have a lot of acquisition activity versus periods when we don't*.

*Id.*

156.    <u>Reasons Why Statements in ¶¶153-155 Were False and Misleading</u>: Krispy Kreme's statements made in its February 17, 2004 and March 10, 2004 press releases announcing the Company's 4Q04 and FY04 earnings results and the associated conference call were false and misleading for all the reasons set forth in the section entitled, "Krispy Kreme False Reporting and GAAP Violations During the Class Period," *infra*, ¶¶243-362:

(a)    Specifically, Krispy Kreme substantially overpaid for its reacquired franchises including the Dallas market to line the pockets of insiders, then allocating the majority of the purchase price to "intangible assets," which defendants failed to amortize, in violation of GAAP.  *See* ¶¶247-291.

(b)    Krispy Kreme, the Individual Defendants and PwC knew or recklessly disregarded that the Company improperly accounted for the Montana Mills acquisition by failing to take any write-downs for known impairments, causing the Company to overstate EPS in violation of GAAP.  *See* ¶¶288-291, 311-323.

(c)    Krispy Kreme, the Individual Defendants and PwC knew or recklessly disregarded that the Company improperly accounted for property and equipment leases and specifically depreciation of lease assets.  *See* ¶¶345-354.

(d)    Krispy Kreme, the Individual Defendants and PwC knew or recklessly disregarded that the Company improperly recognized revenue in its KKM&D segment, by recording revenue upon the shipment of equipment to franchises, rather than upon installation.  *See* ¶¶302-310.

(e)     Krispy Kreme, the Individual Defendants and PwC knew or recklessly disregarded that the Company improperly accounted for certain derivative transactions.

(f)     Krispy Kreme, the Individual Defendants and PwC knew or recklessly disregarded that the Company's 4Q04 and FY04 financial results were also false and misleading because Krispy Kreme failed to properly account for the Company's allowance for doubtful accounts related to receivables by struggling franchises, as discussed *infra*, at ¶¶292-301.

(g)     Defendants' February 17, 2004 and March 10, 2004 statements reiterating fiscal 2005 earnings expectations of $1.16-$1.18 per share and denying any cannibalization effect by off-premises sales strategy were knowingly false and misleading in that throughout the Class Period sales had been progressively declining, as reported by confidential witnesses. *See* ¶¶112(a)-(m).

157.     Krispy Kreme's and the Individual Defendants' false statements and false financials caused the Company's stock price to be artificially inflated.

158.     <u>False and Misleading Statement:</u> On April 16, 2004, Krispy Kreme filed its Report on Form 10-K for FY04, ending February 1, 2004. The Form 10-K was signed by defendants Livengood and Phalen and McAleer. Both Livengood and Phalen also submitted signed certifications pursuant to Sarbanes-Oxley, §§302 and 906, attesting to the accuracy of the financials in the Form 10-K material information therein, and the adequacy of internal controls within Krispy Kreme. The Form 10-K also included an Unqualified Audit Report by PwC.[19] The Form 10-K falsely represented its FY04 quarterly and year end financial

---

[19]     The Form 10-K stated:

results, the status of the Montana Mills subsidiary, and curiously reported a decrease in reserves for doubtful accounts, despite an increase in accounts receivables. Ex. 16. At fiscal year end 2003, Krispy Kreme's receivables and allowance for doubtful accounts were $46.9 million and $1.5 million, respectively. *Id.* At fiscal year end 2004, however, Krispy Kreme's receivables and allowance for doubtful accounts were $67.1 million and $1.3 million, respectively. *Id.* Therefore, while Krispy Kreme's receivables increased 30% during the year, its allowance for doubtful accounts decreased by 14.86%, despite the fact that typically, a company's allowance will increase as its accounts receivable balance increases. *Id.* Indeed, as discussed below, on November 22, 2004, Krispy Kreme spontaneously doubled its allowance for doubtful accounts.

159. With regard to the Montana Mills acquisition, the Report on Form 10-K continued to repeat the false statements that the bread company would expand the Company's revenue-generating product offerings and, more importantly, that the Company was committed to developing the Montana Mills concept and would spend two years doing so.

> We believe that this acquisition will provide an opportunity to leverage our existing capabilities, such as our brand building and operational

---

Our audits of the consolidated financial statements referred to in our report dated March 31, 2004 appearing in the 2004 Annual Report to Shareholders of Krispy Kreme Doughnuts, Inc. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10-K) also included an audit of the financial statement schedule listed in Item 15(a)(2) of this Form 10-K. In our opinion, this financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

Ex. ___.

capabilities including our distribution chain, off-premises sales and coffee-roasting expertise, to expand Montana Mills' business opportunity. *We anticipate spending up to 24 months refining and expanding the Montana Mills concept, retaining its core best-in-class breads, but expanding the offering to include bread-based meals and appropriate accompaniments in an inviting setting*.

*Id.*

160. For all the reasons stated in ¶¶156, 243-362, the defendants' statements in Krispy Kreme's Form 10-K for FY04 were false and misleading.

**Krispy Kreme Admits Severe Sales Declines and Closes and Divests Montana Mills Taking a $40 Million Charge Sending the Stock Price Plummeting Lower – Defendants Falsely Blame "Low-Carb Diet" Trend – Fail to Disclose All True Facts Concerning Financial Statements and Business Conditions**

161. <u>False and Misleading Statement and Partial Disclosure</u>: On May 7, 2004, Krispy Kreme issued a press release entitled, "In Response to Recent Industry Dynamics, Krispy Kreme Updates Business Outlook." The Company admitted that its business was not performing at the growth rates that it had falsely represented throughout the Class Period, essentially corroborating what CWs reported was occurring throughout the Class Period, *i.e.*, that doughnut sales were suffering a continued decline and that the Company's off-premises sales created cannibalization and over saturation in certain markets also resulting in sales growth declines. Krispy Kreme disingenuously blamed sales growth declines on the "low-carb diet" trend. The Company stated in its press release:

> *Scott Livengood, Chairman, President and Chief Executive commented, "For several months, there has been increasing consumer interest in low-carbohydrate diets, which has adversely impacted several flour-based food categories, including bread, cereal and pasta. This trend has little discernable effect on our business last year. However, recent market data suggests consumer interest in reduced carbohydrate consumption has heightened significantly following the beginning of the year and has accelerated in the last two to three months. This phenomenon has affected us most heavily in our off-premises sales channels, in particular sales of packaged doughnuts to grocery store customers."*

- 102 -

In the first quarter, the Company's off-premises sales growth resulted from an increase in the number of customer doors served offset by a decrease in per-door productivity. As a result of these factors and *a higher product return rate*, we experienced certain operating inefficiencies and lower operating leverage relative to our existing route and delivery infrastructure. Due to these operating inefficiencies, which also impacted recently-acquired markets, we estimate that the first quarter Company Store segment margin will be below that of the fourth quarter of fiscal 2004.

> *Due primarily to lower than expected Company Store segment profits, the Company has revised guidance for the first quarter and now estimates diluted earnings per share from continuing operations, excluding asset impairment charges described below, will be approximately $0.23. As noted above, the Company also expects fiscal 2005 diluted EPS from continuing operations, excluding asset impairment and other charges described below, to be between $1.04 and $1.06, which is approximately 10% lower than prior guidance. Including the charges, diluted earnings per share from continuing operations are estimated to be approximately $0.16 for the first quarter and between $0.93 and $0.95 for fiscal 2005.*

Exs. 35, 49.

162.    The press release further disclosed that the Company would completely divest the Montana Mills operation, which only three weeks earlier it had assured investors it would spend two years developing and throughout the Class Period stated would be break-even or profitable. The Company also told investors that it would take a $40 million charge to earnings to account for the impairment of Montana Mills:

> [W]e intend to minimize any expenditures related to both the existing Montana Mills concept and the developing concept prototype. . . . *As a result, we will divest the existing Montana Mills operation. We plan to close the majority of the existing Montana Mills locations, which are underperforming, and will pursue a sale of the remaining Montana Mills stores. . . . In conjunction with this action, we will record a non-cash, pre-tax asset impairment charge of approximately $35-$40 million in the first quarter and anticipate recording pre-tax charges of approximately $2-$4 million in subsequent quarters related to potential lease and severance obligations*.

*Id.*

163.   <u>False and Misleading Statements and Partial Disclosure:</u> On the same day,

May 7, 2004, the Company held a conference call for analysts and investors hosted by

defendants Tate, Livengood, and Phalen during which it reported false FY04 financial

results, announced its FY05 revenue and earnings increase, continued to blame the decline

on the "low carb diet."  The Company nonetheless admitted that it had been experiencing

high product return rates as reported by CW12 and CW13.  And, sales declines were indeed

more pronounced in areas where its stores participated in off-premises sales.  Accordingly,

Krispy Kreme announced that it would be closing factory stores in several cities, including

Charlottesville, Virginia; Hayward, California; Baltimore, Maryland; Indianapolis, Indiana;

Cincinnati, Ohio; and Columbus, Ohio.  Defendants stated during the conference call:

> We . . . generated a 26 percent volume increase for the 12 weeks
> ended April 18, '04, according to IRI. . . .  Unfortunately, at the same time,
> we were beginning to experience declining (indiscernible) productivity and a
> higher product return rate.  The declining per-door productivity has an impact
> on our business model, particularly in those company markets where we
> utilize large-scale production facilities or commissaries to serve off-premises
> accounts.

*      *      *

> **Finally, in the current environment, as Scott indicated, we're
> making difficult decisions to ensure that our market production capacities
> are aligned with our customers' needs.  Four factory stores, each originally
> designed to serve primarily retail customers, are located in declining trade
> areas and in most cases were not designed to augment their capacity
> utilization with off-premises business.  Factory stores in Charlottesville,
> Virginia, Cincinnati and Columbus, Ohio, and Indianapolis, Indiana, will
> be closed in the near future.  Additionally, two commissaries, one in
> Hayward, California and one in Baltimore, Maryland, are not adequately
> positioned or represent excess capacity to serve current and anticipated
> customers.  The commissaries will be closed after we have provided for a
> smooth, uninterrupted customer transition.**

*      *      *

- 104 -

*As mentioned earlier, the decrease in per-door productivity and increased product returns in our off-premises sales channel adversely impacted store margins in the first quarter. As a result of these factors, we experienced certain operating inefficiencies and lower operating leverage across both heritage and recently acquired markets.*

\* \* \*

*The actions announced today will affect our financial statement presentation. Specifically, the decision to divest Montana Mills will result in restating prior and current financial results to recast Montana Mills as discontinued operations.* In conjunction with this decision, we will record a non-cash, pre-tax asset impairment charge of approximately 35 to $40 million in the first quarter and anticipate recording pretax charges of approximately 2 to 4 million in subsequent quarters related to potential lease and severance obligations.

Ex. 1.

164. During the same May 7, 2004 conference call, the Company misrepresented the state of affairs for KremeKo, the Canadian Krispy Kreme joint venture of which Krispy Kreme owned 57%, stating:

We are evaluating every opportunity to help our joint venture partners accelerate their development of a profitable franchise entity. In many cases, this is including hands-on assistance in the accelerated rollout of off-premises accounts. *In some specific cases, like KremeKo, our franchise partner for central and eastern Canada, we are actively participating with them to formulate immediate strategies for selected cost reductions, including salary and benefit costs and marketing expenses, acceleration of convenience store roll-outs with 75 to 100 additional unplanned doors this year, and an increased emphasis on fund-raising. We estimate that these actions will have the potential to increase the profitability of this franchise by 2 to $3 million alone.*

*Id.*

165. <u>Reasons Why Statements in ¶¶161-164 Were False and Misleading:</u> Defendants' May 7, 2004 statements, blaming the reduction in public revenue and earnings guidance on the "low carb diet" and misrepresenting the growth potential of KremeKo, its

- 105 -

Canadian area developer, were false and misleading when made because Krispy Kreme and the Individual Defendants knew or recklessly disregarded:

(a)     Krispy Kreme's growth strategy, *i.e.*, increased store opening and off-premises sales into convenience stores and department stores had resulted in market oversaturation and a dramatic decline in sales, as reported by CW1-CW7, CW10-CW16 (¶¶112(a)-(m), 137(h), 147(e)).

(b)     Krispy Kreme, in order to artificially boost quarterly and or year-end revenues and earnings, had been engaging in improper channel stuffing, as reported by CW8 and CW9 (¶137(e)-(g)).

(c)     Krispy Kreme, the Individual Defendants and PwC knew or recklessly disregarded that reported quarterly and year-end financials were a result of improper accounting as set forth in the section entitled, "Defendants' False Financial Reporting and GAAP Violations During the Class Period," as pled *infra* at ¶¶243-362. Specifically, defendants:

(i)     Improperly accounted for Krispy Kreme's franchise reacquisitions;

(ii)     Failed to properly account for Krispy Kreme's allowance for doubtful accounts;

(iii)     Failed to timely record impairment charges for Montana Mills;

(iv)     Improperly recognized revenues concerning off-premises sales, rather, "channel-stuffing";

(v)     Improperly recognized revenue in its KKM&D segment;

(vi)     Improperly accounted for its derivative transactions; and

- 106 -

(vii)     Improperly accounted for its leases and the related depreciation of leased assets.

(d)     Defendants' May 7, 2004 statement pertaining to the status of KremeKo were also false, as defendants knew but failed to disclose that KremeKo was suffering from serious financial problems and in May 2004 had already appointed a "Special Committee" to consider steps to address its difficulties, which according to KremeKo were encountered as a result of what KremeKo has characterized as Krispy Kreme's "flawed business model [it] has been required to execute . . . ." *See* Ex. __ and Ex. 1.  Thus, defendants were well aware both that their business model was defective and that KremeKo's financial state was so dire that the company would not be able to make it profitable.

**Analysts and Investors Challenge the Credibility of Krispy Kreme Management**

166.     Investors and analysts expressed disbelief at the "low carb" excuse proffered by defendants and challenged the credibility of Krispy Kreme executives.  For example, during the question and answer session of the May 7, 2004 conference call analysts openly challenged the credibility of Krispy Kreme management:

Larry Schudamacher Analyst

***I guess it seems pretty disingenuous that you guys are blaming all of these problems on a diet phenomenon when doughnuts, as a food category, is not really a diet food.  So you now, store closings, revamping growth plans, selling a company you bought about twelve months ago, all because people are eating low-carb diet foods?  It seems hard to believe that that's what is going on here.***

\*     \*     \*

Skip Carpenter – ***Thomas Weisel Partners*** – Analyst

- 107 -

Maybe it's just a follow-up from Larry's question – again, could you maybe like put a little bit of a time perspective in the sense that this demand scenario vis-à-vis the low-carb craze has been going on for some time and there are some studies indicating that it peaked out in terms of incremental dieters or people trying this kind of diet in the January time frame. . . . *You know, you are closing stores, the Montana Mills; it just seems like – and maybe if you could, Scott, kind of take us a step back in terms of what prompted such a massive, strategic revamping of multiple issues facing the Company?* I mean, was it bought [sic] about by this kind of the lagging in demand here recently, or has this – has it clearly been something that you guys have been thinking about and recalibrating, if you will, over the last couple of quarters? *Because I'm just kind of shocked at all that's unraveling here today and pointing towards a dynamic that I think many in the marketplace have known about for a long time. What I'm hearing about it from other consumer-related companies that maybe the worst is behind us.*

*Id.*

167.    On May 7, 2004, for example, a J.P. Morgan analyst issued a report entitled,

"Right Issues Not Addressed," criticizing management's failure to admit the true reasons for

the shortfall – *i.e.,* over-saturation and declining sales.

- *Krispy Kreme management hosted a conference call following their earnings pre-release. In our opinion, the company did not properly address the issues of the rapid new unit development rate affecting same store on/off premises sales.*

- *Mgt. stated that franchisee health is very strong – a statement not supported by the broad decline in new unit avg. weekly sales and "same door" off-premise productivity declines in older mkts.*

Ex. 50.

168.    On May 7, 2004, *Reuters* reported:

"We believe many issues are internal," J.P. Morgan analyst John Ivankoe said in a note.

                    *        *        *

*"It's not as if a majority of Americans are changing their diets," said Harry Balzer, vice-president of market research firm The NPD Group. "About 6 to 7 percent of the population are on a low-carb diet."*

Ex. 51.

169.    Upon the Company's May 7, 2004 disclosures, Krispy Kreme's stock dropped

from $31.80 per share to as low as $22.48 per share before ***closing at $22.51 per share on***

***May 7, 2004, some 54% below the Class Period high of $49.74*** per share and a one-day

drop of 29%, on volume of 20.5 million shares as opposed to only 574,000 on May 6, 2004.

Ex. 10.

170.    Recognizing that in reality, Krispy Kreme's core business had, in fact, slowed

tremendously, on May 21, 2004, a Thomas Weisel Partners LLC issued a report entitled,

"Pricing Power, Franchise Model & New Initiatives Are Key to Near (Part 4 of 7)":

> ***We believe, pointing to the low carb diet fad is an effort to disguise***
> ***the significant slowdown in Krispy Kreme's core business.  Low carb***
> ***consumption trends have been on the rise over the last year and a half, and***
> ***its impact on food and beverages companies have been well-publicized over***
> ***the last six months.  Our industry sources from other restaurant industry***
> ***players have indicated that low carb diets fad peaked in the first quarter.***

Ex. 52.

171.    Defendants' failure to disclose all true facts concerning the Company's

financial condition including severely slowing sales and false financial reporting caused the

Company's stock price to remain artificially inflated.

172.    On May 25, 2004, *The Wall Street Journal* reported that, "Krispy Kreme

Franchise Buybacks May Spur New Concerns," discussing the Company's franchise

buybacks and claims that the accounting for the transaction caused the Company's public

earnings results to be artificially inflated.  Ex. 18.  The article further criticized the Company

for failing to disclose to investors, a related party transaction in which defendant

Livengood's wife received $1.5 million from the Company as part of the purchase of Golden

Gate, the Northern California franchise reacquisition discussed *supra* at ¶¶150-151, 173:

- 109 -

*Since going public in 2000, Krispy Kreme Doughnuts Inc. has faced questions about its accounting transparency and potential for conflicts of interest in investments that its executives made in its franchises*. . . .

But two recent deals in which Krispy Kreme bought back franchisees could spark new concerns. *Some independent accounting experts say the Winston-Salem, N.C., company may have used aggressive bookkeeping to boost its earnings when it acquired its Michigan franchise last year. In the other buyout, completed in January, Krispy Kreme didn't disclose that one of the sellers was Chief Executive Scott Livengood's ex-wife, whose share was valued at about $1.5 million*.

Ex. 17.

After reaching a preliminary agreement, this person says, Krispy Kreme asked Dough-Re-Mi to close two underperforming stores and pay Krispy Kreme accrued interest on past-due loans. *Krispy Kreme agreed to boost the purchase price to cover the additional cost of the moves*.

Krispy Kreme declines to discuss details, saying only that the final contract called for Dough-Re-Mi to cover the new costs. Part of the deal, Company executives add, was that Krispy Kreme would "reimburse" Dough-Re-Mi more than $1 million for store-closing expenses. They decline to provide any figure for the interest payment. The deal closed in October 2003, for a price that Krispy Kreme eventually pegged at $32.1 million.

*Why would Krispy Kreme pay its franchisee extra money just so the franchisee could turn around and repay that same amount in past interest? One possible answer, accounting experts say: boosted earnings*.

*Collecting on the unpaid interest resulted in an immediate profit for Krispy Kreme in the form of "interest income." The cost was rolled into the total purchase price, nearly all of which was put on Krispy Kreme's balance sheet as an intangible asset called "reacquired franchise rights." That asset doesn't get amortized, or subtracted from earnings over time*.

*"It looks like they took money from one pocket, put it into another pocket, and called it income," says Lori Holder-Webb, an accounting professor at the University of Wisconsin who specializes in acquisition accounting*. . . . *Charles Mulford, a professor at Georgia Institute of Technology, says that "if true, that sounds to me like a flat-out violation" of accounting principles, which he believes may have resulted in earnings being overstated*.

Accounting experts also raise questions about how Krispy Kreme treated store-closing costs. Had the Company bought the franchise and then closed the stores by terminating their leases, it would have been an operating

- 110 -

cost.  *But by rolling the store-closing costs into the price of the deal, there was no hit to Krispy Kreme's bottom line – and the costs also became an intangible balance-sheet asset.*

\*     \*     \*

Krispy Kreme's fiscal third quarter ended less than a week after the Michigan deal closed.  *The company reported results that exactly met Wall Street expectations – net income of $14.5 million, or 23 cents a share.  Had the company not gotten the interest income from the Michigan deal and recognized the store-closing costs as an expense, it could well have fallen short of expectations.*

\*     \*     \*

*Krispy Kreme let the executive go shortly after the deal, and had to pay about $5 million more than the sum it had included for the promissory note in its original estimate.  The extra sum was again rolled into "reacquired franchise rights," and so didn't hit Krispy Kreme's bottom line.*

Accounting experts say such a big increase in the payout in such a short period raises questions about whether at least some of the dispersal was akin to a severance or settlement cost – which typically is expensed immediately – not really part of buying the franchise.  At the very least, they say, the big increase raises questions about whether the "reacquired franchise rights" asset is overvalued.  Krispy Kreme says its accounting was accurate, adding that the payment wasn't severance because it was made to Dough-Re-Mi, not directly to the executive.

Ex. 18.

173.    The May 25, 2004 *Wall Street Journal* article also discussed use of a

Company deal to benefit Livengood's ex-wife:

The ex-wife of Mr. Livengood, the company's chief executive, got her stake in the company's northern California franchise through a complicated chain of events.  Krispy Kreme allowed its executives to own stakes in franchises, a holdover from the era when the Company was closely held.  That practice is unusual and Yum Brands Inc., operator of KFC and Pizza Hut, bans employee ownership of franchisees, viewing it as a conflict of interest.  Wendy's International Inc. allows its employees to hold only "nominal" amounts of a publicly traded franchisee's stock.

Krispy Kreme in 2002 bought out the interests of several company officers, at no profit to them, in an investment pool that owned a piece of

- 111 -

seven franchisees. Mr. Livengood also sold what he described as "my 3% in the same seven franchise operations" back to Krispy Kreme for the "original investment." While the Company didn't acknowledge any wrongdoing, Mr. Livengood said in March 2002 that he hoped "these actions will affirm the trust and confidence that investors have placed in Krispy Kreme."

*Mr. Livengood and Krispy Kreme didn't tell investors that the 3% stakes hadn't been his entire investment. He actually held 6% stakes until reaching a separation agreement with his then-wife*, Adrienne, in August 2001, when she "got half of whatever I had," Mr. Livengood says. They divorced in June 2002. According to a company spokeswoman, a 10k filed in May 2002 that reported Mr. Livengood had only "3% investments" in the franchises as of January 2001 "was incorrect," adding that "whoever proofed that, missed it." She also noted that Krispy Kreme doesn't plan to correct the error in a revised filing because "it's not a material issue."

Mr. Tate, the chief operating officer, acknowledges that the franchise stakes were valued as part of Mr. Livengood's separation-agreement talks, but "because everything was split down the middle, he didn't avoid giving her" other assets.

*Id.*

**Notwithstanding the May 7, 2004 Disclosures, False and Misleading Statements by the Company Continue – the Stock Price Remains Artificially Inflated**

174.    <u>False and Misleading Statement:</u> Subsequently, on May 25, 2004, Krispy Kreme announced false 1Q05 financial results including a loss in EPS of $0.38, and earnings forecasts of $1.04 - $1.06 per share.  The release stated in part:

First quarter systemwide sales including sales of company and franchise stores advanced 24.2%.  *Total revenues for the quarter, which includes sales from company stores, franchise operations and Krispy Kreme Manufacturing and Distribution (KKM&D) increased 24.0% to $184.4 million compared with $148.7 million in the first quarter of last year*.  *Revenues from franchise operations grew 40.2% to $7.1 million; KKM&D revenues increased 27.5% to $52.7 million and company store sales advanced 21.8% to $124.5 million*.  *On a comparable store basis, systemwide sales increased 4.0% and company store sales advanced 5.2%*.

*         *         *

*The Company estimates fiscal 2005 earnings per diluted share from continuing operations of between $1.04 and $1.06*.  The Company now

- 112 -

estimates that fiscal 2005 systemwide sales will increase approximately 20% to 25% and systemwide comparable store sales growth will be in the low- to mid-single digits.

Ex. 53.

175. <u>False and Misleading Statement:</u> On the same day, May 25, 2004, Krispy Kreme, through defendants Livengood and Phalen, hosted a conference call for investors and analysts in which they repeated Krispy Kreme's false financial results. Ex. 73.

176. <u>False and Misleading Statements:</u> Also during that May 25, 2004 conference call, Livengood falsely assured the public that *The Wall Street Journal* May 25, 2004 article was inaccurate. Livengood falsely stated:

> Before I begin with my prepared remarks let me address the Wall Street Journal article that ran this morning. I take exceptions with any implications questioning our governance practices, propriety of our accounting, and thus our integrity. ***We reiterate that the accounting for the Michigan acquisition was in accordance with generally accepted accounting principles and any assertion to the contrary is false and inaccurate***. We take further exception to the writers and writer's sources characterization of our accounting for the Michigan acquisition as aggressive.

*Id.*

177. <u>False and Misleading Statements:</u> On June 14, 2004, Krispy Kreme filed its Report on Form 10-Q for 1Q05, repeating false 1Q05 financial results. The 1Q05 was signed by defendants Livengood and Phalen, each of whom submitted certifications pursuant to Sarbanes-Oxley, §§302 and 906 attesting to the accuracy of the information in the financial statements.

178. <u>Reasons Why Statements in ¶¶174-177 Were False and Misleading</u>: Krispy Kreme's statement in its May 25, 2004 press release, including its conference call and 1Q05 financial results in its Report on Form 10-Q filing, and denial of any accounting improprieties, were false when made for all of the reasons set forth below:

- 113 -

(a)     Krispy Kreme and the Individual Defendants knew or recklessly disregarded that their accounting practices in connection with the reacquired Michigan franchise and Golden Gate franchise were in violation of GAAP as the Company ultimately admitted on January 4, 2005, *infra* at ¶¶197-201.

(b)     Krispy Kreme failed to consolidated the financial results of KremeKo, a failing Canadian franchise, which caused the Company 1Q05 earnings results to be overstated as discussed in detail, *infra* at ¶¶211-213, 337-342.

(c)     Krispy Kreme failed to properly account for reacquired franchise rights as alleged in the Section entitled, "Krispy Kreme Improperly Accounted for its Franchise Reacquisitions," by overpaying for franchises to line the pockets of insiders, and allocating the majority of the purchase price to the "intangible assets" which Krispy Kreme failed to amortize, *infra* at ¶¶247-291.

(d)     Krispy Kreme failed to properly account for the Company's allowance for doubtful accounts related to receivables by its struggling franchises, *infra* at ¶¶292-301.

(e)     Krispy Kreme also improperly accounted for property and equipment leases and the related depreciation of the leased assets, as alleged *infra* at ¶¶345-354.

(f)     Krispy Kreme's 1Q05 financial results were also false because defendants improperly recognized revenue in its KKM&D segment as detailed in ¶¶302-310 and because defendants improperly accounted for certain derivative transactions, as detailed in ¶¶355-358.

**The SEC Announces Investigation of Krispy Kreme
Forecasts and Financial Reporting for Franchise Acquisitions**

179.     On July 29, 2004, the Company announced that the SEC opened an investigation of Krispy Kreme related to the Company's franchise reacquisitions and its May

- 114 -

7, 2004 reduction in earnings guidance which set the stock price spiraling downward. The Company issued a press release with the announcement and media organizations followed. Ex. 54. *CNNMoney* also published an article entitled, "SEC Probes Krispy Kreme." Ex. 55. The investment community expressed distrust in management, as *The Motley Fool* reported:

> Another Hole in Krispy Kreme
> By Alyce Lomax
> July 29, 2004
>
> Krispy Kreme (NYSE: KKD) was the subject of more bad news today, sending shares in the doughnut purveyor down more than 10%, to a three-year low, in fact. The freefall was sparked by the company's disclosure that the Securities & Exchange Commission is performing an informal, nonpublic investigation, ***eyeing Krispy Kreme's repurchases of franchises, as well as its well-known earnings warning that occurred several months ago***.

Ex. 56.

180.    The July 29, 2004 news of the SEC investigation lopped another 15% of the Company's stock price, causing a price drop from $18.66 per share to $15.71 per share on 7.5 times more volume than that of July 28, 2004. Ex. 10.

181.    On August 16, 2004, *BusinessWeek* published an article entitled, "What's Really Inside Krispy Kreme?" Ex. 28. The article further discussed the Company's franchise reacquisitions and buybacks, and the manner in which the Company accounted for them. *BusinessWeek* also criticized the Company's failure to amortize money spent on reacquisitions by categorizing them as intangible assets. The impact of this practice resulted in the artificial inflation of the Company's assets and earnings. The article also discussed Krispy Kreme's related party transaction with Livengood's ex-wife, and the inflated price it paid for certain reacquisitions:

> ***More nasty surprises could be in store for shareholders in the Winston-Salem (N.C.) chain as the SEC probe gets going. Consider the way Krispy Kreme accounts for the franchises it buys back, on which it has***

- 115 -

*spent nearly $150 million over the past year. Because much of the outlay pays for the property, plant, and equipment, most food chains amortize this cost over several years. Krispy Kreme doesn't. Company documents show it has been booking most of the spending as so-called intangible assets, which don't have to be amortized. The result: Krispy Kreme's reported earnings are higher than they would have been had it written them off.* "Krispy Kreme's accounting for the franchise acquisitions is the most aggressive we've found," says Robert Miceli, analyst at Scottsdale (Ariz.) Camelback Research Alliance.

*     *     *

*The accounting treatment isn't the only potential problem with the acquisitions. Krispy Kreme didn't disclose that one of the owners of a Northern California franchise it bought earlier this year was Livengood's ex-wife. Nor did it identify two of the owners of the Dallas and Shreveport, La., franchises acquired last year as the brother and cousin of a senior executive.* Krispy Kreme has said it believes it wasn't required to under SEC rules. But, says Sanjai Bhajat, a professor of finance and corporate governance at the University of Colorado: "These kinds of relationships should be disclosed."

*The prices paid for some of the company's acquisitions have also raised eyebrows. Krispy Kreme shelled out $67 million in cash for the Dallas and Shreveport franchises, a total of six stores.* That's more than $11 million a store. Just months before, Krispy Kreme was paying an average of $6.5 million a store.

*Id.*

182.     On August 16, 2004, Krispy Kreme announced COO Tate's departure from Krispy Kreme "to pursue another opportunity." Ex. 57.

183.     <u>False and Misleading Statement</u>.     On August 26, 2004, Krispy Kreme announced its false 2Q05 financial results in a press release including $177 million in revenue and $0.09 EPS. Defendants reported false 2Q05 financial results, stating:

*Second quarter systemwide sales, including sales of company and franchise stores, increased 14.8% compared with the second quarter last year. Total revenues for the quarter, which includes sales from company stores, franchise operations and Krispy Kreme Manufacturing and Distribution (KKM&D), increased 11.5% to $177.4 million compared with $159.2 million in the second quarter of last year. Company store sales*

*increased 18.7% to $123.8 million, revenues from franchise operations grew 13.7% to $6.8 million and KKM&D revenues decreased 4.1% to $46.9 million due to lower equipment sales. On a comparable store basis, systemwide sales increased 0.1% and company store sales increased 0.6%.*

Ex. 74.

184.    <u>False and Misleading Statement:</u> On the same day, August 26, 2004, Krispy Kreme, through defendants Livengood and Phalen, hosted a conference call wherein defendants repeated the false 2Q05 financial results. Ex. 75.

185.    <u>False and Misleading Statement:</u> On September 10, 2004, Krispy Kreme filed its Report on Form 10-Q for 2Q05 in which repeated the 2Q05 false financial results. The Form 10-Q was signed by defendants Livengood and Phalen, each of whom signed and submitted certifications pursuant to Sarbanes-Oxley, §§302 and 906, attesting to the accuracy of the financial statements and material statements therein.

186.    <u>Reasons Why Statements in ¶¶183-185 Were False and Misleading</u>: Defendants' statements made in the Company's August 26, 2004 press release, conference call and September 17, 2004 Form 10-Q announcing false 2Q05 results were false and misleading when made because:

(a)    Defendants knew or recklessly disregarded that accounting practices in connection with their reacquired franchises were in violation of GAAP, as alleged in the section entitled, "Krispy Kreme False Reporting and GAAP Violations During the Class Period," *infra*, at ¶¶243-362.

(b)    Krispy Kreme failed to consolidate the financial results of KremeKo, a failing Canadian franchise, as analyzed in detail, *infra*, at ¶¶211-212, 337-342.

- 117 -

(c)     Krispy Kreme also improperly accounted for its property and equipment leases and the related depreciation of the leased assets, as alleged, *infra*, at ¶¶345-354.

(d)     Krispy Kreme's financial results for 2Q05 were also false because defendants improperly recognized revenue in its KKM&D segment as detailed in ¶¶302-310 and because defendants improperly accounted for certain derivative transactions, as detailed in ¶¶355-358.

(e)     Finally, Krispy Kreme's 2Q05 financial results were false because the Company failed to properly account for the Company's allowance for doubtful accounts related to receivables by its struggling franchises, *infra* at ¶¶292-301.

**Partial Admissions and Disclosures Seep into the Market
but Reported Earnings and Assets Are Still Overstated and
Krispy Kreme's Stock Price Is Still Artificially Inflated**

187.     On September 3, 2004, *The Wall Street Journal* published a critical article on Krispy Kreme's failing business strategy and questionable practices relating to the reacquisition of franchise rights and recognition of revenue on money given to Dough-Re-Mi then paid directly back to Krispy Kreme:

> The biggest problem for Krispy Kreme may be that the company grew too quickly and diluted its cult status by selling its doughnuts in too many outlets while trying to impress Wall Street.
>
> *             *             *
>
> Krispy Kreme has spent $100.5 million to repurchase two franchises owned by corporate insiders.  And it accounts for franchise repurchases in a way that largely avoids the need to deduct their value gradually from future earnings.
>
> *             *             *
>
> Mr. Livengood sold 235,500 shares in August 2003, a week after the all-time high, despite having said nine months earlier he wouldn't sell more stock "for

- 118 -

at least a year." He said the sale was "totally consistent" with the "spirit" of his pledge.

* * *

In a deal 15 months ago, Krispy Kreme paid $67.5 million for franchise rights for Dallas and Shreveport, La., from Joseph A. McAleer Jr., a former Krispy Kreme chief executive and director, and Steven D. Smith, an emeritus director.

[F]ranchisee had just five stores and one "commissary," or wholesale facility. A Krispy Kreme outlet typically costs about $2 million to build. . . . Krispy Kreme executives have said the price was reasonable as a multiple of cash flow, and also because of the huge untapped potential in Dallas in particular. . . .

***Krispy Kreme typically assigned more than 85% of the purchase price to an intangible asset category called "reacquired franchise rights."*** . . .

Of the four that recorded reacquired franchise rights, all amortized those costs over time. . . .

***Last October, Krispy Kreme repurchased its Michigan franchisee, called Dough-Re-Mi Ltd., for $32.1 million. Part of the price went to pay past-due interest Dough Re-Mi owed to Krispy Kreme. Krispy Kreme booked this sum as immediate profit. Some outside experts have said the company appeared to be taking money from one pocket, putting it into another and calling it income.*** Krispy Kreme officials have steadfastly defended their accounting and handling of franchise buybacks.

Ex. 58.

**Krispy Kreme's Outside Auditor, PwC, Refuses to Sign-Off on 2Q05 Krispy Kreme Financial Reports**

188.     On September 13, 2004, Krispy Kreme's outside auditor, PwC, refused to complete and sign-off on the Company's 2Q05 financial statement until and unless an investigation by an independent law firm was completed. Ex. 59. On that day, *The Business Journal* published an article stating:

Filing:  ***Krispy Kreme auditor refuses to OK quarterly report***

Krispy Kreme Doughnuts Inc. disclosed in a recent regulatory filing that its independent auditors have refused to sign off on the Winston-Salem

- 119 -

company's quarterly financial statement until an outside law firm performs additional work.

> **The doughnut maker disclosed in its second-quarter filing with the Securities & Exchange Commission that it hired an outside law firm on Aug. 30 to investigate "a specific matter relating to an acquisition in fiscal 2004." The filing did not disclose the identity of the law firm**.

*     *     *

The quarterly filing said the subsequent investigation by the law firm found no wrongdoing on the part of Krispy Kreme or any of its employees.

The quarterly filing also did not identify the firm that performs Krispy Kreme's auditing tasks. The company had been using PricewaterhouseCoopers LLP as its independent accountants, according to the company's proxy materials filed with the SEC earlier this year.

> **However, the company's auditor refused to complete its evaluation of Krispy Kreme's second-quarter financial report until the law firm completes "additional procedures, which are currently under way," the filing said**.

Krispy Kreme said the law firm's additional work primarily will involve further review of certain electronic files. The filing did not elaborate.

*Id.*[20]

### SEC Formalizes Its Krispy Kreme Investigation

189.    On October 8, 2004, *CNNMoney.com* issued an article entitled, "Krispy Kreme SEC Probe Widens," stating of the SEC investigation:

> **Krispy Kreme Doughnuts Inc. said Friday it has been informed by the Securities and Exchange Commission that the agency's investigation of the company has now become a formal probe**.

---

[20]    On October 4, 2004, Krispy Kreme announced it had appointed two independent members to Krispy Kreme's Board. Ex. 60. Notably, one of these individuals, Michael Sutton, was Chief Accountant of the SEC from 1995 to 1998. *Id.* On the same day, Krispy Kreme announced the formation of a Special Committee to investigate matters being investigated by the SEC. Ex. ___.

Shares of Krispy Kreme fell about 4 percent on the New York Stock Exchange. Krispy Kreme's stock is down 65 percent year-to-date.

\*     \*     \*

At the time, the Winston-Salem, N.C. – based chain, which is struggling to right its slowing sales, said that the investigation involved the way it accounted for its repurchased franchises and its previously announced reduction in earnings guidance.

\*     \*     \*

"This is definitely very bad news," said Carl Sibilski, analyst with Morningstar wrote in a research note Friday [sic]. "Until now, we had given the company's management the benefit of the doubt with respect to certain franchise-acquisition activities. We believe that the SEC's decision indicates that, for some reason, cooperation between the company and the agency in the preceding informal investigation broke down, leading the commission to seek the greater legal powers of a formal investigation."

Ex. 61.

190.    <u>False and Misleading Statement:</u>    On November 22, 2004, Krispy Kreme announced false 3Q05 results, along with the recording of $2 million for doubtful accounts. The Krispy Kreme press release quoted defendant Livengood, stating: "'Clearly, we are disappointed with our third quarter results. We are focused on addressing the challenges facing the Company and regaining our business momentum.'" Ex. 62. The Company's press release falsely reported Krispy Kreme's 3Q05 financial results, stating in part:

**Krispy Kreme Announced Third Quarter Results**

WINSTON-SALEM, N.C., Nov. 22 /PRNewswire-FirstCall/ -- Krispy Kreme Doughnuts, Inc. (NYSE: KKD) today reported unaudited financial results for the third fiscal quarter ended October 31, 2004.

*Total revenues for the quarter, which include sales from company stores, franchise operations and Krispy Kreme Manufacturing and Distribution (KKM&D), increased 1.4% to $170.1 million compared with $167.8 million in the third quarter of last year. Company store sales increased 9.6% to $121.2 million, revenues from franchise operations decreased 5.4% to $6.2 million and KKM&D revenues decreased 15.7% to $42.7 million.* The Company store sales increase was attributable to sales

- 121 -

from new stores as well as the inclusion of sales from New England Dough, LLC, the Company's consolidated joint venture partner in Connecticut, Maine, Massachusetts, Rhode Island, Vermont and New Hampshire, which was consolidated in May 2004 pursuant to FIN 46-R and the inclusion of sales from the Michigan market, which was acquired in October 2003, partially offset by decreased sales from existing stores.

*Third quarter systemwide sales, including sales of company and franchise stores, increased 4.7%. Systemwide average sales per week decreased 16.7% from the prior year comparable period to approximately $52,200 per store, and company store average sales per week decreased 19.9% to approximately $58,400 per store. On a comparable store basis, systemwide sales and company store sales decreased 6.4% and 6.2%, respectively.*

*Net loss for the third quarter was $3.0 million, or $0.05 per diluted share, compared with net income of $14.5 million, or $0.23 per diluted share, in the comparable period last year. Loss from continuing operations for the third quarter of fiscal 2005 was $1.0 million compared with income from continuing operations of $15.0 million, or $0.24 per diluted share, in the third quarter last year.* For the quarter, income from continuing operations before impairment and store closing costs was $2.4 million, or $0.04 per diluted share. The pre-tax impairment charge and store closing costs were approximately $5.5 million primarily related to the closure or pending closure of four factory stores, which are all commissaries. In the quarter, the Company reported a loss from discontinued operations, net of taxes, of approximately $2.0 million, or $0.03 per diluted share, related to the pending divestiture of the existing Montana Mills operation. Early in the fourth fiscal quarter, the Company sold the remaining assets of Montana Mills for a modest amount.

*For the first nine months of fiscal 2005, total revenues increased 11.8% to $531.9 million compared with $475.6 million for the comparable period in fiscal 2004. Sales from company stores increased 16.5% to $369.6 million, revenues from franchise operations increased 14.3% to $20.1 million and KKM&D sales increased 1.0% to $142.3 million. During this period, systemwide sales increased 14.3%.*

Ex. 62.

191. <u>False and Misleading Statement:</u> On the same day, Krispy Kreme, through

defendants Livengood and Phalen, hosted a conference call with analysts, in which they

- 122 -

repeated Krispy Kreme's false 3Q05 results. The Company's press release falsely reported Krispy Kreme's 3Q05 financial results. Ex. 63.

192. Moreover, for the first time, defendants declined to take questions from analysts. In fact, during the November 20, 2004 conference call, defendants essentially admitted that:

(a) Defendants' May 7, 2004 "low-carb" excuse for the "sudden" decline in earnings was false, stating specifically that consumers were in fact moving away from low-carb diet trends to a more balanced diet approach.

(b) The market had, in fact, been oversaturated, stating that it had "overcapacity":

> Clearly, these are disappointing sales and earnings results. It's our belief that they do not reflect the potential of this brand. We're facing a variety of challenges, and we believe that we are developing appropriate responses.

> \* \* \*

> ***We have intentionally, as we announced, slowed our store growth while we work on these operational issues, and continue to roll out several small retail store concepts*** . . . . While that decision will have a predictably negative impact on our growth and operating results over the next year, I believe it is the right decision for the longer-term creation of value for our brand and for our shareholders.

> \* \* \*

> ***We are not providing systemwide sales or earnings per share guidance for the fourth quarter*** . . . .

> \* \* \*

> ***Specifically related to the third point, we concluded that we had overcapacity in certain markets and made the decision to close four commissaries*** . . . .

> \* \* \*

- 123 -

We've also identified a number of cost savings opportunities in all segments of our system, stores, manufacturing, distribution, and corporate support functions. For example, we are pursuing a continued emphasis on managing the cost of our off premises channels, **primarily focusing on returns and shrinkage optimization**, and route consolidation and mileage reductions.

\*       \*       \*

**While our brand remains strong and deeply connected to our customers, 70% of those surveyed say they have not altered the frequency of their purchases at Krispy Kreme**.

\*       \*       \*

**Meanwhile, the low carb trend has clearly impact [sic] the some of our consumers. Recently published reports as well as our own research suggest that consumers may be beginning to move away from this diet to a more balanced approach to diet and nutrition**.

Ex. 63.

193.    <u>Reasons Why Statement in ¶¶190-192 Were False and Misleading:</u> Krispy Kreme's November 22, 2004 announcement of 3Q05 financial results and the subsequent conference call repeating those results were false and misleading when made because:

(a)      Defendants knew or recklessly disregarded that Krispy Kreme's accounting practices in connection with reacquired franchises were in violation of GAAP, as alleged in the section titled, "Krispy Kreme False Reporting and GAAP Violations During the Class Period," *infra*, ¶¶247-291.

(b)      Krispy Kreme also improperly accounted for property and equipment leases and the related depreciation of the leased assets, as alleged *infra* at ¶¶345-354.

(c)      Krispy Kreme's 3Q05 financial results were also false because defendants improperly recognized revenue in its KKM&D segment as analyzed in ¶¶302-310

- 124 -

and because defendants improperly accounted for certain derivative transactions, as analyzed in ¶¶355-358.

194.    Despite limited admissions regarding the weak demand for Company products which substantially hurt growth projections, defendants failed to disclose that publicly reported earnings for FY01-FY04 were in fact each false and misleading in violation of GAAP.

**Krispy Kreme Misses Its Deadline to File Its 3Q04 Report
on Form 10-Q with the SEC**

195.    <u>False and Misleading Statement with Partial Disclosure</u>: On December 13, 2004, Krispy Kreme announced that it would be unable to timely file its Report on Form 10-Q financial results for the period ended October 31, 2004, stating that certain accounting adjustments would have to be made relating to its FY04 financial results.  However, the Company specifically stated that the adjustments would be "immaterial to its financials statements," *i.e.,* no restatement forthcoming.  The extension granted the Company five additional days to make the required Form 10-Q filing.  *See* Ex. 76.  In its Form 8-K and press release, the Company stated:

>        Certain other errors and related proposed adjustments have been identified with respect to the Company's historical financial statements for fiscal 2004, which the Company is reviewing.  These proposed adjustments, as well as the matter discussed in the preceding paragraph, primarily relate to the accounting for the Company's acquisitions of its Michigan and Northern California franchises and would reduce net income for fiscal 2004 by 2.7% and net income for the fiscal 2004 second, third and fourth quarters by 1.9%, 2.1% and 6%, respectively.  Subject to the outcome of the Special Committee's investigation discussed below, management and ***the Audit Committee believe that these matters are immaterial to the Company's financial statements***.  Two of the proposed adjustments involve treating as compensation expense, rather than as purchase price, a part of the disproportionate purchase prices paid to a former operating manager of the Michigan franchise and a former operating manager of the Northern

- 125 -

California franchise, each of whom worked for the Company for a short period of time.

Krispy Kreme Doughnuts, Inc. (NYSE:KKD) today announced that the Company will be unable to file its Form 10-Q for the fiscal quarter ended October 31, 2004 by the extension deadline of December 15, 2004.

On December 13, 2004, the Company filed a Notification of Late Filing on Form 12b-25 stating that its quarterly report on Form 10-Q for the period ended October 31, 2004 could not be filed timely due to ongoing analysis related to the accounting treatment of certain franchise matters in the Company's third fiscal quarter, primarily concerning the Company's consolidation of Kremeko, Inc., its area developer for Central and Eastern Canada.

Ex. 77.

196. <u>Reasons Why Statements in ¶195 Were False and Misleading:</u> Krispy Kreme's statements in its December 13, 2004 Report on Form 8-K claiming that any accounting adjustments would be immaterial were false and misleading when made because defendants knew or deliberately disregarded that it would indeed have to restate approximately 16 quarters of financial results, many in which it initially reported that it had beaten first call consensus estimates signifying strength and growth prospects for the Company. Krispy Kreme's failures to disclose these facts caused the company's stock price to be artificially inflated.

**Krispy Kreme Announces that It Must Restate Its Earnings for 2Q04, 3Q04, 4Q04, FY04, 1Q05, 2Q05, and that It Was at Risk of Defaulting on Its $150 Credit Facility**

197. <u>False and Misleading Statement and Partial Disclosure</u>: On January 4, 2005, Krispy Kreme announced that it would restate its financial results ***at least*** for 2Q04, 3Q04, 4Q04, FY04, 1Q05 and 2Q05. The Company further stated that the financial statements issued in those quarters should "***no longer be relied upon***." The expected net result of the restatement was expected to reduce earnings by between $6.2 million and $8.1 million, or

- 126 -

$0.07-$0.08 per share. The restatement announcement translated to a reduction in profits (earnings) for 2004 of between $4.89 and $6.3 million, or 6.6% – 8.6%. *See* Exs. 66 & 78.

198.    On January 4, 2005, the stock plunged another 17% in a single day, on 10.4 million shares volume trading compared to 2.4 million shares volume trading on January 3, 2005 the previous day.

199.    Moreover, the Company's January 4, 2005 statement left open the possibility that the restatement, ultimately, may encompass a longer time period and be for a larger amount. The Company detailed the restatement as follows:

The principal adjustments, which relate to the Company's accounting for the acquisitions of certain franchisees, are as follows:

- *a pre-tax adjustment of between $3.4 million and $4.8 million to record as compensation expense, rather than as purchase price, some or all of the disproportionate consideration paid to a former owner of the Michigan franchise, who was its operating manager and who subsequently worked for the Company for a short period of time*

- *a pre-tax adjustment of approximately $0.5 million to reverse certain income and to record as expense amounts that were improperly accounted for as part of the Company's acquisition of the Michigan franchise*

- *a pre-tax adjustment of between $0.5 million and $1.0 million to record as compensation expense, rather than as purchase price, some or all of the disproportionate consideration paid to a former owner of the Northern California franchise, who was its former operating manager and who worked for the Company for a short period of time*

- *a pre-tax adjustment of approximately $0.8 million to record as expense, rather than as purchase price, part of the consideration paid to another former owner of the Northern California franchise; this adjustment was proposed subsequent to the Company filing its Current Report on Form 8-K filed December 16, 2004*

- *a pre-tax adjustment of approximately $0.6 million to reverse income recorded as a management fee prior to the Company's*

- 127 -

> > *acquisition of the minority interest in the Northern California franchise*
>
> - *a pre-tax adjustment of approximately $0.5 million to record as expense, rather than as purchase price, part of the consideration in the Company's acquisition of the Charlottesville franchise*
>
> > \*     \*     \*
>
> > *Restatement of the Company's financial statements to reflect the six principal adjustments referred to above and certain other minor adjustments are expected to reduce net income for fiscal 2004 by between approximately $3.8 million and $4.9 million (between 6.6% and 8.6%) and net income for the fiscal 2004 second, third and fourth quarters by approximately $0.3 million (2.2%), approximately $0.3 million (2.1%) and between approximately $3.2 million and $4.3 million (19.3% and 26.3%), respectively. The adjustments are expected to reduce diluted earnings per share ("EPS") for fiscal 2004 by between approximately $0.07 and $0.08 and diluted EPS for the fiscal 2004 second, third and fourth quarters by approximately $0.01, less than $0.01 and between $0.05 and $0.07, respectively.* As a result of the restatement of the fiscal 2004 financial statements, the Company also expects to restate its financial statements for the first and second quarters of fiscal 2005 to reflect the effects of the restatement of the February 1, 2004 balance sheet; however, the Company's previously reported results of operations for the first and second quarters of fiscal 2005 are not expected to be materially affected by this restatement.

*See* Ex. 66.

200.    The largest sums in the proposed restatement relate to payments made to a former principal owner of the Michigan franchise Dough-Re-Mi, which was reacquired in 2003, and which defendant Livengood specifically told investors had been properly accounted for. *See* ¶145.  Krispy Kreme indicated that it inaccurately recorded between $3.4 million and $4.8 million in connection with that deal.  *See* Ex. 79.  Indeed, it was only seven months earlier, on May 25, 2004, that Livengood assured investors "the accounting for the Michigan franchise was in accordance."

- 128 -

201.    The January 4, 2005 announcement of a restatement caused the Company stock price to drop from a high of $12.60 per share on January 3, 2005 to close at $9.70 per share on January 5, 2005 on more than ten million shares traded.

202.    <u>Reasons Why Statements in ¶¶197-199 Were False and Misleading</u>: Defendants' January 4, 2005 restatement announcement was false and misleading because, as defendants knew or recklessly disregarded, they would reverse income reported in fiscal 2001, 2002 and 2003.

203.    The announcement of the restatement impacted more than just the Company's financial results – Krispy Kreme's inability to file its Report Form 10-Q constituted an event of default under the Company's $150 million credit facility, absent a waiver. Ex. 80. As of the filing of the January 4, 2005 Form 8-K, the Company had approximately $91 million outstanding under its credit facility. In addition, Krispy Kreme had guaranteed approximately $52.3 million in franchisee debt, $16.7 million of which was attributed to franchisees in violation of their credit agreements. In the interim, however, Krispy Kreme would be unable to borrow any additional funds. *Id.*

204.    With respect to the credit facility, the Company specifically stated:

> The failure of the Company to deliver to its lenders the Company's financial statements for the quarter ended October 31, 2004 on or before January 14, 2005 (which will not be delivered on or before that date for the reasons discussed above) will, absent a waiver from the lenders, constitute an event of default under the Company's $150 million Credit Facility. Additionally, the adjustments to the Company's fiscal 2004 financial statements described herein may also constitute an event of default.

*Id.*

205.    Krispy Kreme's failure to file its financials in a timely manner rendered the Company at risk for delisting by the NYSE. *See* Exs. 81-83.

- 129 -

206. Krispy Kreme shareholders were furious, and many demanded the immediate firing of CEO Livengood. *Bloomberg News* reported:

> Krispy Kreme Investors Seek Ouster of Chief Executive
>
> * * *
>
> A growing number of Krispy Kreme Doughnuts Inc. shareholders are seeking the ouster of Chief Executive Scott Livengood, after an accounting investigation and a 74 percent plunge in the company's shares in the past year.
>
> "The guy has behaved very badly," said Chuck Akre, president of Akre Capital Management in Middleburg, Virginia, which owned 400,000 Krispy Kreme shares . . . among $1.3 billion in assets. "It's past time for him to go."
>
> Krispy Kreme . . . said on Jan. 4 it will revise 2004 results lower to restate the repurchase of franchise stores. The Securities and Exchange Commission began a formal probe of the company's accounting practices in October following allegations it used the transactions to inflate profit as doughnut sales slowed.
>
> "The company has been badly mismanaged," said Donald Hodges, president of Dallas-based Hodges Capital Management Inc. . . . . "I don't see how he can effectively serve based on the things that have come out."

Ex. 84.

**Krispy Kreme Ousts CEO Livengood, Replacing Him with the
Enron Turnaround Expert, However Livengood's Termination Is
Structured to Pay Him Anyway**

207. On January 18, 2005, Krispy Kreme announced that CEO Livengood had suddenly "retired" as part of a series of "'important actions to address the company's current situation.'" *See* Exs. 85-86. In his stead, the Company placed Stephen Cooper ("Cooper"), a turnaround specialist who most recently spearheaded the Enron bankruptcy reorganization. The Company also announced that it had appointed Steven Panagos ("Panagos") as President and COO. *Id*. Cooper and Panagos were to serve as consultants on an interim basis for a combined fee of $1455 per hour. *See* Ex. 87.

- 130 -

208. The Company announced, however, that Livengood would remain as a consultant for an initial term of six months, renewable for an additional six-month period. Krispy Kreme would pay Livengood a fee of $45,833 per month – the equivalent of his salary prior to his "retirement." Moreover, Livengood's "retirement" triggered an option to purchase 330,125 additional shares of Krispy Kreme stock. All told, Livengood has vested options to purchase at least 1.3 million shares of Krispy Kreme stock. *See* Ex. 70.

209. On February 24, 2005, the Company announced that the United States Attorney's Office for the Southern District of New York had commenced an investigation related to the same matters currently being investigated by the SEC. Ex. 95.

210. On April 4, 2005, the Company announced that its subsidiary, Krispy Kreme Doughnut Corporation, closed senior secured credit facilities totaling $225 million funded by a group led by Credit Suisse First Boston and Silver Point Capital, LP.

**Krispy Kreme's Joint Canadian Venture KremeKo Files for Debt Protection – Documents Say Krispy Kreme Knew of Its Financial Problems**

211. On April 15, 2005, the Company announced that KremeKo, in which the Company retains a 40.6% interest, had filed an application with the Ontario Superior Court of Justice for KremeKo's debt protection and restructuring. Ex. 113.

212. KremKo, Inc.'s ("KremKo") restructuring documents with the Ontario court, however, reveal a great deal about both Krispy Kreme's knowledge of KremKo's dire financials, and the problems with Krispy Kreme's business model. Herb Greenberg of *MarketWatch.com* reported in a May 2, 2005 article entitled, "Inside a Krispy Kreme Franchisee:"

> *It now appears the low-carb claim was the company's last-ditch effort to sugar-coat the truth: that Krispy Kreme's business was far worse than it was letting on.*

- 131 -

*How much worse? If the company's KremeKo franchisee is any indication, much worse!*

The details of just how bad it really was can be found in recently filed court papers related to the restructuring of KremKo, Krispy Kreme (KKD) struggling Canadian operation in which Krispy Kreme itself owns 40.6%

Despite the hoopla over Krispy Kreme's fast growth, KremeKo never made money and was in crumbly shape as far back as a year ago, according to court documents. Things were so bad at the time that KremeKo was forming a special committee of its directors to deal with the problem. According to an affidavit by Krispy Kreme CFO Michael Phelan, "KremeKo's management concluded that its revenues could not support the existing structure."

*KremeKo's attorney, Susan Grundy, was more direct in a recent letter to Krispy Kreme – included in the court filing. She said: "As KremeKo has advised KKD for months, the financial difficulties it faces are a direct result of the flawed business model KremeKo has been required to execute and other requirements imposed on the business by KKD."*

The situation became so dire that on April 1 Krispy Kreme loaned KremeKo $342,384 so it wouldn't default on loans to Bank of Nova Scotia and GE Capital.

By then, however, KremeKo was on the hook to both lenders for a total of nearly $17 million, with an additional $7.2 million owed to Krispy Kreme.

By April 6 Grundy wrote a letter to Krispy Kreme saying that KremeKo's "cash position was no longer tenable," and that unless it received additional cash, it would have to prepare "for an immediate assignment in bankruptcy."

Exs. 114-115.

**Krispy Kreme Announces Additional Restatements and Announces
Financial Statements for FY01, FY02, FY03 and First Three
Quarters of FY05 Should No Longer Be Relied Upon**

213.    By mid-April 2005, Krispy Kreme's stock was trading in the $7.40-$7.75 per

share range. Then, on April 18, 2005, Krispy Kreme filed a Form 12b-25 Notice of Late

Filing of its FY05 Report on Form 10-K as it could not complete its accounting. On April

19, 2005, Krispy Kreme issued a press release announcing that its prior financial statements

going back to and including FY01 could no longer be relied upon due to multiple GAAP

- 132 -

violations. The announcement also revealed that the restatement announced on January 4, 2005 would be larger than previously reported. The April 19, 2005 release stated in part:

> The Company has filed a Notification of Late Filing on Form 12b-25 stating that its annual report on Form 10-K for fiscal 2005 could not be filed timely due to ongoing analysis related to the proper application of generally accepted accounting principles to certain transactions which occurred in the fiscal year ended February 1, 2004 ("fiscal 2004") and earlier years as well as in fiscal 2005. Until such analyses are complete, the Company is unable to finalize its financial statements for fiscal 2005. *The Company is also filing today a Current Report on Form 8-K reporting that, because of pending restatements, the Audit Committee and management have concluded that the Company's financial statements for fiscal 2001, 2002 and 2003 and the first three quarters of fiscal 2005, in addition to the financial statements for fiscal 2004, should no longer be relied upon.*

> In a Current Report on Form 8-K dated December 28, 2004, the Company disclosed that its Board of Directors had concluded that the Company's previously issued financial statements for fiscal 2004 should be restated to correct certain errors contained therein. The Company further disclosed that the Company was conducting analyses of additional matters which could give rise to additional restatement adjustments to previously issued financial statements, and that certain investigations were ongoing which also could give rise to additional restatement adjustments. The Company's analyses and the investigations are ongoing; in addition, the Company is conducting discussions with the Staff of the Division of Corporation Finance of the Securities and Exchange Commission (the "Commission") regarding the Staff's inquiries concerning certain accounting matters, including certain of the matters giving rise to the adjustments described below.

> *       *       *

> *In addition to the foregoing adjustments, the Company's ongoing analyses have resulted in conclusions that additional restatement adjustments are necessary, as follows:*

> - *pre-tax adjustments to increase earnings for fiscal 2004 by approximately $1.2 million and to decrease earnings for years prior to fiscal 2004 by approximately $0.2 million to record mark-to-market adjustments on certain derivative transaction which previously had not been recorded; correlative adjustments are expected to reduce fiscal 2005 first quarter and second quarter pre-tax earnings by approximately $0.4 million and $1.0 million,*

- 133 -

*respectively, and increase fiscal 2005 third quarter pre-tax earnings by approximately $0.2 million*

- *pre-tax adjustments currently estimated to be approximately $1.4 million to decrease earnings for fiscal 2004 to correct errors in the application of accounting principles to certain leases and leasehold improvements; these adjustments are necessary principally to account properly for lease renewal options and/or rent escalations in computing rent expense for operating leases, to determine properly the depreciable lives of leasehold improvements when renewal options are present in leases and to require use of the same lease term in determining the operating or capital classification of a lease, rent expense thereunder and depreciable lives of related leasehold improvements; the Company estimates that correlative adjustments to the first, second and third quarters of fiscal 2005 will reduce pre-tax earnings by approximately $0.5 million, $0.5 million and $0.6 million, respectively; the Company currently is computing the effects of correlative adjustments on years prior to fiscal 2004, and expects the annual amount of such adjustments to be significantly less than for fiscal 2004*

- *a pre-tax adjustment of between $0.6 million and $0.8 million in fiscal 2004 to reverse income related to certain equipment sold by the Company to its Dallas franchisee prior to the Company's acquisition of such franchise*

*Restatement of the Company's financial statements to reflect all of the adjustments referred to above and certain other minor adjustments is expected to reduce net income for fiscal 2004 by between approximately $5.2 million and $6.2 million (between 9.2% and 10.9%). The adjustments are expected to reduce diluted earnings per share for fiscal 2004 by between approximately $0.09 and $0.10. Certain restatement adjustments the Company has identified but not enumerated above will affect reported earnings for interim periods within fiscal years but have an immaterial effect on earnings for the full fiscal year.*

*The Company has also has concluded that under the provisions of FIN46(R), it should have consolidated the financial statements of KremeKo Inc. ("KremeKo"), its area developer for Central and Eastern Canada, effective as of the end of the first quarter of fiscal 2005 rather than as of the end of the third quarter of fiscal 2005. The Company currently expects that restatement adjustments to previously issued interim financial information for fiscal 2005 to correct this error will not have a material effect on pre-tax earnings for such interim periods. On April 15, 2005, the Company announced that KremeKo was commending a financial restructuring. The Company is in the process of assessing the impact of the*

- 134 -

*pending restructuring on the carrying value of KremeKo's assets and liabilities.*

*The Company also believes it is likely that additional restatement adjustments to previously issued financial statements for fiscal 2004 and earlier years, and potentially to interim financial information for fiscal 2005, will be required to correct the timing of revenue recognition with respect to certain sales of equipment to franchisees. While the Company's analysis to this matter is not complete, the Company expects that adjustments will be recorded to recognize revenue from certain equipment sales on or after the installation of the equipment rather than when the equipment was either shipped or delivered. The Company currently is reviewing the accounting and quantifying the effects of such potential adjustments which, if necessary and recorded, are expected to affect principally fiscal 2004 and earlier years.*

The Company currently is conducting impairment testing of the reported amounts of goodwill, and anticipates that *it will conclude that goodwill is impaired and that an impairment charge will be reflected in fiscal 2005 earnings; however, the Company has not concluded in which interim period or periods of fiscal 2005 such charge or charges, if any, should be recorded*. The interim financial information previously published by the Company for fiscal 2005 does not reflect any such impairment charges.

Because the investigation by the Special Committee of independent directors of the Company (discussed in the Company's Current Report on Form 8-K dated December 15, 2004) is ongoing, there can be no assurance that, upon completion of the investigation, the Special Committee will not conclude, either for quantitative or qualitative reasons, that the Company's historical financial statements require restatement with respect to matters beyond those discussed above. In such event, there can be no assurance that the amount of any additional adjustments will not be material individually or in the aggregate.

In addition, the previously disclosed investigations of the Company by the Division of Enforcement of the Commission and the United States Attorney's Office for the Southern District of New York are ongoing.

In order that all restatements of previously issued financial statements be accomplished at one time, the Company has concluded that the completion of the fiscal 2005 financial statements and the filing of its annual report on Form 10-K for fiscal 2005 (as well as the quarterly report on Form 10-Q for the period ended October 31, 2004) should await the completion of the Company's analyses discussed above, the conclusion of the Special Committee's investigation and the conclusion of the Company's discussions

- 135 -

with the Commission staff regarding accounting matters. The completion of such ongoing work could result in adjustments of previously issued financial statements in addition to the adjustments described herein and such adjustments could, individually or in the aggregate, be material.

As a result of the foregoing, the Company was not able to file its annual report on Form 10-K by April 15, 2005, and it does not expect to be able to file its Form 10-K by April 30, 2005. The Company is not at this time able to predict when the Form 10-K will be filed, but intends to file the report at the earliest practicable date.

Ex. 98.

214. The same press release also contained an update of its financial results for FY2005 which showed how poor Krispy Kreme's previously reported financial results were without the financial manipulations:

*Results for fiscal 2005 were adversely impacted by significant sales declines. For the full fiscal year, systemwide and Company average weekly sales per factory store decreased approximately 13% and 19%, respectively, compared to fiscal 2004. For the fourth fiscal quarter ended January 30, 2005, systemwide and Company average weekly sales per factory store decreased approximately 20% and 27%, respectively, compared to the fourth quarter of fiscal 2004.*

*On a preliminary basis, the Company expects to report fiscal fourth quarter revenues of approximately $153 million, representing a 16% decrease from the prior year comparable period, and fiscal 2005 revenues of approximately $685 million, representing a 4% increase from fiscal 2004. The annual revenue increase was primarily attributable to an increase in Company store revenues, which was due to sales from new stores as well as the inclusion of sales from New England Dough, LLC, the Company's consolidated joint venture partner in Connecticut, Maine, Massachusetts, Rhode Island, Vermont and New Hampshire, which was consolidated in May 2004 pursuant to FIN 46(R) and the inclusion of sales from the Michigan market. . . . The Company expects to report a net loss for the fourth fiscal quarter ended January 30, 2005. The Company's financial results are also being adversely impacted by the substantial costs associated with the legal and regulatory matters previously disclosed by the Company.*

Systemwide average weekly sales per factory store is a non-GAAP financial measure. Systemwide sales data include sales at all company and

- 136 -

franchise stores. The Company believes systemwide sales information is useful in assessing the Company's market share and concept growth.

*Id*.

215. After this news was disclosed, Krispy Kreme's stock dropped from $7.59 per share on April 18, 2005 to as low as $6.25 per share on April 19, 2005.

## PRICEWATERHOUSECOOPERS' PARTICIPATION IN THE SCHEME AND ISSUANCE OF FALSE FINANCIALS

216. PwC, a firm of CPAs, was engaged by Krispy Kreme to provide independent auditing and accounting services prior to and throughout the Class Period. PwC's Greensboro office, which handles the Greensboro/Winston/Salem triad business area in North Carolina, was engaged to examine and report on Krispy Kreme's financial statements for FY01, FY02, FY03 and FY04, to perform review services on Krispy Kreme's interim FY02 through FY05 results, and to provide significant consulting, tax and due diligence services from FY01 through FY04. Exs. 91-92. PwC signed off on each of the Company's annual statements during the Class Period. As a result of the far-reaching scope of services provided by PwC and the close relationship with Krispy Kreme management, PwC personnel were intimately familiar with Krispy Kreme's business, including Krispy Kreme's accounting for its reacquired franchise rights, its relationship with its franchisees, its accounting for its joint ventures, its revenue recognition practices and its acquisition of Montana Mills.

217. PwC participated in the wrongdoing alleged herein in order to retain Krispy Kreme as a client and to protect the fees it received from Krispy Kreme. PwC enjoyed a lucrative, long-standing business relationship with Krispy Kreme's senior management for

- 137 -

which it has received millions of dollars in fees for auditing, consulting, tax and due diligence services.

218.     A major portion of the services provided by PwC is related to work performed by PwC outside the scope of the financial statements audits.  For example, in 2003 and 2004, PwC also provided services to Krispy Kreme for the following other services: employee benefit plan audits; *services related to business acquisitions*; accounting consultations; *audits of certain of Krispy Kreme's joint ventures*; tax compliance services; tax advice and planning services; services for a cost segregation study prepared by PwC; and actuarial services performed in connection with the Company's insurance plans.  In fact, in 2003 and 2004, 66% and 61%, respectively, of the fees PwC received from Krispy Kreme related to non-audit services performed by the CPA firm.  Since audit fees for each year represented less than 40% of the total fees generated from Krispy Kreme, PwC was highly motivated not to allow any auditing disagreements with Krispy Kreme management to interfere with its other lucrative practice areas.

219.     PwC (and its predecessor Price Waterhouse) has enjoyed a long history with Krispy Kreme.  Paul Breitbach ("Breitbach"), defendant Tate's predecessor, began his accounting career with Price Waterhouse in 1960.  He became a partner in the firm in 1973. Ex. 93.  In 1983, he transferred from the Chicago office to the Winston-Salem office and thereafter served as the managing partner of the Winston-Salem Price Waterhouse office from 1983 to 1992.  He further served as the group managing partner for all Price Waterhouse offices in North Carolina, South Carolina and East Tennessee from 1987 to 1992.  Ex. 94.

- 138 -

220.    In February 1992, Krispy Kreme became a Price Waterhouse client. Breitbach – a prominent person in the Price Waterhouse network – handled the Krispy Kreme account himself.  One of Price Waterhouse's (and Breitbach's) first assignments was to make recommendations to Krispy Kreme on hiring a financial executive.  During the course of the executive search, defendant Livengood asked Breitbach to accept the position [of CFO].  Ex. 93.  In November of 1992, after a 32-year career at Price Waterhouse, Breitbach left the firm to become the CFO of Krispy Kreme.[21]  A year later, two of Breitbach's Price Waterhouse colleagues, defendant Casstevens and Michelle Parman,[22] also left Price Waterhouse to join Krispy Kreme after enjoying successful careers with the CPA firm.  On January 30, 2002 Krispy Kreme also hired Sherry Luper, a former PwC employee, as Krispy Kreme's Senior Vice President of Human Resources, and on January 31, 2002, Sherry Polonsky, former PwC Senior Audit Manager, as Krispy Kreme's Vice President of Finance.

---

[21]    Although Breitbach stepped down as CFO in October of 2000, he remains an active part of the Krispy Kreme organization.  He served as an Executive Vice President for the Company from October 2000 through February of 2002.  Thereafter, he transitioned into his new responsibilities with Krispy Kreme relating to charitable giving and other special projects.  Currently, Breitbach is serving as the President of the Krispy Kreme Foundation.  The Foundation was created in 2003 with Breitbach as its president.  At the Company's annual meeting held on June 4, 2003, defendant Livengood announced the creation of the new foundation.  According to Livengood, the purpose of the Foundation is to donate to causes that celebrate and promote storytelling.  Breitbach's term expires in 2006. *See* Exs. 94-95.

[22]    Parman, who married defendant Livengood in 2002, served as Krispy Kreme's Senior Vice President of Corporate Development from 1998 – 2002.  *See* Ex. 86.

Case 1:04-cv-00416-JAB   Document 125   Filed 05/23/05   Page 145 of 214

**PwC's False Statements as to Krispy Kreme's FY03-FY04 Financial Statements**

221.    PwC knew or recklessly disregarded that it falsely represented that Krispy Kreme's financial statements for FY01, FY02, FY03 and FY04 were presented in accordance with GAAP and that PwC's audits of Krispy Kreme's financial statements had been performed in accordance with generally accepted auditing standards ("GAAS"). PwC also consented to the incorporation of its false reports on Krispy Kreme's financial statements in Krispy Kreme's Report on Form 10-Ks for those years, which were filed with the SEC. PwC's issuance of and multiple consents to reissue materially false reports on Krispy Kreme's FY01-FY04 financial statements were themselves violations of GAAS.

222.    The SEC has stressed the importance of meaningful audits being performed by independent accountants:

> [T]he capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  ***Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised***.

*Relationships Between Registrants and Independent Accountants*, SEC Accounting Series Release No. 2961, 1981 SEC LEXIS 858, at **8-9 (Aug. 20, 1981).

223.    GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of individual audit engagements.  Statements on Auditing Standards (codified and referred to as AU §___) are recognized by the AICPA as the interpretation of GAAS.

- 140 -

224.    With respect to Krispy Kreme's financial statements for fiscal year end February 2, 2003, PwC represented, in a report dated March 13, 2003 included in the Company's 2003 Report on Form 10-K, the following:

> In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, of shareholders' equity and of cash flows present fairly, ***in all material respects***, the financial position of Krispy Kreme Doughnuts, Inc. and its subsidiaries (the Company) at February 3, 2002 and February 2, 2003, and the results of their operations and their cash flows for each of the three years in the period ended February 2, 2003, ***in conformity with accounting principles generally accepted in the United States of America***. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

> As discussed in Note 2 to the consolidated financial statements, effective February 4, 2002, the Company changed its method of accounting for goodwill and other intangible assets to conform to Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets."

Ex. 96.

225.    PwC issued a nearly identical audit report for fiscal year ending February 1, 2004, issued March 31, 2004 and included in the Company's 2004 Form 10-K. Ex. 97. PwC issued similar, unqualified reports on Krispy Kreme's financial statements for FY01 and FY02.

226.    PwC's reports were false and misleading due to its failure to comply with GAAS and because Krispy Kreme's financial statements were not prepared in conformity with GAAP, as alleged in detail in ¶¶243-360, so that issuing the reports were in violation of

- 141 -

GAAS and SEC rules. PwC knew its reports would be relied upon by the Company as well as by present and potential investors in Krispy Kreme's stock.

**PwC Ignored the Audit Evidence It Gathered**

227. GAAS, as set forth in AU §326, *Evidential Matter*, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved. The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles. ***In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements***. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).

228. PwC's responsibility, as Krispy Kreme's independent auditor, was to obtain "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§110, 150.02.

229. In violation of GAAS, and contrary to the representations in its report on Krispy Kreme's financial statements, PwC did not obtain sufficient, competent, evidential

- 142 -

matter to support Krispy Kreme's assertions regarding its goodwill and intangible assets, including its reacquired franchise rights, its income, its receivables, and its joint ventures for FY01, FY02, FY03 and FY04.

**PwC Ignored Numerous Red Flags**

230.   As one of the largest audit firms in the world, PwC was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit. Also, PwC knew of the audit risks inherent at Krispy Kreme and in the industries in which Krispy Kreme operated because of the comprehensive services it provided to Krispy Kreme over the years (PwC had been Krispy Kreme's auditor since 1992) and its experience with many other clients. In connection with Krispy Kreme's operations, PwC had virtually limitless access to information concerning the Company's true operations as:

- PwC had been Krispy Kreme's auditor since 1992, including assisting the Company in its IPO in April of 2000.

- PwC was present at Krispy Kreme's headquarters and divisions frequently during the Class Period.

- PwC provided Krispy Kreme with substantial non-audit services to Krispy Kreme. In 2003 and 2004, over 60% of PwC's fees related to non-audit services provided to Krispy Kreme.

- PwC had frequent conversations with Krispy Kreme management and employees about the Company's operations and financial statements.

- PwC audited and reviewed Krispy Kreme's financial statements during the Class Period and knew or should have known that Krispy Kreme's financial statements were not accurate or prepared in compliance with GAAP or GAAS.

231.   PwC's intentional failure to comply with GAAS in PwC's performance on the Krispy Kreme audits rose to the level of deliberate recklessness, as the following paragraphs demonstrate. PwC abandoned its role as independent auditor by turning a blind eye to each

- 143 -

of the above indications of improper accounting, including Krispy Kreme's accounting for its reacquired franchise rights, its relationship with its franchisees, its accounting for its joint ventures, its revenue recognition practices, and its acquisition of Montana Mills. Despite this knowledge, PwC did not insist upon adjustments to Krispy Kreme's audited financial statements. Pursuant to GAAS, PwC should have issued a qualified or adverse report, or it should have insisted that Krispy Kreme comply with GAAP.

232.     As to its audits of Krispy Kreme during the Class Period, PwC was required to perform its audit in conformity with the Statements on Auditing Standards ("SAS") No. 82, *Consideration of Fraud in a Financial Statement Audit*, which includes auditing for misstatements arising from the misappropriation of assets. PwC failed to comply with SAS No. 82 in its audit of Krispy Kreme's financial statements. During the course of its audit of Krispy Kreme's financial statements during the Class Period, PwC knew of or should have discovered the irregularities which caused Krispy Kreme's earnings to be misstated for years. The very risk of fraud was a potential reportable condition which should have been reported to the audit committee and possibly senior management.

233.     PwC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of at least a year-and-a-half, leading to false and misstated financial statements.

234.     Furthermore, PwC recklessly disregarded numerous red flags that should have alerted PwC that Krispy Kreme's financial statements were materially false and misleading, including the following:

- From the time Krispy Kreme went public, Krispy Kreme embarked on an explosive growth strategy designed to increase revenue and earnings.

- By early in the Class Period, Krispy Kreme was suffering a consistent and increasing decline in sales. Instead of creating additional demand for Krispy Kreme doughnuts, expansion into off-premises markets and new stores openings resulted in market saturation with new stores taking sales from existing stores.

- Many of Krispy Kreme's franchisees were experiencing serious financial stress – decline in sales, cash flow problems, etc. Indeed, Krispy Kreme had to act as a guarantor for several of its franchisees in order for the franchisees to be able to receive much needed financing.

- Krispy Kreme's management was aggressive in its accounting practices. For example, Krispy Kreme accounted for its reacquired franchise rights as intangible assets not subject to amortization while the franchise industry tended to amortize reacquired franchise rights.

- In April of 2003, Krispy Kreme purchased Montana Mills, an unprofitable company of which defendant Tate was a director and shareholder, for a purchase price of $39 million. Thereafter, 80% of the purchase price was recorded as an intangible asset or goodwill. Because of the potential for abuse in this related party transaction, it required extensive scrutiny.

- Krispy Kreme made several substantial franchise reacquistions during the Class Period, including several from insiders for grossly inflated prices. In many of these transactions, large amounts of the purchase price were recorded as reacquired franchise rights.

- Analysts began to question Krispy Kreme's calculation of its same-store sales metric. In an article on September 16, 2003, *The Wall Street Journal* questioned Krispy Kreme's determination of this important indicator.

- The employment agreements at Krispy Kreme for the Individual Defendants contained huge incentive-based bonus structures which were tailored to reward each executive for achieving earnings and revenue targets.

- Management was unusually aggressive in its practice of committing to meet or beat Wall Street estimates. Throughout the Class Period, Krispy Kreme management continually increased the Company's revenue and earning projections

- The Company's source of cash could be negatively impacted due to certain covenants in its $150 million credit facility related to the Company's earnings. Indeed, Krispy Kreme has admitted that due to its restatement of its financial statements it may have been in default of its credit facility as of fiscal year end February 1, 2004.

- 145 -

235. Many of these red flags mirrored the risk factors PwC was required to consider according to AU §316, *Consideration of Fraud in a Financial Statement Audit*, including:

- Unusually rapid growth or profitability, especially compared with that of other companies in the same industry.

- Specific indicators as to include a motivation for management to engage in fraudulent financial reporting.

- An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices.

- A practice by management of committing to analysts, creditors, and other third parties to achieve what appears to be unduly aggressive or clearly unrealistic forecasts.

- Domination of management by a single person or small group without compensating controls such as effective oversight by the board of directors or audit committee.

- Management setting unduly aggressive financial targets and expectations for operating personnel.

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm.

236. Despite PwC's "clean" audit reports during the Class Period, Krispy Kreme has admitted to false financial statements during the Class Period. Krispy Kreme has announced that it will restate its financial statements *for at least* FY01, FY02, FY03 and FY04, including the last three quarters of the fiscal year, and the first three quarters of FY05.

237. Moreover, in July 2004, the SEC began an inquiry into Krispy Kreme's accounting for its franchise reacquisitions and the Company's previously announced reduction in earnings guidance. The inquiry was upgraded to a formal investigation in October of 2004.

238.    Thereafter, on August 30, 2004, Krispy Kreme's Audit Committee retained an independent law firm to perform an investigation related to Krispy Kreme's acquisition of Dough-Re-Mi.  Despite the law firm's conclusion of its investigation less than two weeks later, PwC refused to sign-off on Krispy Kreme's 2Q05 financial results included in the Company's Report on Form 10-Q filing, filed with the SEC on September 10, 2004, until the independent law firm performed certain additional procedures.

239.    On October 4, 2004, Krispy Kreme formed a Special Committee to investigate matters related to the SEC investigation and a pending shareholders derivative action (brought based upon similar allegations raised in this Complaint).  PwC again announced that it would not complete its review of the Company's quarterly Form 10-Q for the periods ending August 1, 2004 and October 31, 2004 until the investigation by the Special Committee was complete.

240.    On April 18, 2005 Krispy Kreme notified investors that its financial statements for FY01 and FY02 should no longer be relied upon and maybe restated.  These are the same financial statements for which PwC issued an unqualified opinion.

241.    The restatement, the SEC investigation and the Special Committee investigation all involve periods during which Krispy Kreme's financial results had been audited by PwC and for which PwC had issued unqualified opinions.

**PwC's Audit Violated Fundamental Concepts of GAAS**

242.    PwC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of at least a year-and-a-half, leading to false and misstated financial statements.  Due to PwC's false statements and failure to

- 147 -

identify and modify its reports to identify Krispy Kreme's false financial reporting, PwC violated the following GAAS standards:

(a) The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors.

(b) The second general standard is that the auditors should maintain independence in mental attitude in all matters relating to the engagement.

(c) The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report.

(d) The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised.

(e) The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed.

(f) The third standard of field work is that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

(g) The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP.

(h) The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed.

(i) The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report.

(j)     The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

## DEFENDANTS' FALSE FINANCIAL REPORTING AND GAAP VIOLATIONS DURING THE CLASS PERIOD

243.    During the Class Period, defendants caused Krispy Kreme to falsely state the Company's earnings, and to violate GAAP and SEC rules by overstating Krispy Kreme's assets and revenues, understating operating expenses and overstating net income.   The accounting manipulations included:

(a)     Improper accounting for its reacquired franchise rights;

(b)     Failure to properly account for its allowance for doubtful accounts related to receivables by its struggling franchisees;

(c)     Failure to consolidate unprofitable joint ventures;

(d)     Improper revenue recognition concerning its off-premises sales;

(e)     Failure to timely record impairment charges on its Montana Mills acquisition;

(f)     Improper accounting for its leases and the related depreciation of the leased assets;

(g)     Improper revenue recognition in its KKM&D segment; and

(h)     Improper accounting for its derivative transactions.

244.    Krispy Kreme included its false financial statements and results in press releases and in its SEC filings.  The SEC filings represented that the financial information presented therein was a fair statement of Krispy Kreme's financial results and that the results were prepared in accordance with GAAP.

- 149 -

245.     These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Krispy Kreme's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

246.     Regulation S-X [17 C.F.R. §210.4-01(a)(1)] states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual financial statements.

**Krispy Kreme Improperly Accounted for Its Franchise Reacquisitions**

247.     During the Class Period, Krispy Kreme improperly accounted for its intangible assets called reacquired franchise rights by failing to write-down its impaired assets and by failing to amortize its intangible assets in violation of GAAP. During FY04, Krispy Kreme paid $149.4 million for its franchise reacquisitions of which $124.2 million, or approximately 83%, was charged to reacquired franchise rights and recorded as an intangible asset not subject to amortization.[23] The SEC is currently investigating Krispy Kreme's accounting for its franchise reacquisitions. Both the total amount paid for these acquisitions

---

[23]     In 1Q05, Krispy Kreme reclassified the majority of its reacquired franchise rights from intangible assets not subject to amortization to goodwill. Goodwill is similar to intangible assets that are not subject to amortization in that (1) it is not amortized and (2) it is required to be written-down once it becomes impaired.

- 150 -

and the characterization of the reacquired franchise rights as intangible assets not subject to amortization have been called into question.

248.    An asset by definition is an item that will likely provide a company with a future economic benefit as a result of past transactions or events (*i.e.,* an item of economic value).  Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("FASCON") No. 6, ¶¶25-31.

249.    GAAP, as set forth in Statement of Financial Accounting Standards ("SFAS") No. 142, requires that companies review its goodwill and intangible assets to determine if the assets are impaired.  SFAS No. 142, ¶¶15, 17, 19-29.  Intangible assets shall be tested annually or more frequently if events or changes in circumstances indicate that the asset might be impaired.  SFAS No. 142, ¶¶15, 17.

250.    Due to its franchise reacquisitions and the Montana Mills acquisition, the amount of goodwill and intangible assets held by Krispy Kreme dramatically increased during the Class Period.  Krispy Kreme's assets increased from $410.5 million at the end of FY03 to $660.7 million at the end of FY04.  A majority of this large increase (or 63% of the $250 million increase) is due to an increase in goodwill and intangible assets held by Krispy Kreme – a large component of which is reacquired franchise rights.  By the end  of FY04, 26.42% of Krispy Kreme's total assets were composed of an intangible asset called reacquired franchise rights.

251.    Over the past few years, Krispy Kreme has been buying back franchise rights in certain markets that it sold prior to going public.  Krispy Kreme's reacquired franchise rights is an intangible asset that represents the value of the franchise assets purchased by Krispy Kreme.  Under Krispy Kreme's franchise models, its franchisees agree to open a

- 151 -

certain number of stores in certain locations or markets within a given amount of time. Krispy Kreme's acquisitions involved the purchase of the stores in certain markets as well as the rights to develop the Krispy Kreme name in those markets.

252.     During the Class Period, Krispy Kreme engaged in four franchise reacquisitions for a combined price of $149.4 million for its franchise reacquisitions. Although Krispy Kreme used some of its stock to fund these acquisitions, a majority of the price paid to the franchisees was paid in cash.  Some of the cash was raised through Krispy Kreme's ongoing operations and some through borrowings, causing an increase in Krispy Kreme's debt.

253.     Krispy Kreme substantially overpaid for each of its four acquisitions made during the Class Period in order to bail out its franchisees rather than allowing them to go under, which would have negatively affected its stock price, and in some instances in order to enrich certain insiders.  Instead of expensing the excess cost paid for these acquisitions in the period they were acquired, which would have required a hit to its income statement, Krispy Kreme capitalized these costs and held them as assets despite the fact that they did not represent a future economic benefit to the Company.

254.     The majority of the purchase price was accounted for as reacquired franchise rights and was recorded as intangible assets not subject to amortization.  Krispy Kreme's accounting for these as assets was improper for two reasons.  First, the intangible assets were impaired and should have been written-down during the Class Period.  Given the Company overpaid, the intangible assets were impaired upon acquisition and hence should have immediately been written-down upon completion of the acquisitions.  At a minimum, Krispy Kreme should have written-down the impaired assets sometime thereafter during the Class

Period as the assets continued to be impaired. Second, Krispy Kreme failed to amortize its reacquired franchise rights in violation of GAAP.

255. On April 19, 2005, however, Krispy Kreme announced that it was conducting impairment testing of the reported amounts of goodwill, and anticipated that it would have to take an impairment charge.

256. **Kansas Markets** – Krispy Kreme purchased its Kansas franchisee on March 10, 2003, for $33 million. The Kansas franchise operated five stores in the Kansas/Missouri area. Twenty-seven million five hundred thousand dollars of the purchase price, or 83.3% of it, was accounted for as reacquired franchise rights – intangible assets not subject to amortization.

257. At the time of the acquisition, the Kansas market was owned in part by an officer of Krispy Kreme. Additionally, the operating partner of the Kansas market was Jimmy Strickland ("Strickland"). Strickland had been employed by Krispy Kreme for two years prior to establishing the franchise in Kansas City in 1996. After the acquisition, Strickland assumed a senior management position at Krispy Kreme.

258. **Dallas and Shreveport Markets** – Krispy Kreme purchased its Dallas/Shreveport franchisee on June 30, 2003 for $67.5 million. The Dallas/Shreveport franchise operated six stores all in Texas. Fifty-four million dollars of the purchase price, or 80% of it, was accounted for as reacquired franchise rights. This acquisition was funded in large part with short-term debt. The Company originally entered into a short-term promissory note for $55 million to fund this acquisition. This promissory note was rolled into a new credit facility Krispy Kreme entered into in October of 2003.

- 153 -

259.    This transaction was a bail-out designed to enrich insiders.  This franchise was owned in part by Joseph A. McAleer, Jr., a former officer and director of the Company, and Smith, an emeritus director – both of whom had stepped down from Krispy Kreme's Board just three months prior to this acquisition.  The franchise was also owned by Orell, a relative of Joseph A. McAleer, Jr. and a former director, as well.

260.    The price of this transaction was also questioned because at the time of this acquisition, Great Circle had put its Krispy Kreme market up for sale.  Great Circle owned 22 stores in the Southern California market and was looking to sell its stores for $80 million. While the price per store of the Southern California market was on average $3.6 million, with no willing buyers, the Dallas/Shreveport market was purchased for an astounding $11.25 million per store.  The fact that Krispy Kreme declined to purchase this market suggests that Krispy Kreme was only interested in reacquiring franchises that would benefit insiders.

261.    Additionally, Krispy Kreme caused its Dallas franchisee to engage in an equipment purchase transaction with KKM&D immediately prior to the acquisition by agreeing to an increase in the purchase price to cover the cost of the equipment purchase. Then, Krispy Kreme improperly recognized an earnings and asset boost due to this increase in its purchase price.  If the equipment purchase from the Dallas franchisee had taken place after the acquisition, then Krispy Kreme would have had to eliminate the revenue associated with this sale upon consolidation of its financial statements.  By having the franchisee make the purchase before the acquisition took place, Krispy Kreme was able to recognize the revenue in its reported earning results for the quarter.  Krispy Kreme essentially purchased

the equipment from itself and was able to recognize the revenue. Furthermore, Krispy Kreme recognized the increased purchase price on its books as an asset.

262.    Krispy Kreme has indicated that it will restate its financial statements due to this GAAP violation, reducing its pretax income for the quarter ending August 3, 2003 (2Q FY04) between $0.6 million to $0.8 million or between 4% to 6%, respectively.

263.    ***Dough-Re-Mi*** – Krispy Kreme purchased its Michigan franchise, Dough-Re-Mi, in October of 2003 for $32.1 million. The Michigan franchise operated seven stores in the Detroit area.

264.    On September 22, 2003, Krispy Kreme announced its intentions to purchase a 73% interest in the Michigan franchise. The proposed purchase price was $18.6 million and would be payable in Krispy Kreme common stock. At that date, Krispy Kreme also announced that the Michigan franchise would be closing two of its underperforming stores prior to the completion of the acquisition. Ex. 37.

265.    In Krispy Kreme's 3Q03 conference call held on November 21, 2003, in announcing the completion of the acquisition on October 27, 2003, defendant Tate made the following remarks concerning the acquisition:

> The acquisition of the Michigan market one week before the end of the quarter did not materially affect company store growth rates but set the stage for strong contributions moving forward. ***As an update on that acquisition, in the final negotiations, we were able to increase our ownership position to 100%. Total purchase price was $25.4 million which is consistent with the original valuation for the 73% we had announced.***

Ex. 40.

266.    At the same conference call, defendant Casstevens stated:

> Other assets, when compared to the end of the second quarter, increased by a net $29.5 million. ***Other increased $24.5 million was for***

- 155 -

*amounts assigned to reacquire franchise rights for the Detroit market acquisition.*

*Id.*

267.    Nonetheless, in its Report on Form 10-Q for 3Q04, filed on December 17, 2003, Krispy Kreme disclosed that the actual purchase price was $32.1 million – $6.7 million higher than the price announced in the November 21, 2003 conference call. Ex. 27. The $32.1 million purchase price was comprised of the issuance of Krispy Kreme common stock valued at approximately $18.5 million, a promissory note in the amount of $11.3 million and a cash payment of $2.3 million. Ninety-two percent of the total acquisition price constituted an intangible asset – reacquired franchise rights.

268.    In Krispy Kreme's Form 10-K filed on April 16, 2004, it made the following disclosure concerning the allocation of the purchase price:

> Effective October 27, 2003, the Company acquired the rights to certain franchise markets in Michigan, as well as the related assets, which included five stores, from an Area Developer franchisee in exchange for 443,917 shares of common stock, valued at approximately $18,540,000, a promissory note in the amount of $11,286,000 and cash of $2,280,000. The promissory note was paid in full and canceled in January 2004. The purchase price was preliminarily allocated to accounts receivable -- $642,000, inventory -- $144,000, prepaid expenses -- $157,000, property and equipment -- $2,808,000, accrued expenses -- $1,131,000 and reacquired franchise rights -- $29,486,000.

Ex. 16.

269.    During the negotiations, Krispy Kreme and the Michigan franchise agreed that the Michigan franchise would do the following: close two of its underperforming locations prior to completion of the acquisition and pay to Krispy Kreme accrued interest on its past due loans for the money it owed Krispy Kreme. In exchange, Krispy Kreme agreed

- 156 -

to increase its purchase price to cover the costs of the store closings and the accrued interest payment.

270.    Krispy Kreme recognized an improper earnings and asset boost due to this increase in its purchase price.  First, Krispy Kreme recognized interest income on the agreed upon accrued interest payment even though it essentially paid the interest income due to an increase in purchase price.   In addition, Krispy Kreme then recognized the increased purchase price on its books as an asset.

271.    Second, Krispy Kreme avoided recognizing an operating cost by having the Michigan franchise close its underperforming stores prior to the acquisition.  By structuring the deal this way, Krispy Kreme was able to avoid a negative hit to its bottom-line if the stores had been closed after the acquisition took place.  Instead these costs became an asset on Krispy Kreme's balance sheet by way of reacquired franchise rights.

272.    Additionally, Krispy Kreme improperly recorded amounts it paid to an executive at the Michigan franchise as an asset included in the reacquired franchise rights category.  A portion of the purchase price paid to one of the executives at the Michigan franchise, who was its operating manager and a selling shareholder, was in return for his agreeing to work for Krispy Kreme after the purchase for a short period of time.

273.    GAAP, as set forth in SFAS No. 141, ¶34 states that in a business combination:

> [i]f the substance of the agreement for contingent consideration is to provide compensation for services or use of property or profit sharing, the additional consideration given shall be recognized as an expense of the appropriate periods.

(Citation omitted.)

- 157 -

274.     If a portion of the consideration is contingent on continuous employment, then it must be classified as compensation expense rather than as an adjustment to purchase price via the recording of goodwill.  SFAS No. 141, ¶34 and EITF 95-8, ¶¶1-3.  Here, Krispy Kreme paid this executive a disproportionate amount of the purchase price in relation to the other selling shareholders.  The reason was that a portion of the amount received by this executive required the selling shareholder to remain as an employee as a condition of receiving the payment.  Nevertheless, Krispy Kreme improperly categorized the entire amount it paid to this executive as reacquired franchise rights and classified it as an asset instead of treating the portion related to the continued employment as compensation expense.

275.     Krispy Kreme has now admitted that it improperly accounted for its acquisition of the Michigan franchise in the following ways:  it improperly recorded certain amounts as income, it improperly failed to record certain expenses and it improperly classified compensation expense as an intangible asset.  Krispy Kreme has indicated that it will restate its financial statements due to these GAAP violations – reducing its pretax income for the quarter ending November 2, 2003 (3Q04) between $3.9 million to $5.3 million or between 16% to 22%, respectively.

276.     **Golden Gate** – Krispy Kreme purchased the remaining 33% interest in its Northern California franchise, Golden Gate, on January 30, 2004 for $16.8 million.  The Golden Gate franchise operated 16 stores in the Northern California market.  Thirteen million two hundred thousand dollars, or 78% of the purchase price was allocated to reacquired franchise rights.

277.     Krispy Kreme acquired its original 59% interest in Golden Gate in March of 2000 for $2 million.  In March of 2002, Krispy Kreme acquired an additional 8% interest –

5% from Krispy Kreme Equity Group, LLC ("KKEG")[24] and 3% from defendant Livengood. Defendant Livengood's ex-wife, Adrienne Livengood, owned 3% interest in Golden Gate at the time of the acquisition in January of 2004. Defendant Livengood originally owned a 6% interest in six joint ventures, including Golden Gate, however, his ex-wife received half of his interest upon their divorce in June of 2002.[25] This interest was not disclosed in the acquisition by Krispy Kreme.

278. As CW3, former Golden Gate Vice President of Finance, explained, the Golden Gate franchise had been struggling financially prior to the acquisition. According to CW3, the franchise was struggling to meet its sales projections and comparable store sales. Krispy Kreme headquarters set unrealistic sales projections for Golden Gate. For FY04, Golden Gate missed its sales target by approximately $3 million. *See* CW3. Golden Gate's retail sales were declining long before Krispy Kreme acquired the franchise as its off-premises sales were detracting from its retail operations. *Id.*

279. Due to its slowing sales, Golden Gate was experiencing cash flow problems. It was unable to obtain loans in order to fund the opening of new stores without guarantees

---

[24]    In March 2000, prior to going public, Krispy Kreme established KKEG, a pooled investment fund. Krispy Kreme's officers were eligible to invest in the fund. The fund invested exclusively in certain joint ventures with new area developers, obtaining a 5% interest in them. As of fiscal year end 2002, KKEG owned 5% in six joint ventures, including Golden Gate. CEO Scott Livengood owned an additional 3% interest in these same joint ventures. On March 5, 2002, the members of KKEG voted to dissolve the fund and to sell their interests to Krispy Kreme for an amount equal to his or her total investment – an aggregate amount of $940,100. At the same time, Krispy Kreme purchased Livengood's 3% interest in these same joint ventures for his original cost – an amount of $558,800.

[25]    The Report on Form 10-K filed in May of 2002 improperly identified defendant Livengood as only having a 3% interest since January of 2001.

from Krispy Kreme. *Id.* In October of 2001, Golden Gate entered into a $6.75 million revolving line of credit, which Krispy Kreme guaranteed. At quarter end August 3, 2003, $6.72 million was outstanding on this credit line.

280. On October 31, 2003, Krispy Kreme entered into a $150 million unsecured bank credit facility. Thereafter, Krispy Kreme provided Golden Gate with a loan in order to repay the amount due under the revolving line of credit, which was repaid in full on October 31, 2003, by Golden Gate. Krispy Kreme funded this acquisition in part due to its new credit facility.

281. Krispy Kreme recognized an improper earnings and asset boost due to the inflated purchase price it paid for the Golden Gate franchise. During the negotiations, Krispy Kreme and Golden Gate agreed that Golden Gate would pay to Krispy Kreme a management fee. In exchange, Krispy Kreme agreed to increase its purchase price to cover the additional fee Golden Gate would pay to the Company. Then, Krispy Kreme recognized the management fee paid by Golden Gate as income even though it essentially paid the fee due to the increase in purchase price. In addition, Krispy Kreme then recognized the increased purchase price on its books as an asset.

282. Additionally, Krispy Kreme improperly recorded amounts it paid to two executives at the Golden Gate franchise as an asset included in the reacquired franchise rights category. A portion of the purchase price paid to these executives at the Golden Gate franchise, who were selling shareholders, was in return for their agreeing to work for Krispy Kreme after the purchase for a short period of time.

283. GAAP, as set forth in SFAS No. 141, ¶34 states that in a business combination,

- 160 -

> [i]f the substance of the agreement for contingent consideration is to provide compensation for services or use of property or profit sharing, the additional consideration given shall be recognized as an expense of the appropriate periods.

(Citation omitted.)

284. If a portion of the consideration is contingent on continuous employment, then it must be classified as compensation expense rather as an adjustment to purchase price via the recording of goodwill. SFAS No. 141, ¶34 and EITF 95-8, ¶¶1-3. Here, Krispy Kreme paid two executives disproportionate amounts of the purchase price in relation to the other selling shareholders. The reason was that a portion of the amount received by these executives required the selling shareholders to remain as employees as a condition of receiving the payments. Nevertheless, Krispy Kreme improperly categorized the entire amount it paid to these two executive as reacquired franchise rights and classified it as an asset instead of treating the portion related to the continued employment as compensation expense.

285. Krispy Kreme has now admitted that it improperly accounted for its acquisition of the Golden Gate franchise in the following ways: it improperly recorded certain amounts as income and it improperly classified compensation expense as an intangible asset. Krispy Kreme has indicated that it will restate its financial statements due to these GAAP violations – reducing its pretax income for the quarter ending February 1, 2004 (4Q04) between $1.9 million to $2.4 million or between 7% to 9%, respectively.

286. ***Charlottesville Franchise*** – Krispy Kreme purchased its Charlottesville, Virginia franchise in 2Q04 for an undisclosed amount. Similar to the Michigan and Golden Gate purchases, Krispy Kreme improperly recorded certain amounts it paid to an executive at

- 161 -

the Charlottesville franchise as an intangible asset rather than recording it as compensation expense.

287.    Krispy Kreme has now admitted that it improperly classified compensation expense as an intangible asset in connection with its acquisition of the Charlottesville franchise. Krispy Kreme has indicated that it will restate its financial statements due to this GAAP violation – reducing its pretax income for the quarter ending August 3, 2003 (2Q04) by $0.5 million or approximately 2%.

288.    *Failure to Amortize* – Krispy Kreme also violated GAAP by failing to amortize its reacquired franchise rights during the Class Period. Under GAAP, a company must determine if an intangible asset has a definite life or indefinite life. The company must amortize an intangible asset over its useful life unless the company determines that it has an indefinite life. A useful life is the period over which an asset is expected to contribute to the future cash flows of the entity. SFAS No. 142, ¶¶11-14. Amortization is similar to depreciation as it reduces the value of an asset over time. The reduction consists of a non-cash charge to income, thus reducing earnings.

289.    The franchise industry tends to amortize reacquired franchise rights. The majority of the companies with business models similar to Krispy Kreme's account for reacquired franchise rights as intangible assets subject *to* amortization.

290.    One of the most basic and central concepts of GAAP is that a company's financial statements must be reliable. The principles that financial reporting should be reliable in that it faithfully represents what it purports to represent and that information should be reliable as well as relevant, are notions that are central to accounting. FASCON No. 2, ¶¶58-59. Here, Krispy Kreme violated this most basic principle by not amortizing its

- 162 -

reacquired franchise rights. Krispy Kreme's Reacquired Franchises had actually been struggling financially for some time. Indeed, the Michigan franchise owed Krispy Kreme substantial sums of money prior to the acquisition and was behind in its payments. *See* CW4. The franchise further had to close two of its stores as they were admittedly underperforming. Accordingly, it was improper for Krispy Kreme to determine that the reacquired franchise rights had indefinite lives. Krispy Kreme's failure to amortize its reacquired franchise rights was overly aggressive and improper and thus was not a fair presentation of Krispy Kreme's financial statements during the Class Period as it did faithfully represent what it purported to represent.

291. At the end of FY04, Krispy Kreme held $174.5 million on its books as reacquired franchise rights. If Krispy Kreme was forced to amortize these amounts, it would seriously reduce Krispy Kreme's future earnings. By failing to write-down its impaired Franchise Reacquisition Rights and by failing to amortize these rights in accordance with GAAP, Krispy Kreme's assets and earnings were overstated during the Class Period.

**Krispy Kreme Improperly Failed to Provide for an
Adequate Allowance for Doubtful Accounts**

292. In connection with its accounts receivable, a company is required to establish an allowance for doubtful accounts, *i.e.,* a reserve for the estimated amount of receivables that a company deems to be uncollectible. GAAP, as set forth in FASB SFAS No. 5, ¶8, states:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if ***both*** of the following conditions are met:
>
> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is

- 163 -

implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.      The amount of loss can be reasonably estimated.

(Footnotes omitted, emphasis in original.)

293.    Krispy Kreme's accounts receivables arise primarily from three sources: (a) royalties earned on sales by its franchisees; (b) sales by KKM&D of equipment, mix, coffee and other supplies to Krispy Kreme's stores; and (c) off-premises sales by Company-owned stores to convenience and grocery stores. According to Krispy Kreme, the majority of its allowance for doubtful accounts relates to receivables from convenience and grocery stores as opposed to its franchisees.

294.    Krispy Kreme earns money from its franchisees in two forms: (a) based upon royalties paid by the franchisees and (b) based upon its equipment and other sales to its franchisees by KKM&D.

295.    Krispy Kreme's franchisees pay royalties to the Company based upon the amount of sales generated by each store operated by a franchisee. Franchisees deemed Associates (franchisees prior to the mid-1990s) pay royalties of 3%-4% of sales. Franchisees deemed Area Developers (the current franchisee program developed in the mid-1990s) pay royalties of 4.5%-6% of sales and upfront franchise fees for each store ranging from $20,000 to $50,000. Each franchisee also pays an additional 1% for advertising and public relations fees. Approximately 3.5%-4% of Krispy Kreme's revenue is derived from its royalty fees.

296.    The KKM&D segment sells mixes, equipment, coffee and other items to Krispy Kreme's Company-owned stores and franchisee-owned stores. Krispy Kreme's franchisees are required to purchase the majority of their equipment and supplies from KKM&D often at hefty mark-ups. The sales KKM&D makes to the Company-owned stores

- 164 -

and Krispy Kreme's consolidated joint ventures are eliminated in consolidation in preparation of Krispy Kreme's financial statements. Accordingly, all of this segment's income relates to sales it makes to franchisee-owned stores.

297. Approximately 30% of Krispy Kreme's revenue is derived from its KKM&D segment. This segment generates high profit margins in the 20% range derived solely from its sales to franchisees.

298. Despite the fact that many of Krispy Kreme's franchisees had been suffering financial stress during much of the Class Period, Krispy Kreme has provided very little allowance for doubtful accounts related to its franchisees.

299. In fact, while Krispy Kreme's receivables increased substantially during the Class Period, its allowance for doubtful accounts actually decreased. Typically a company's allowance will increase as its accounts receivable balance increases. At the end of FY03, Krispy Kreme's balance for its gross receivables and allowance for doubtful accounts were $46.9 million and $1.5 million, respectively. At the end of FY04, Krispy Kreme's receivable and allowance balances were $67.1 million and $1.3 million, respectively. Basically, this means that although Krispy Kreme's receivables increased over 30% during the year, its allowance for doubtful accounts actually decreased by 14.86%.

300. In its press release dated November 22, 2004, announcing its 3Q05 results, Krispy Kreme announced its first loss since going public in 2000. Part of this loss related to Krispy Kreme's decision to finally increase its allowance for doubtful accounts by $2 million (more than doubling its fiscal year end 2004 balance). The $2 million is related specifically to the KKM&D segment. In this press release, Krispy Kreme stated in pertinent part:

> During the third quarter, the Company recorded a $2 million allowance for doubtful accounts with respect to accounts receivable from two

franchisees as an estimate of potential exposure. The Company will continue to monitor franchise receivables and make appropriate adjustments to the allowance as circumstances warranted.

Ex. 62.

301. By not providing a proper allowance for its doubtful accounts related to its franchisees during the Class Period, Krispy Kreme's assets and earnings were overstated in violation of GAAP.

**During the Class Period, Krispy Kreme Improperly Recognized Revenue in Its KKM&D Segment Prior to Its Being Earned and Realizable in Violation of GAAP**

302. GAAP, as described by FASCON No. 5, ¶¶83-84, requires that revenue be both earned and realizable (collectible) prior to recognition. Per SAB No. 101, *Revenue Recognition in Financial Statements*, revenue is generally realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectibility is reasonably assured.

(Footnotes omitted.) Furthermore, SAB No. 101 provides that:

> After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs. Customer acceptance provisions may be included in a contract, among other reasons, to enforce a customer's rights to (1) test the delivered product, (2) require the seller to perform additional services subsequent to delivery of an initial product or performance of an initial service (*e.g.*, a seller is required to install or activate delivered equipment), or (3) identify other work necessary to be done before accepting the product. The staff presumes that such contractual customer acceptance provisions are substantive, bargained-for terms of an arrangement. Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes

- 166 -

> that the seller should not recognize revenue until customer acceptance occurs
> or the acceptance provisions lapse.

(Footnotes omitted.)

303.    KKM&D manufactures and sells the doughnut-making equipment that all of Krispy Kreme's franchisees are required to purchase. Each new Krispy Kreme store opened is required to purchase doughnut-making equipment and peripheral equipment from KKM&D. Payment terms from KKM&D's equipment sales are 54 days from the date of installation. Additionally, in FY04, KKM&D developed peripheral equipment designed to enhance its traditional doughnut-making equipment to sell to existing Krispy Kreme stores.

304.    Due to Krispy Kreme's written agreements with its franchisees and GAAP, Krispy Kreme was not permitted to recognize revenue until after installation had taken place and the franchisee had accepted the equipment. Nonetheless, during the Class Period, in violation of GAAP, Krispy Kreme prematurely recognized revenue in connection with the sales of its equipment and recognized revenue either when shipped or delivered to the franchisee rather than upon installation of the equipment. Krispy Kreme has indicated that due to this GAAP violation it may be required to restate its financial statements for FY04 and the interim periods of FY05, as well as possibly for a year or more prior to FY04.

**Krispy Kreme Improperly Recognized Revenue**

305.    In order to artificially inflate its stock price during the Class Period, Krispy Kreme overstated its income by improperly recognizing revenue on contingent sales. Krispy Kreme's revenue recognition practices concerning its off-premises sales violated GAAP, and Krispy Kreme violated GAAP by engaging in channel stuffing at the end of each quarter in order to meet its earning projections.

- 167 -

306.    Under GAAP, as set forth in SFAS No. 48, *Revenue Recognition When Right of Return Exists*, if a right of return exists on a sale, then revenue can only be recognized if all of the following conditions are met:

a.    The seller's price to the buyer is substantially fixed or determinable at the date of sale.

b.    The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

c.    The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

d.    The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

e.    The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

f.    The amount of future returns can be reasonably estimated.

SFAS No. 48, ¶6 (footnotes omitted, citation omitted).  If these conditions are not met, revenue recognition is postponed.  If these conditions are met, revenue and cost of sales are recognized in the current period but are reduced to reflect estimated returns and expected costs or losses that may occur in connection with the returns.  SFAS No. 48, ¶¶6-8.

307.    Krispy Kreme's primary source of revenue is derived from its Company Store Operations.  For the FY04, its Company store operations composed 66.4% of Krispy Kreme's total revenue for the year.  Revenue from Krispy Kreme's Company store operations is derived from two sources: (a) the sale of doughnuts and related products at on-premises sites (*i.e.*, its retail operations); and (b) the sale of doughnuts at off-premises sites (*i.e.*, its wholesale operations).

308.    Krispy Kreme's large off-premises customers, such as grocery stores, contract with Krispy Kreme for a continuous supply of doughnuts to sell.  The contract dictates a

- 168 -

minimum amount the customer must purchase but no maximum. *See* CW8. Krispy Kreme determines the amount of doughnuts to deliver to individual customers on specific days of the week based upon historical sales data. *Id.*

309. As explained by CW9, Krispy Kreme recognized off-premises sales at the time of delivery. This accounting practice is a clear violation of GAAP in light of the right of return. Revenue recognition for Krispy Kreme's doughnuts at the time of delivery is not permissible because the sales were contingent upon the resale of the product by the off-premises customer selling the doughnuts to a consumer. Accordingly, recognition must be postponed until the doughnuts are ultimately sold to a consumer and the right of return no longer exists. SFAS No. 48, ¶6(b).

310. Moreover, Krispy Kreme further violated SFAS No. 48 by engaging in "channel-stuffing." As revealed by CW8 and CW9, at the end of each reporting period, Krispy Kreme would intentionally increase its deliveries to customers of the packaged doughnuts without the customer's request in order to artificially inflate its revenue and meet its earning projections. In some cases, Krispy Kreme even doubled customer orders. *See* CW8 and CW9. The customers would accept the additional amounts because the customers knew they had no obligation for unsold product. A few days after the close of the period, the customer would then return the unsold doughnuts for credit. By recognizing revenue at the time of delivery, Krispy Kreme would be able to inflate its current period revenue only to reverse the revenue amount in the following quarter. *See* CW9.

**Krispy Kreme Failed to Timely Record Impairment Charges**
**Related to Its Acquisition of Montana Mills**

311. Krispy Kreme overstated its assets and income for 2Q04-4Q04 by failing to timely record charges for impairment of its long-lived assets and goodwill and other

intangible assets related to its Montana Mills acquisition as required by GAAP. At the time Krispy Kreme acquired Montana Mills in 1Q04, the assets were already impaired. Krispy Kreme substantially overpaid for this acquisition due to the ownership interest of defendant Tate in Montana Mills. Krispy Kreme continued to ignore the significant negative evidence indicating that an impairment charge was necessary throughout the remainder of FY04, failing to take a charge in either 2Q04, 3Q04 or 4Q04. Ultimately, eleven months after purchasing Montana Mills for $39.8 million, Krispy Kreme announced that it was completely divesting itself of Montana Mills and it was taking a $34.5 million impairment charge in 1Q05, writing down the remaining assets and liabilities, primarily property and equipment, to their estimated recoverable value and writing off 100% of the goodwill and intangible assets association with Montana Mills.

312. Montana Mills is an owner and operator of uPwCale "village bread stores" in the Northeastern United States. Its stores produce and sell a variety of breads and baked goods prepared in an open-view format – similar to Krispy Kreme's doughnut making theater. In January of 2003, Krispy Kreme announced its plans to acquire Montana Mills in order to develop a bakery and cafe concept, "the Krispy Kreme way," based upon the Montana Mills stores. Defendants anticipated it would take two years to fully develop the concept. Defendant Tate was a director of Montana Mills and an owner of 13,333 shares of Montana Mills. Defendant Tate's investment in Montana Mills was at risk, as Montana Mills had not performed well and its stock price dropped to as low as $3.70 per share in late 2002.

313. On April 7, 2003, Krispy Kreme acquired, through an exchange of stock, Montana Mills, for a purchase price of $39.8 million. In connection with this acquisition,

- 170 -

Krispy Kreme issued approximately 1.2 million shares of Krispy Kreme common stock, valued at $37.8 million, in exchange for all the outstanding shares of Montana Mills common stock.[26] Krispy Kreme assumed additional options and warrants to purchase approximately 460,500 shares of Krispy Kreme common stock, valued at $2 million.

314.    In completing this acquisition, Krispy Kreme allocated $31.8 million, or 80%, of the $39.8 million purchase price to intangible assets – $19.7 million was recorded as goodwill, $11.3 million was recorded as trademarks and trade names and $876,000 was recorded as recipes. The remaining $7.9 million or 20% was recoded as tangible assets, such as cash and property and equipment, or liabilities.

315.    GAAP, as set forth in FASB SFAS No. 144, requires that companies review long lived assets to determine if the assets are impaired and to take an impairment charge if the company determines that the carrying amount of the long-lived asset is not recoverable and exceeds its fair value:

> A long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable. The following are examples of such events or changes in circumstances:
>
> a.    A significant decrease in the market price of a long-lived asset (asset group)
>
> b.    A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition
>
> c.    A significant adverse change in legal factors or in the business climate that could affect the value of the long-lived asset (asset group), including an adverse action or assessment by a regulator

---

[26]    Montana Mills was a public company at the time of the acquisition. In June of 2002, Montana Mills went public trading on the AMEX exchange trading under MMX.

d.       An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)

e.       A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)

f.       A current expectation that, ***more likely than not***, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life.

SFAS No. 144, ¶¶8-9 (footnote omitted, emphasis in original).

316.    Likewise, GAAP, as set forth in SFAS No. 142, requires that companies review its goodwill and intangible assets to determine if the assets are impaired.  SFAS No. 142, ¶¶15, 17, 19-29.

Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount.  Examples of such events or circumstances include:

a.       A significant adverse change in legal factors or in the business climate

b.       An adverse action or assessment by a regulator

c.       Unanticipated competition

d.       A loss of key personnel

e.       A more-likely-than-not expectation that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of

f.       The testing for recoverability under Statement 144 of a significant asset group within a reporting unit

g.       Recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

SFAS No. 142, ¶28.

317.    Intangible assets shall be tested annually or more frequently if events or changes in circumstances indicate that the asset might be impaired based upon the indicators set forth in SFAS No. 144.  SFAS No. 142, ¶¶15, 17.

318.    Nevertheless, in order to avoid causing Krispy Kreme to post disappointing earnings and avoid admitting that the acquisition was a complete failure, the defendants did not timely record an impairment charge on Krispy Kreme's long-lived assets or its goodwill and intangible assets.  Despite the extensive negative evidence identified *infra* indicating that a good portion of Krispy Kreme's assets associated with its acquisition of Montana Mills had been impaired at the date of acquisition, Montana Mills opted to not take a write-down for 1Q04-3Q04 or for FY04.  Krispy Kreme made the determination that no impairment charge was necessary in the face of the following negative evidence that was available to the Company prior to the acquisition in April of 2003:

- For quarter ending October 30, 2002, Montana Mills had incurred at least eight straight quarters of operating losses during the previous quarters.

- For quarter ending October 30, 2002, Montana Mills had experienced its fourth consecutive quarter of a decline in its gross profit.

- Montana Mills was not experiencing revenue growth but either a decline in revenue or at a minimum its revenues were flat.  For quarter ending October 30, 2002, Montana Mills' revenue remained constant over the period before. Prior to this quarter, Montana Mills had experienced two consecutive quarters of decline.

- For quarter ending October 30, 2002, Montana Mills recorded a net loss of $1.7 million – $1.2 million of this total was composed of a non-cash charge to establish a valuation allowance against its deferred tax assets under SFAS No. 109.  The implication of the establishment of a valuation allowance is that management of a company does not expect a company to return to profitability at any point in the near future.  It is a strong negative indicator about management's future expectations for the company.

- For quarter ending October 30, 2002, Montana Mills' net book value was $12.6 million, most of this was due to the funds raised in the Company's IPO

- 173 -

in June of 2002. Prior to the IPO, Montana Mills' net book value was only $1.4 million.

- The Company had been experiencing serious cash flow problems. For quarter ending October 30, 2002, Montana Mills' operations resulted in at least eight consecutive quarters of a negative cash flow from operations.

- On March 19, 2003 (two weeks before the deal closed), Montana Mills announced that it was going to close nine of its 31 stores as they were either underperforming and/or in markets where the Company's penetration was generally weak. All of these stores were closed prior to the acquisition.

319. Furthermore, even after the acquisition, Montana Mills continued to remain unprofitable, experiencing a decline in revenue and generating operating losses. In fact, for year end 2004, Montana Mills only generated revenue of $6.7 million compared to its operating expenses of $8.2 million – a loss of $1.5 million.[27] Yet, despite the negative evidence available to Krispy Kreme both pre- and post-acquisition, Krispy Kreme ignored the negative evidence and failed to take an impairment charge for 1Q04-3Q04 or at year end 2004.

320. Aside from the information that would normally be available to a company like Krispy Kreme in connection with its decision to acquire another company, here defendant Tate was intimately involved in Montana Mills' operations prior to the acquisition by Krispy Kreme. In November of 2001, defendant Tate joined the Board of Montana Mills, where he served on the audit committee and the compensation committee – the only two

_____

[27] This amount consists of Montana Mills' operations from April 7, 2003 - February 2, 2004.

Board committees.[28] As a member of the audit committee, pursuant to Montana Mill's audit committee written charter, Tate's responsibilities included:

- Reviewing the annual audited financial statements and the adequacy of Montana Mill's internal controls with management and the independent auditor.

- Reviewing analysis prepared by management and the independent auditor concerning significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- Reviewing Montana Mill's accounting and auditing principles and practices with the independent auditor and reviewing major changes to Montana Mill's accounting and auditing principles and practices as suggested by management and the independent auditors.

321.    After the acquisition was announced, several articles and analysts discussed Tate's prior association with Montana Mills. In fact, Tate, himself, regarded his relationship as a positive aspect of the acquisition. On March 1, 2003, an article entitled, "Krispy Kreme Chooses a Bread Maker as a Platform for Its Cafe Concept" in the *Mergers & Acquisitions Journal*, stated as follows:

> Tate notes that he coincidently joined Montana Mills' board about 15 months ago in order to develop industry relationships. He says he was impressed by the similarities in the two companies' culture, values, and customer relationships. ***Serving on the board allowed him to observe firsthand how the company was run***. ***"So when we made the acquisition, there was a degree of certainty about what we would be getting," he [Tate] states.***

Ex. 64.

---

[28]    At the time of the IPO in June 2002, Tate owned 13,333 shares of Montana Mills common stock. Additionally, in its Registration Statement in connection with its IPO, Montana Mills indicated that prior to the closing of the Offering it intended to grant to Tate an option to purchase 40,000 shares of common stock.

322.    Not only did Krispy Kreme fail to take an impairment charge during the Class Period but, Krispy Kreme also continued to discuss its future plans in developing its Montana Mills concept.  In fact, in Krispy Kreme's Report on Form 10-K filed on April 16, 2004, Krispy Kreme made the following representations:

> In April 2003, we completed the acquisition, through an exchange of stock, of Montana Mills Bread Co., Inc. ("Montana Mills"), an owner and operator of uPwCale "village bread stores" in the Northeastern United States.  As of February 1, 2004, 21 Montana Mills stores were in operation.  Montana Mills' stores produce and sell a variety of breads and baked goods prepared in an open-view format.  We believe that this acquisition will provide an opportunity to leverage our existing capabilities, such as our brand building and operational capabilities including our distribution chain, off-premises sales and coffee-roasting expertise, to expand Montana Mills' business opportunity.  ***We anticipate spending up to 24 months refining and expanding the Montana Mills concept, retaining its core best-in-class breads, but expanding the offering to include bread-based meals and appropriate accompaniments in an inviting setting.***

Ex. 16.

323.    Nonetheless, ***three weeks later***, in its press release dated May 7, 2004, Krispy Kreme stunned the market when it announced that it would be divesting itself of the Montana Mills operation.  It planned to close the majority of the existing Montana Mills stores and it would look to sell the remaining stores.  In connection with this action, Krispy Kreme recorded an impairment charge in 1Q05 in the amount of $34.5 million.  Krispy Kreme took an impairment charge of $31.8 million to write-off 100% of the goodwill and intangible assets Krispy Kreme had acquired only a year before.  Krispy Kreme took an additional charge of $2.8 million to reduce the carrying amount of other Montana Mills' assets and liabilities, primarily property and equipment, to their estimated recoverable value.  Krispy Kreme anticipates recording additional charges between $2-$4 million in subsequent quarters related to store closing costs.

**Krispy Kreme Improperly Failed to Consolidate Unprofitable Joint Ventures**

324.    In order to artificially inflate its stock price during the Class Period, Krispy Kreme overstated its income and understated its liabilities by failing to consolidate its New England Dough and KremeKo joint ventures, which, pursuant to GAAP, were required to be consolidated into Krispy Kreme's financial statements during the Class Period.

325.    GAAP, as set forth in Accounting Research Bulletin ("ARB") No. 51 and as amended by SFAS No. 94, requires consolidation of all majority-owned subsidiaries unless control is temporary or does not rest with the majority owner.  ARB No. 51, ¶1, states in part:

> The purpose of consolidated statements is to present, primarily for the benefit of the shareholders and creditors of the parent company, the results of operations and the financial position of a parent company and its subsidiaries essentially as if the group were a single company with one or more branches or divisions.  There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies.

326.    Financial control is generally presumed when one company directly or indirectly owns over 50% of the voting shares of the other company.  SFAS No. 94, ¶2.

327.    *New England Dough* – Here, in violation of GAAP, Krispy Kreme failed to consolidate its interest in New England Dough into its financial statements for FY03 and FY04 despite owning a more than 50% interest in the joint venture by improperly claiming that control did not rest with Krispy Kreme.  As New England Dough was an unprofitable entity, Krispy Kreme was able to avoid consolidating New England Dough's poor operations into its operating income.  Krispy Kreme was further able to avoid recognizing liabilities on its financial statements associated with New England Dough.

- 177 -

328.     New England Dough was established in FY02 generating no sales in its first fiscal year and recording a loss of $293,000.  Upon creation of the joint venture, Krispy Kreme acquired a 49% interest in New England Dough, KKEG acquired a 5% interest and defendant Livengood acquired a 3% interest.

329.     On March 5, 2002, Krispy Kreme acquired KKEG's and Livengood's interest in New England Dough, thus increasing its interest to 57%.  Even though it owned over 50% of the venture, Krispy Kreme failed to consolidate New England Dough into its financial statements.

330.     For FY03, New England Dough again suffered a loss of $843,000.  Furthermore, New England Dough's current liabilities stood at $7,882,000, while its current assets were only $2,907,000.  Indeed, its total assets were $7,756,000, $126,000 less than its total liabilities.  Additionally, Krispy Kreme was a guarantor of certain loan/lease obligations of New England Dough – an amount that was not recorded as a liability on Krispy Kreme's financial statements.  At fiscal year end 2003, Krispy Kreme's total loan/lease guarantees related to New England Dough stood at $2.3 million of which $2.2 million was expiring in FY04.

331.     Beginning with its 1Q05 results (just as New England Dough was finally beginning to show a profit), Krispy Kreme began to consolidate New England Dough into its financial statements allegedly due to the implementation of a new accounting standard – FASB Interpretation ("FIN") No. 46, later replaced by FIN No. 46(R), *Consolidation of Variable Interest Entities*.

332.     Nonetheless, Krispy Kreme was required under GAAP to consolidate New England Dough prior to the enactment of FIN No. 46 in light of the fact that Krispy Kreme

- 178 -

owned over a 50% interest in the joint venture and did maintain control over the joint venture.

333.    Krispy Kreme had been closely involved with the New England Dough joint venture since its inception.  In addition to owning a 57% interest in New England since March of 2002, Krispy Kreme also acted as a guarantor of certain loan/lease obligations of New England Dough, thus, exposing Krispy Kreme to a greater degree of financial risk with respect to New England Dough.

334.    Moreover, as the franchisor, Krispy Kreme exercised a great degree of control over New England Dough's operations.  Krispy Kreme dictated many of the important decisions in the joint venture's day-to-day operations, such as products to be offered, the type of operations the joint venture would engage in (*i.e.*, in-store operation or wholesale operation), the marketing plan and even the supplier.  In this case, Krispy Kreme's own manufacturing segment, KKM&D, supplied New England Dough with its equipment and supplies.

335.    Furthermore, the usual exceptions to the general rule requiring consolidation are situations in which the majority owner does not have control due to the other entity being in legal reorganization or bankruptcy.  SFAS No. 94, ¶¶3-10.  Neither of these situations exists here.

336.    By failing to consolidate New England Dough into its operations at a time when the joint venture was unprofitable, Krispy Kreme was able to inflate its operating income and reduce the amount of liabilities that it held on its financial statements.

337.    ***KremeKo*** – Krispy Kreme failed to consolidate its unprofitable Canadian joint venture, KremeKo in its 1Q05 and 2Q05 results in violation of GAAP.

338.    Prior to the enactment of FIN No. 46(R), a company would consider whether or not to consolidate another entity into its consolidated financial statements based solely on financial control. If the Company controlled the entity through voting interest (*i.e.,* by owning more than a 50% interest), then consolidation would generally take place. With the enactment of FIN No. 46(R),[29] a company is required to assess its equity investments to determine if they are "variable interest entities" and to decide whether to consolidate the variable interest entity based on factors other than strict voting control. Variable interests may arise from financial instruments, service contracts, guarantees, leases or other arrangements with the entity. A company will consolidate the entity if it determines it is the primary beneficiary of the entity and the risks associated with the entity are not properly dispersed amongst the other owners. A company is the primary beneficiary if it will absorb a majority of the entity's losses or returns.

339.    Here, Krispy Kreme did not consolidate KremeKo into its financial statements for 1Q05 or 2Q05 in violation of GAAP. KremeKo, an area developer for Central and Eastern Canada, suffered a $2 million loss for FY04. As of 1Q05, Krispy Kreme owned a 40.6% interest in KremeKo. As Krispy Kreme's ownership in the joint venture was the largest ownership interest, it had the right to designate two members of the joint venture's 11-member Board.[30] In addition to Krispy Kreme's ownership interest, it also

---

[29]    FIN No. 46(R) is effective for all non-special purpose variable interest entities for the first interim or annual period ending after March 15, 2004. In the case of Krispy Kreme, it applies to the Company's 1Q05 results for the period ending May 2, 2005.

[30]    Three other shareholders were each permitted to select one director. The remaining six directors were nominated by the Board and elected by the shareholders.

provided KremeKo with additional financial support by way of loan and lease guarantees. For 1Q05 and 2Q05, Krispy Kreme provided loan/lease guarantees to KremeKo in the amount of $3.5 million. The combination of Krispy Kreme's voting control and the additional financial support it provides to KremeKo required consolidation under FIN No. 46(R) as of 1Q05.

340. In its press release announcing its 3Q05 results on November 22, 2004, Krispy Kreme announced that it would be consolidating KremeKo into its financial results for 3Q05 based upon its financial support of the joint venture.

341. On December 13, 2004, Krispy Kreme filed a notification of late filing with the SEC for its Report on Form 10-Q for the quarter ending October 31, 2004. According to Krispy Kreme, the primary reason for the delay was due to analysis concerning the timing of its consolidation of KremeKo. Krispy Kreme indicated that it was evaluating whether KremeKo should be consolidated as of the adoption of FIN No. 46(R) in 1Q05. It subsequently indicated that it will have to restate its 1Q05 and 2Q05 results due to its failure to consolidate KremeKo into its results for the respective periods.

342. Ultimately, less than three years after Krispy Kreme opened its first Canadian outlet, its KremeKo subsidiary filed for insolvency. This was announced April 15, 2005. KremeKo had filed for protection under Canada's Companies' Creditors Arrangement Act and will restructure.

**Krispy Kreme's Restatement Is an Admission of Falsity**

343. As detailed above, the fact that Krispy Kreme will revise and restate downward its assets and net income ***for at least*** FY01-FY04 and the first three quarters of

- 181 -

FY05, is an admission that the financial statements originally issued were false and that the misstatements were material.

344.     Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatements and revisions announced by Krispy Kreme were to correct for material errors in previously issued financial statements.  APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  APB No. 20, ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.,* when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.   Krispy Kreme's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements.  Thus, the restatements and revisions were an admission by Krispy Kreme that its previously issued financial results and its public statements regarding those results were false and misleading.

**Krispy Kreme Improperly Accounted for Its Property and**
**Equipment and the Related Depreciation of the Leased Assets**

345.     In order to artificially inflate its stock price during the Class Period, Krispy Kreme overstated its income and assets by failing to properly account for its leases and the depreciation of the related leased assets during the Class Period.

346.     A basic concept of accounting is a theory known as the "matching principle." This principle is based upon the premise of matching revenues generated in a period with the

expenses incurred to generate that revenue to ensure a fair presentation of an entity's financial results. FASCON No. 6, ¶¶134-152.

347. An asset is initially recorded at cost. Thereafter, depreciation of the asset reduces the value of an asset over time. Depreciation is the method of allocating the cost of an asset over a specified period (*i.e.*, its estimated useful life). It is the wear and tear which reduces the value of the asset in generating revenue. FASCON No. 6, ¶¶26-34, 141-142 and 149.

348. A leasehold improvement is an improvement of a leased asset that increases the asset's value. The expense of a leasehold improvement is carried as an asset that declines in value over time, as the value is depreciated over the life of the lease or the improvement. Leasehold improvements are depreciated over the estimated useful life of the improvements or over the original term of the lease, whichever is shorter, without regard to renewal options. SFAS No. 13, ¶¶11 and 19.[31]

349. In a letter dated February 7, 2005, sent to Robert J. Kueppers, the American Institute of Certified Public Accountants' Chairman for its Public Company Audit Firms, Donald T. Nicolaisen, the Chief Accountant for the SEC, reaffirmed this accounting guidance, stating that:

> The staff believes that leasehold improvements in an operating lease should be amortized by the lessee over the shorter of their economic lives or the lease term, as defined in paragraph 5(f) of FASB Statement 13 ("SFAS 13"), Accounting for Leases, as amended. The staff believes amortizing leasehold improvements over a term that includes assumption of lease renewals is

---

[31] *See also* Montgomery's Auditing, Twelfth Edition, Part 3, Chapter 22 *Auditing Property, Plant, and Equipment, and Intangible Assets and Deferred Charges.*

appropriate only when the renewals have been determined to be "reasonably assured," as that term is contemplated by SFAS 13.

*       *       *

To the extent that SEC registrants have deviated from the lease accounting standards and related interpretations set forth by the FASB, those registrants, in consultation with their independent auditors, should assess the impact of the resulting errors on their financial statements to determine whether restatement is required. ***The SEC staff believes that the positions noted above are based upon existing accounting literature*** and registrants who determine their prior accounting to be in error should state that the restatement results from the correction of errors or, if restatement was determined by management to be unnecessary, state that the errors were immaterial to prior periods.

350.    In Krispy Kreme's Report on Form 10-K filed on April 16, 2004, it stated the following with respect to its depreciation policy:

> ***Depreciation of property and equipment is provided on the straight-line method.*** The estimated useful lives of depreciable property are generally as follows:  Buildings -- 15 to 35 years; Machinery and equipment -- 3 to 15 years; ***Leasehold improvements -- lesser of useful lives of assets or lease term.***

Ex. 16.

351.    Inconsistently, Krispy Kreme used the initial lease term in determining whether to classify the lease as a capital lease or an operating lease[32] and in calculating its rent expense, and on the other hand, Krispy Kreme depreciated the assets associated with the lease (buildings, leasehold improvements) over a period that included both the initial term of the lease and its option periods (or the useful life if shorter).  By depreciating its leasehold assets over a period that includes both the initial term and the renewal options, Krispy Kreme

---

[32]    Under GAAP, there are different methodologies used in accounting for leases available to lessees and to lessors.  SFAS No. 13, *Accounting for Leases,* ¶6.  In the case of a lessee, a lease can be classified as either a capital or an operating lease depending on the characteristics of the lease.

violated GAAP. This accounting violation resulted in Krispy Kreme's understating depreciation expense for the affected periods and thus causing the company to overstate earnings.

352. Moreover, this practice is akin to expensing real estate leases under a different time line than the stores atop them. Basically, Krispy Kreme is depreciating the leased assets over a longer period than they initially have the right to the property per the original lease agreement. It is a further violation of the basic accounting concept of matching by not using the same period to determine the depreciation of the related lease assets as used in determining the lease classification and rent expense.

353. In announcing its decision to restate its financial statements in its press release dated January 4, 2005 and again on April 19, 2005, Krispy Kreme indicated that it was further reviewing its accounting practices for leases and depreciation of related assets to determine whether or not its practices violated GAAP. According to Krispy Kreme, the pending restatement may result in "increased depreciation and/or rent expense compared to that previously reported" due to the following corrections:

> [C]orrections to properly account for lease renewal options and/or rent escalations in computing rent expense for operating leases; to determine properly the depreciable lives of leasehold improvements when renewal options are present in leases; and to require use of the same lease term in determining the operating or capital classification of a lease, rent expense thereunder and depreciable lives of related leasehold improvements.

354. Krispy Kreme further indicated that due to this GAAP violation it may be required to restate its financial statements for FY04 and for the interim periods of FY05, as well as possibly for a year or more prior to FY04. Krispy Kreme subsequently admitted that its restatements may extend to FY01 and FY02 and that those financial statements should no longer be relied upon.

- 185 -

**Krispy Kreme Improperly Accounted for its Derivative Transactions**

355.    During the Class Period, Krispy Kreme improperly accounted for certain derivative transactions by failing to record mark-to-market adjustments in violation of GAAP.

356.    Under GAAP, as set forth in SFAS No. 133, "[t]he gain or loss on a derivative instrument not designated as a hedging instrument shall be recognized currently in earnings." Basically, at the end of a reporting period, a company is required to record adjustments that are recognized in its current period earnings in order to mark or adjust the value of the derivative instrument to its then current market value (*i.e.*, to mark it to market value or mark-to-market). SFAS No. 133, ¶18.

357.    Here, Krispy Kreme failed to record the gain or loss on certain derivative transactions in its reported earnings during the Class Period. It failed to mark the value of certain of its derivative instruments to their market value at the end of the reporting periods as required.

358.    Krispy Kreme has indicated that it will restate its financial statements due to this GAAP violation, reducing its pretax income for years prior to FY04 by approximately $0.2 million and reducing its 1Q and 2Q05 results by $0.4 million and $1.0 million, respectively, and by increasing its pretax income for FY ending 2004 and 3Q05 by approximately $1.2 million and $0.2 million, respectively.

**Krispy Kreme's Financial Statements Violated Fundamental Concepts of GAAP**

359.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including violation of the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASCON No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASCON No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASCON No. 1, ¶42);

(f)	The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant, is a notion that is central to accounting (FASCON No. 2, ¶¶58-59);

(g)	The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASCON No. 2, ¶79); and

(h)	The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASCON No. 2, ¶¶95, 97).

360.	Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**Defendants Falsely Certified the Accuracy of the Financial Results**

361.	During the Class Period, starting with the Company's September 10, 2002 Report on Form 10-Q filed with the SEC, in accordance with Sarbanes-Oxley, §§302 and 906, defendants Livengood, Phalen and Casstevens falsely certified the accuracy of the financial statements.

- 188 -

(a)    For example, on May 2, 2003, defendant Livengood falsely certified the accuracy of Krispy Kreme's Report on Form 10-K for the fiscal year ended February 2, 2003, stating:

> I, Scott A. Livengood, President and Chief Executive Officer of Krispy Kreme Doughnuts, Inc. (the "Company"), certify that the accompanying Annual Report on Form 10-K of the Company for the fiscal year ended February 2, 2003 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and the information contained in such report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Ex. 116.

(b)    Similarly, on the same day, May 2, 2003, defendant Casstevens also filed a certification in accordance with Sarbanes-Oxley, §§302 and 906 attesting to the accuracy of the contents of Form 10-K for the fiscal year ended Februay 2, 2003, stating:

> I, Randy S. Casstevens, Chief Financial Officer of Krispy Kreme Doughnuts, Inc. (the "Company"), certify that the accompanying Annual Report on Form 10-K of the Company for the fiscal year ended February 2, 2003 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and the information contained in such report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Ex. 117.

(c)    On April 16, 2004, for the fiscal year ended February 1, 2004, defendant Livengood filed another certification in accordance with Sarbanes-Oxley, §§302 and 906, attesting to the accuracy of the contents of the Form 10-K, stating:

> I, Scott A. Livengood, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the accompany Annual Report on Form 10-K of Krispy Kreme Doughnuts, Inc. (the "Company") for the fiscal year ended February 1, 2004 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and the information contained in such report fairly presents, in all material respects, the financial condition and results of operations of the Company.

- 189 -

\*      \*      \*

This certification shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934, as amended, and will not be incorporated by reference into any registration statement filed under the Securities Act of 1933, as amended, unless specifically identified therein as being incorporated therein by reference.

A signed original of this written statement required by Section 906 has been provided to Krispy Kreme Doughnuts, Inc. and will be retained by Krispy Kreme Doughnuts, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Ex. 118.

(d)     On April 16, 2004, also in support of Krispy Kreme's Report on 10-K for FY04, Livengood filed a certification attesting to the absence of fraud and adequacy of the Company's internal controls, stating:

I, Scott A. Livengood, President and Chief Executive Officer of Krispy Kreme Doughnuts, Inc., certify that:

1.      I have reviewed this annual report on Form 10-K of Krispy Kreme Doughnuts, Inc.;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)) and 15d-15(e)) for the registrant and have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made

- 190 -

known to us by others within those entities, particularly during the period in which this report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Ex. 119.

(e) Also on April 16, 2004, defendant Phalen filed a certification in accordance with Sarbanes-Oxley, §§302 and 906, attesting to the accuracy of Krispy Kreme's FY04 results, stating:

I, Michael C. Phalen, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the accompany Annual Report on Form 10-K of Krispy Kreme Doughnuts, Inc. (the "Company") for the fiscal year ended February 1, 2004 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and the information contained in such report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*     *     *

This certification shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934, as amended, and will not be incorporated by reference into any registration statement filed under the Securities Act of 1933, as amended, unless specifically identified therein as being incorporated therein by reference.

A signed original of this written statement required by Section 906 has been provided to Krispy Kreme Doughnuts, Inc. and will be retained by Krispy Kreme Doughnuts, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Ex. 120.

(f)     Also, on April 16, 2004, in further support of Krispy Kreme's Report on Form 10-K for FY04, Phalen filed a certification attesting to the absence of fraud and the adequacy of the Company's internal controls, stating:

I, Michael C. Phalen, Chief Financial Officer of Krispy Kreme Doughnuts, Inc., certify that:

1.     I have reviewed this annual report on Form 10-K of Krispy Kreme Doughnuts, Inc.;

2.     Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made

- 192 -

known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Ex. 121.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

362.    At all relevant times, the market for Krispy Kreme's publicly traded securities was an efficient market for the following reasons, among others:

(a)      Krispy Kreme's common stock met the requirements for listing, and was listed and actively traded on the NYSE, which is a highly efficient and automated market;

- 193 -

(b)     As a regulated issuer, Krispy Kreme filed periodic public reports with the SEC and the NYSE;

(c)     Krispy Kreme regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Krispy Kreme was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

363.     As a result of the foregoing, the market for Krispy Kreme's publicly traded securities promptly digested current information regarding Krispy Kreme from all publicly available sources and reflected such information in the prices of Krispy Kreme's publicly traded securities.  Under these circumstances, all purchasers of Krispy Kreme's publicly traded securities during the Class Period suffered similar injury through their purchase of Krispy Kreme's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

364.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class consisting of purchasers of Krispy Kreme publicly traded securities during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

365.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Krispy Kreme's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are scores of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Krispy Kreme or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

366.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

367.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

368.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

          (a)     Whether the federal securities laws were violated by defendants' acts as alleged herein;

          (b)     Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Krispy Kreme; and

- 195 -

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

369.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

370.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and in a course of conduct that artificially inflated Krispy Kreme's stock price and operated as a fraud or deceit on Class Period purchasers by misrepresenting the Company's financial results, demand and sales growth and general business success.   Defendants achieved this façade of exponential growth by: (1) misrepresenting the Company's demand and sales growth, then channel stuffing to meet expectations, (2) reacquiring failing franchises and Montana Mills and improperly accounting for these acquisitions in Krispy Kreme's financial statements, (3) failing to consolidate unprofitable joint ventures in which Krispy Kreme exercised the requisite control of maintained a majority ownership, and (4) filing false financial results that materially overstated the Company's assets and earnings and materially understated the Company's liabilities.   Thus, throughout the Class Period, defendants improperly inflated Krispy Kreme's assets and earnings.  Later, however, when the true state of defendants' operations reached the market, Krispy Kreme stock fell precipitously as the prior artificial inflation

came out of Krispy Kreme's stock price. As a result of their purchases of Krispy Kreme stock during the Class Period, lead plaintiffs and other members of the class suffered economic losses, *i.e.*, damages, under the federal securities laws.

371. By continuously meeting and beating Wall Street expectations and reporting exponential growth, defendants presented a misleading picture of Krispy Kreme's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Krispy Kreme's demand and sales growth was rapidly waning, defendants caused Krispy Kreme to falsely report exponential growth. Throughout the Class Period, defendants repeatedly emphasized that "our business momentum remains strong. We've kept our focus on opening stores, establishing strong relationships with our customers and communities, adding greater market penetration through multiple channels of sales." ¶¶127, 130; Exs. 31-32. Defendants claimed that this focus allowed the Company "to meet, and in some cases exceed our previous projections for the quarter." *Id.*

372. In addition, defendants consistently led the market to expect extraordinary systemwide sales growth of 25%-30% and continuously ratcheted up its target EPS. ¶¶127, 130, 144-145; Exs. 31-32, 39-40, 46. These claims of extraordinary results caused and maintained the artificial inflation in Krispy Kreme's stock price throughout the Class Period and until the truth was later revealed to the market.

373. The Krispy Kreme defendants' fraudulent scheme and manipulative acts, however, did not end there. In order to implement this fraudulent scheme and meet the Wall Street expectations, defendants committed a series of accounting violations and filed false financial results. Defendants overpaid for failing franchises and improperly allocated the purchase prices as intangible assets not subject to amortization. The Company further

acquired Montana Mills, a failing business, without taking any then-known impairment charges. Defendants failed to consolidate unprofitable joint ventures, despite having the requisite ownership and control. Defendants failed to properly account for the Company's allowance for doubtful accounts related to receivables by its struggling franchises. Defendants improperly accounted for Krispy Kreme's leases and the related depreciation of leased assets. Defendants improperly accounted for derivative transactions. Defendants improperly accounted for income from its KKM&D. Defendants even double-shipped orders, recognizing revenue upon delivery of doughnuts they knew would be returned the very next day. Combined, these practices impacted Krispy Kreme's reported revenue and earnings throughout the Class Period, allowing defendants to claim that they had met and exceeded earnings projections and demonstrate to the market and investors that Krispy Kreme was successful.

374. Ironically, during the Class Period, and in the midst of defendants' own accounting manipulations, Livengood assured investors, "'In the current economic climate, investors understandably are paying closer attention to the financial strength of companies. . . . The perception and confidence of our investors and customers is more important than the propriety of accounting vehicles.'" ¶83; Ex. 107.

375. Defendants' false and misleading statements had the intended effect and caused Krispy Kreme stock to trade at artificially inflated levels up to $49.74 per share throughout the Class Period. *See* ¶7 and the stock chart attached as Ex. A.

376. Beginning May 7, 2004, defendants were forced to make partial disclosures. On May 7, 2004, the Company was forced to admit that its business was not performing at the growth rates that it had falsely represented throughout the Class Period. On this news,

the inflation began to come out of Krispy Kreme's stock price, damaging investors. On the Company's May 7, 2004 disclosures, Krispy Kreme's stock dropped from $31.80 per share to as low as $22.48 per share before closing at $22.51 per share on May 7, 2004 – a one-day drop of 29% on volume of 20.5 million shares.

377.     Krispy Kreme's disclosures continued, and the inflation continued to come out of the Company's stock price, damaging investors. On July 29, 2004, the Company announced that the SEC had commenced an investigation into Krispy Kreme's franchise reacquisitions and the May 7, 2004 sudden change in earnings guidance. On that news, the stock price dropped another 15%, causing a drop from $18.66 per share to $15.71 per share on 7.5 times more volume than that one day earlier.

378.     Krispy Kreme's bad news continued to seep out, and on October 8, 2004, the Company announced that the SEC had formalized its investigation. On that news, the stock dropped another 4% as the inflation continued to come out of the stock price.

379.     On January 4, 2005, Krispy Kreme announced that it would be restating its financial results for *at least* 2Q04, 3Q04, 4Q04, FY04, 1Q05 and 2Q05. The errors were expected to reduce the Company's previously reported net income for FY04 by 6.6%-8.6%. On that news, the stock plunged 17% in a single day on a trading volume of five times the previous day, further removing inflation from the stock price, damaging investors.

380.     Then, on April 19, 2005, Krispy Kreme expanded its restatement to include FY01, FY02 and FY03, along with increasing the magnitude of the previously announced restatement of FY04 – now estimated to reduce previous reported earnings by 9.2%-10.9%. On that news, Krispy Kreme's stock collapsed to $6.48 per share. These incremental drops upon seepage of the truth as to defendants' operations removed the inflation from Krispy

Kreme's stock price during the Class Period, causing damage to the lead plaintiffs and other members of the class. Notably, however, Krispy Kreme has not yet filed its actual restated financial results, so it is unclear at this time whether the stock price to date remains inflated should defendants again increase the magnitude of the restatement, which it has estimated it may.

381. The 87% decline in Krispy Kreme's stock price as the bad news was incrementally disclosed revealing the true state of defendants' operations was directly related to defendants' prior misrepresentations and fraudulent conduct.

382. The timing and magnitude of Krispy Kreme's stock price declines negate any inference that the loss suffered by lead plaintiffs and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which Krispy Kreme's stock price fell 87% as a result of defendants' fraud being revealed, the Standard & Poors 500 securities index lost little value, and the Standard & Poors midcap Restaurants Index (without Krispy Kreme), comprised of public corporations in Krispy Kreme's industry peer group, *increased* 0.5% in value. The economic loss, *i.e.*, damages, suffered by lead plaintiffs and other members of the class, was a direct result of defendants' fraudulent scheme to artificially inflate Krispy Kreme's stock price and the subsequent significant decline in the value of Krispy Kreme's stock when the true state of the Company's operations was revealed to the market.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

383.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

384.    During the Class Period, Krispy Kreme, the Individual Defendants and PwC carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding Krispy Kreme's business, operations, management and the intrinsic value of Krispy Kreme's publicly traded securities; (b) enable Krispy Kreme to exchange 1.2 million shares of its common stock in acquisitions; and (c) enable defendants to sell over 1.18 million shares of their stock for proceeds exceeding $44.7 million.

385.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's publicly traded securities in an effort to maintain artificially high market prices for Krispy Kreme's publicly traded securities in violation of §10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

386.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and

- 201 -

participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Krispy Kreme as specified herein.

387. These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Krispy Kreme's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Krispy Kreme and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Krispy Kreme's publicly traded securities during the Class Period.

388. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of

- 202 -

information to the investing public which they knew or recklessly disregarded was materially false and misleading.

389. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were made knowingly or with a reckless disregard for the truth and for the purpose and effect of concealing Krispy Kreme's operating condition and future business prospects from the investing public and supporting the artificially inflated prices of its publicly traded securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

390. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Krispy Kreme's publicly traded securities were artificially inflated during the Class Period. In ignorance of the fact that the market prices of Krispy Kreme's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the markets in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Krispy Kreme publicly

traded securities during the Class Period at artificially high prices and were damaged thereby.

391.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs, the other members of the Class and the marketplace known the truth regarding the problems that Krispy Kreme was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Krispy Kreme publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

392.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

393.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages, *i.e.*, real economic loss as set forth above in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against Individual Defendants and Krispy Kreme

394.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

395.    The Individual Defendants acted as controlling persons of Krispy Kreme within the meaning of §20(a) of the Exchange Act as alleged herein.  Krispy Kreme controlled all of its employees and each of the Individual Defendants.  By virtue of their

- 204 -

high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

396.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

397.    As set forth above, Krispy Kreme and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying plaintiffs as class representatives under Fed. R. Civ. P. 23;

B.    Awarding compensatory damages in favor of plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Disgorgement of defendants Livengood and Casstevens' insider trading proceeds, in accordance with Sarbanes-Oxley, §§302 and 906;

E.    Disgorgement of defendant Tate's and McAleer's insider trading proceeds;

F.    An accounting for profits illegally gained by defendants Tate, Casstevens, Livengood and McAleer through insider sales;

G.    Restitution of investors' monies of which they were defrauded;

H.    Awarding preliminary and permanent injunctive relief in favor of plaintiffs and the class against defendants and their counsel, agents and all persons acting under, in concert with or for them, including an accounting of and the imposition of a constructive trust and/or an asset freeze on defendants' insider trading proceeds; and

I.    Such equitable/injunctive or other and further relief as the Court may deem just and proper.

- 206 -

# JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  May 23, 2005

/s/ L. Bruce McDaniel
L. BRUCE McDANIEL (N.C. State Bar #5025)
WILLIAM E. ANDERSON (N.C. State Bar #098)
Attorneys for Plaintiff
McDANIEL & ANDERSON, L.L.P.
Lafayette Square
4942 Windy Hill Drive
P.O. Box 58186
Raleigh, NC  27658
Telephone:  919/872-3000
919/790-9273 (fax)

**Liaison Counsel**

**Lead Counsel for Plaintiffs:**

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
SYLVIA WAHBA-KELLER
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PAUL J. GELLER
DAVID J. GEORGE
ROBERT J. ROBBINS
197 S. Federal Highway, Suite 200
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SANDRA STEIN
1845 Walnut Street, Suite 945
Philadelphia, PA  19103
Telephone:  215/988-9546
215/988-9885 (fax)

- 207 -

**Attorneys for Plaintiff:**

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
MICHAEL E. MOCO
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1202 (fax)

T:\CasesSF\Krispy Kreme\CPT Second Amended_2ndTurn.doc